**UNITED STATES of America,**
**Plaintiff,**

v.

**The FIRST NATIONAL BANK OF**
**JACKSON and the Bank of**
**Greenwood, Defendants,**

and

**William B. Camp, Comptroller of the**
**Currency, Intervenor.**

**Civ. A. No. 4310.**

United States District Court
S. D. Mississippi,
Jackson Division.

June 27, 1969.

John M. Toohey, John W. Clark, Frank N. Bentkover, Larry L. Yetter, Anti-Trust Division, Department of Justice, Washington, D. C., for plaintiffs.

Earl T. Thomas, Thomas A. Coleman, Jackson, Miss., R. Cunliffe McBee, Greenwood, Miss., for defendants.

Philip L. Roache, Jr., W. A. Howland, Jr., Comptroller of the Currency, Washington, D. C., for intervenor.

## OPINION OF THE COURT

NIXON, District Judge.

This is an action instituted by the Plaintiff, United States of America on May 28, 1969, pursuant to Section 15 of the Clayton Act (Act of Congress of October 15, 1914, ch. 323, 38 Stat. 736, as amended 15 U.S.C. section 25), praying for injunctive relief to prevent and restrain the proposed merger of the Defendant banks, The First National Bank of Jackson (hereinafter referred to as FNB Jackson) and The Bank of Greenwood (hereinafter referred to as GB), which the Plaintiff charges violates Section 7 of the Clayton Act (38 Stat. 731, as amended by the Act of Congress of December 29, 1950, ch. 1184, 64 Stat. 1125, 15 U.S.C. section 18), in that the proposed merger may substantially lessen competition or tend to create a monopoly in commercial banking in Leflore County, Mississippi through the elimination of *potential* competition of The First National Bank of Jackson and other potential competitors.

The Defendant, First National Bank of Jackson, is a banking association organized under the laws of the United States of America, with its principal place of business in Jackson, Hinds County, Mississippi within the Southern District of Mississippi.

The Defendant, Bank of Greenwood, is a banking association organized under the laws of the State of Mississippi, with its principal place of business in Greenwood, Leflore County, Mississippi, within the Northern District of Mississippi.

The Defendant banks, both of which are engaged in interstate commerce, on January 19, 1968 entered into an agreement to merge into and under the charter and title of FNB Jackson, which proposed merger was approved by the Intervenor herein, William B. Camp, Comptroller of the Currency, who found favorably to the Defendant banks on all the banking factors involved and also found that the proposed merger would have no adverse effects on competition or potential competition, that it would not tend toward monopoly, and that it would not violate Section 7 of the Clayton Act.

After this action was commenced in this Court, the Intervenor on July 2, 1968 intervened in this action pursuant to its statutory right granted in 12 U.S.C. section 1828(c), The Bank Merger Act of 1966 (hereinafter BMA–66).

It is the duty and responsibility of this Court to decide, de novo, whether or not the proposed merger of the Defendant banks is anti-competitive, when measured by traditional Clayton Section 7 standards, and if so, whether or not the anti-competitive effects of the proposed merger are clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served. The burden of proving the affirmative of the former question is upon the Plaintiff and the burden of proving the affirmative of the latter question is upon the Defendants and Intervenor.[1]

---

1. United States v. First City National Bank of Houston, 386 U.S. 361, 366, 87 S. Ct. 1088, 1092, 18 L.Ed.2d 151 (1967) : "First is the question whether the burden of proof is on the defendant banks to establish that an anticompetitive merger is within the exception of 12 U.S.C. § 1828(c) (5) (B) or whether it is on the Government. We think it plain that the banks carry the burden. That is the general rule where one claims the benefits of an exception to the prohibition of a statute."

In deciding the above questions, this Court is required to and shall review de novo the issues presented and in doing so must apply the substantive rule of law set forth in Section 18(c) (5) of the Federal Deposit Insurance Act, as amended by BMA–66, by applying the standards' identical with those of the banking agencies as required by Section 18(c) (7) (B), as amended. The so-called "substantive rule of law set forth in Section 18(c) (5)" is stated in the act as follows:

(5) The responsible agency shall not approve—

(A) Any proposed merger transaction which would result in a monopoly, or which would be in furtherance of any combination or conspiracy to monopolize or to attempt to monopolize the business of banking in any part of the United States, or

(B) Any other proposed merger transaction whose effect in any section of the country may be substantially to lessen competition, or to tend to create a monopoly, or which in any other manner would be in restraint of trade, unless it finds that the anti-competitive effects of the proposed transaction are clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served.

In every case, the responsible agency shall take into consideration the financial and managerial resources and future prospects of the existing and proposed institutions and the convenience and needs of the community to be served.

The Court's de novo findings and conclusions based upon all of the pleadings, testimony and exhibits in this case must form the basis of the result in the ultimate determination of this issue.

After several lengthy but productive pre-trial conferences which produced a relatively brief, concise instrument reflecting agreed and contested issues of fact and law and a well-prepared agreed pre-trial order which contained stipulations of fact, the names of witnesses who were to testify, and the designation and numbering of exhibits to be offered at the trial of this cause, this case was tried to completion in six and one-half days through the splendid cooperation and competence of all counsel involved, and despite the fact that 46 witnesses testified and 322 exhibits were admitted in evidence. Following the trial, counsel were permitted to file briefs and proposed findings of fact with the Court. The responsibility and duty then devolved upon this Court to decide this case based upon all of the evidence received, the applicable statutory law and the established case law.

Prior to discussing this cause and deciding it on the merits, it is appropriate and helpful to review the history and operation of the Defendant banks, events leading to the merger agreement, and the nature and perspective of banking in Mississippi.

The Defendant, FNB Jackson, the second largest bank in Mississippi, came into existence as a result of a merger between Jackson State National Bank and Capitol National Bank in 1949 (Plaintiff's Exhibit (hereinafter PX) 165; Hearin, Transcript (hereinafter Tr.) 519–520, 522; Lampton, Tr. 622). In the latter part of 1965 (PX165), but effective on January 1, 1966 (Hearin, Tr. 522, Line 16), FNB merged with four other Mississippi banks to form four branch banks of FNB namely: (1) Commercial National Bank of Greenville, located approximately 90 miles northwest of Jackson in Washington County; (2) First National Bank of McComb, located approximately 75 miles south of Jackson, in Pike County; (3) Amite County Bank, about 90 miles southwest of Jackson, in Amite County;

and (4) Tylertown Bank, approximately 80 miles south of Jackson, in Walthall County (PX165):

On December 31, 1967, just prior to the January 19, 1968 merger agreement, FNB Jackson had total deposits of $287,-966,000 and loans and discounts of $207,-423,000 (Complaint, Paragraph 9 and Answers of Defendants and Intervenor thereto), holding approximately 11.8% of the total commercial bank deposits in Mississippi (PX202). On June 30, 1968, FNB Jackson had total deposits of $287,-713,916 or 11.7%, of the total commercial bank deposits in Mississippi, and had total loans and discounts of $197,-468,400 (PX201).

FNB Jackson is a full service, general and commercial bank and trust company with its head office and its twenty additional banking offices all located within 100 miles of Jackson, the territorial limitation of branch banking under Mississippi law being 100 miles from its head or principal office.[2] It has approval to operate three additional offices. FNB Jackson operates its office and ten of its branches in the city of Jackson and has approval to operate an additional office in Jackson. It also operates ten offices in areas outside Hinds County, four of its offices being located in the Greenville-Leland area of Washington County, about 90 miles northwest of Jackson; three offices are in the Gloster-Crosby-Liberty area of Amite County, about 90 miles southwest of Jackson; two offices are in the McComb-Fernwood area of Pike County, about 75 miles south of Jackson; and one office is in Tylertown, Walthall County, about 80 miles south of Jackson. It also has approval to operate two additional offices in Pike County and it has applied for approval to operate an additional office in Walthall County (PX201; Complaint, Para. 9–10; Defendants' Answer, Para. 9–10).

All of the ten banking offices operated by FNB Jackson outside of Hinds County were acquired by and through the above four mergers (Complaint, Para. 10 and Defendants' Answer thereto). It operates three computer centers, one in Jackson, one in Greenwood and one in Columbus, Mississippi (Hearin, Tr. 540–543, 557, 560; PX17, page 14).

The Bank of Greenwood was chartered and organized in 1933 and now has approximately 50 employees. Its home office and only branch office are located approximately three blocks apart in the City of Greenwood, Mississippi (Miller, Tr. 647, Line 21 and Tr. 648, Lines 8–16). GB was organized because Greenwood, located in Leflore County, was a one-bank town, with only the Bank of Commerce operating therein and Greenwood needed another bank. GB grew much more rapidly than the Bank of Commerce and had slightly more than three-fifths of the banking business or market in Leflore County at the time that Leflore Bank and Trust Company, an additional bank, was organized in 1944 (Haywood, Tr. 1410, Lines 15–25 and Tr. 1411, Lines 1–9).

In December, 1964 GB had total deposits of $23,413,000 or 52.1% of the total deposits of commercial banks in Leflore County, with Leflore Bank and Trust Company having 22.1% of said deposits, the Bank of Commerce holding 19.6% of such deposits and the Itta Bena branch of the Grenada Bank, which is the only bank located outside the city limits of Greenwood in Leflore County, approximately nine miles west of Greenwood, holding 6.2% (PX168).

In 1965, The First National Bank of Greenwood was organized and began operating, after which GB's total deposit

2. Miss.Code Ann. sec. 5229 (1942): "Branch banks may be established within a radius of one hundred miles of the parent bank provided that no parent bank shall be permitted to establish more than fifteen branch banks; provided further that no parent bank shall be permitted to establish a branch bank in any town or city of less than 3,100 population according to the last preceding Federal census where such town or city has one or more banks in operation."

share of the Leflore County banks total deposits then progressively decreased, as evidenced at the end of December of each of the following years; 1965 to 48.1%; 1966 to 47.2%; 1967 to 46.4% (PX168). On June 30, 1968 its total deposit share decreased to 45.8%, its total deposits having declined from its December 31, 1967 amount of $26,599,000 to $24,201,000 (PX169).

GB is the largest of the four commercial banks headquartered in Leflore County and the second largest of the five banks which maintain banking offices in the County; GB ranks as the fifteenth largest commercial bank in Mississippi (PX168–173, 201; Complaint, Para. 11 and Defendants' Answer thereto).

Both of the Defendant banks are engaged in interstate commerce, and their head offices are approximately 94 miles apart. The closest office of FNB Jackson is approximately 50 miles west of the offices of GB (Complaint, Para. 13; Defendants' Answer, Para. 13; Intervenor's Answer, Para. VIII; PX167).

## THE BACKGROUND OF EVENTS LEADING TO THE PROPOSED MERGER

Subsequent to the initiation of negotiations between FNB Jackson and the four banks with which it thereafter merged, Robert P. Parrish and C. A. Miller, Jr., President and Executive Vice President, respectively, of GB, approached Robert M. Hearin, then President of FNB Jackson and now Chairman of its Board of Directors, in a hotel in Chicago, Illinois in the fall of 1965 at an American Bankers Association Convention. Messrs. Parrish and Miller inquired of Mr. Hearin concerning the announced proposed merger between FNB Jackson and The Commercial National Bank of Greenville, particularly in view of the fact that Miller knew the latter bank to be an excellent bank and that the President thereof was "one of the most capable bankers in the State," having been a past President of the Mississippi Bankers Association and an Executive officer with the Bank of Clarksdale for years. (Miller, Tr. 664–666; Hearin, Tr. 521–523.) Mr. Miller knew FNB Jackson to be a "real strong conservative bank," and that there must be some advantages for Commercial National to merge with it for additional reasons (Miller, Tr. 664–666).

At the time that Messrs. Parrish and Miller approached Mr. Hearin at Chicago and thereafter during the pendency of merger negotiations, GB had been reasonably successful since its organization in 1933. However, because of the change in the economy in Greenwood and Leflore County, demands have begun to exceed the Bank's means of serving the community in the manner it feels that it should be served. GB feels its services are deficient for the following reasons: (1) its President, Robert P. Parrish, is 63 years of age and its Executive Vice President is 61 years of age; the next man down in the chain of command is Ralph Pettey, 61 years of age, and these three constitute the top management of the bank; six others who constitute the next level of management, one of whom was recently employed as a college graduate range in age up to 51 years. In addition, GB has no training program for prospective new executives and has lost two of its top potential management people to the First National Bank of Greenwood and another through death as a result of an unfortunate accident; the payment of high salaries to college graduates, necessary to attract them to the Greenwood area, would create a serious morale problem among the bank's established employees, who are primarily women (Miller, Tr. 667, 671–72, 737); (2) as mentioned above, the considerable change of the economy with a commensurate demand for more money from customers, which GB is unable to supply (Tr. 660, Lines 21–23); (3) the demand for specialized services which GB has attempted to render, but because it cannot employ specialists to do the job that should be done and is thus unable to render these necessary services in Greenwood on a basis

comparable with the Memphis, Tennessee banks, where much of Leflore County's big money goes instead of staying within the county (Miller, Tr. 660–661); (4) the need for a larger capital base because with changing times there is a demand for larger deposits. GB analyzed the possibility of selling stock and broadening its capital base but since needs were seasonal because of the seasonal crops, the major part of Leflore's economy, the additional dividends and additional tax commensurate therewith would bar the expansion of its capital structure because it would exceed the benefits received from the contemplated expansion (Miller, Tr. 661, Lines 13–25); (5) the necessity for a larger and new bank building, having been in the same building for 25 years or more with inadequate space, but with insufficient capital to put into fixed assets, the cost of which has been estimated to be from $200,000 to $300,000 up to $750,000 which would deprive the bank of the needed capital with which to operate (Miller, Tr. 662, Lines 1–14); (6) GB has no one to meet the demand for specialized trust services (Miller, Tr. 668, Lines 1–17), in consumer lending or in the installment loans field (Miller, Tr. 669, Lines 9–17); (7) GB's risk in making cotton loans and taking the chance of absorbing a substantial loss because of the uncertainty and instability of the cotton market which comprises about one-half of its loan portfolio, whereas a merger with FNB Jackson would greatly reduce the risk and allow the absorption of large potential losses (Miller, Tr. 684, Lines 1–25).

Although GB's correspondent relationship with FNB Jackson has enabled it to obtain some loan participations with them, this has not proved satisfactory because a bank desires to be the prime lender so that its hands are not tied with reference to its rate and terms. The bank also likes to give a quick answer to its customers and at times is unable to get a participation and particularly is the latter important in view of GB's cotton financing of heavy equip-

ment dealers which often require money "in bigger slugs * * * than the average needs." (Miller, Tr. 662, Lines 22–25 and Tr. 663, Lines 1–24.)

The discussions concerning the merger were next had between Mr. Hearin and Messrs. Parrish and Miller at a Mississippi Bankers Association meeting on the Mississippi Gulf Coast in the spring of 1966, and thereafter Parrish and Miller visited Jackson and Hearin visited Greenwood until the merger proceedings came to a successful conclusion in the latter part of 1967 (Hearin, Tr. 523, Lines 2–9).

The merger would result in a substantial additional number of services that could be provided by a bank the size of FNB Jackson to the residents of Leflore County that could not be provided by a smaller bank such as GB, including trust services, special services, consumer services, substantial increase in the lending limits to any one individual or entity, namely, from the approximate amount of $210,000, or 15% of GB's capital and surplus under state law, to approximately $2,000,000, or 10% of FNB's capital surplus as regulated by national regulations (Hearin, Tr. 524, Lines 3–25; Tr. 525, Lines 1–18).

GB's Executive Vice President, Miller, testified as follows:

A. Judge, let me tell you. I think I know all about the First National Bank, you know we're not just dealing with those guys because we like them. * * * We think that they can offer us something that would be good for us and may be good for them. (Miller, Tr. 678, Lines 14–16, 20–21)

After the merger was agreed to between the two Defendant banks, the Intervenor herein, Comptroller of the Currency, found favorably to the banks on all the banking factors involved and also found that the proposed merger would have no adverse effect on competition and that it would not tend toward monopoly, and that it would not violate Section 7 of the Clayton Act, as amended.

Subsequently, this action was commenced by the United States through the Justice Department on May 28, 1969 for an injunction restraining the consummation of the merger after which the Comptroller intervened as permitted by law. So much for the history up to the time of this trial.

## THE NATURE AND PERSPECTIVE OF BANKING IN THE STATE OF MISSISSIPPI AND THE ECONOMIC MILIEU IN WHICH IT OPERATES

In view of the fact that the Defendant, FNB Jackson, is the second largest bank in the State of Mississippi and operates in various parts of the State within 100 miles of its home office as restricted by Mississippi law, and in order to better understand the potential impact and effect of the proposed merger with reference to its alleged anti-competitive effects, it is helpful and necessary to review the banking and economic situation in the State of Mississippi.

The State of Mississippi is a capital deficit area or state (Lampton, Tr. 613, Lines 21–24; McNew, Tr. 802; Wagner, Tr. 902; Burt, Tr. 840), and particularly so with reference to the State's concern for developing "home grown business and industry" (Wagner, Tr. 902, Lines 9–12) which has led to its seeking programs for the development of such types of business and industrial operations (Wagner, Tr. 902, Lines 9–14). The term "capital deficit state" signifies that the State's citizens do not generate savings in sufficient quantity to produce sufficient capital resources, but have to consume most of their income. The primary cause of this is the fact that Mississippi has the lowest per capita income of any State in the nation and needs additional capital resources. It is therefore necessary that Mississippi utilize its existing resources as best it can and bring in outside capital resources if it is to have the industrial and economic development desired in order for its citizens to have a satisfactory standard of living (McNew, Tr. 802, Lines 6–17, 21–25 and Tr. 803,

Lines 1–6). Presently, the State is primarily a producer of raw materials, and is largely confined to its highest-valued crop, cotton, which is shrinking in demand to the point that the State faces the prospect of having to switch a major segment of its farm workers to industrial enterprises (Sayre, Tr. 1003, Lines 5–11). Although industries have moved into Mississippi in recent years, the overall rate of economic growth in the State has been unsatisfactory and the State has not made the type progress it should have in closing the gap between the national average per capita income and that of Mississippi which is approximately 60% thereof (McNew, Tr. 821, Lines 17–25 and Tr. 822, Lines 1–5, 14–17).

The fact that Mississippi is a capital deficit State has a definite negative effect on its efforts to industrially develop in a manner so that profits are retained within the State rather than flowing out of the State, as at present, with out-of-state ownership of much of the industry located in Mississippi (Wagner, Tr. 902, Lines 18–23).

If Mississippi is to have the industrial and economic development necessary in order for its citizens to have a satisfactory standard of living, it must bring in outside capital resources, because use of its currently available resources in the most advantageous manner possible is simply not enough (McNew, Tr. 803, Lines 1–6).

The national average per capita personal income in 1967 was $3,159 whereas that of Mississippi was $1,896 or 60% thereof (Defendants' Exhibit (hereinafter DX) 35; Lampton, Tr. 577, Lines 16–24), the lowest per capita income of any State in the nation (McNew, Tr. 802, Lines 10–11; Burt, Tr. 840, Lines 14–15). In fact, Mississippi is the only state that has a per capita income of less than $2,000 (Lampton, Tr. 577, Lines 16–24; Wagner, Tr. 908, Lines 24–25, and Tr. 909, Lines 1–3). While the rate of growth of Mississippi's per capita income has been steadily increasing, nonetheless it has continued to fall

further behind the national average, so that the actual difference between Mississippi's average and the national average of per capita income is approximately $1,300 (McNew, Tr. 821, Lines 17–25 and Tr. 822, Lines 1–5; Burt, Tr. 853, Lines 17–21), as compared to the difference of $800 some few years ago (McNew, Tr. 822, Lines 1–5). One goal of the Mississippi Research and Development Center, the "R & D Center," is to equalize the per capita income of Mississippians with that of the State in the approximate projected average of $5,000 by the year 2,000, which would require a tripling of the per capita income of Mississippians within a 30 year period (Wagner, Tr. 909, Lines 12–18).

The new minimum wage law has caused a relatively high rate of out migration of people from areas in Mississippi which have already suffered from relatively high unemployment (Wagner, Tr. 914, Lines 15–18).

Although Mississippi historically has been an agricultural State (Burt, Tr. 853, Lines 11–16), there has been a decline in the importance of agriculture and a shift or trend away from small to larger farms resulting in fewer farms consisting of larger amounts of acreage (Lampton, Tr. 579, Lines 1–12). This shift or trend of agriculture has displaced a number of farm workers, particularly in the Delta area, including Leflore County, which area is principally and particularly oriented to agriculture, particularly cotton farming (Lampton, Tr. 579, Lines 1–12). The decline of the economic possibilities in the Delta area since 1940, and particularly the Leflore County area, which is the agreed relevant geographic market for purposes of determining the Clayton Section 7 question herein, has resulted in this being a capital deficit area (Neill, Tr. 1216, Lines 21–25 and Tr. 1217, Lines 1–7). Therefore, one of the principal problems facing Mississippi is the attraction and procurement of out of state industry to provide needed jobs for workers displaced from their agricultural jobs (Lampton, Tr. 579, Lines 1–12).

Although Mississippi initiated its Balance Agriculture with Industry program (BAWI) in 1936, it was not able to balance employment in agriculture and industry until the spring of 1965 when 165,000 people were employed in each area (Burt, Tr. 853, Lines 11–16). According to Defendants' eminently qualified witness, Dr. Charles Foster Haywood,[3] the State's banking system has not yet adjusted adequately to the change in the agricultural base of its economy and the shift of workers from rural to urban areas; rather, it is thought by economists that Mississippi is approximately ten to 15 years behind the nation in adjusting the structure of its banking system to the changes that

---

3. Dr. Haywood, who qualified as an expert in the fields of banking and economics (Haywood, Tr. 346, Lines 4–9), is Dean of the College of Business and Economics at the University of Kentucky and Professor of economics in that college. He received his Ph.D. from the University of California at Berkeley with a major in economics. He was formerly employed by the American Bankers Association as an economic analyst from 1954 to 1955; served as a member of the Tulane University faculty in the Department of Economics, 1955–1957; and was a Financial Economist for the Bank of America in San Francisco for approximately 1½ years, 1957–58. From September, 1958 to January, 1963 he was on the faculty and a member of the administration at the University of Mississippi, serving as Professor of Economics and Banking and Provost, or number two man in the administration. He served as Director of Research for the Bank of America in San Francisco from January, 1963 to July, 1965 before going to the University of Kentucky. Dr. Haywood's doctoral dissertation was titled "The Implementation of Monetary Policy with Special Attention to the Availability of Credit." He has taught elementary economics, statistics, intermediate economic theory, money and banking, bank management, financial institutions and published articles in many journals and banking periodicals. He was the first professor to occupy the Chair of Banking at the University of Mississippi (Haywood, Tr. 340, Line 17; Tr. 346, Line 2).

have taken place in the underlying economy (Haywood, Tr. 392, Lines 15–23).

Dr. Joseph A. Greene, Jr., Dean of the School of Business Administration at the University of Southern Mississippi, is of the opinion, based upon his observations during his 20 years in Mississippi, that in those areas within the State where the small unit banks have been predominant, there has been a "real lack of financial leadership and of economic growth" (Greene, Tr. 975, Lines 20–23).

In order to raise the standard of living of Mississippians to a satisfactory level it is necessary that outside sources of capital be obtained. In the attraction of outside industry and capital into the State and the efficient utilization of the capital already present, Mississippi's banking structure is of prime importance (McNew, Tr. 803, Lines 7–15). If Mississippi's banks are confined to their home cities they cannot serve the needs of the State and its people because Mississippi has no truly large metropolitan areas in which to generate growth internally. Without growth Mississippi banks cannot compete with the large banks in New Orleans or Memphis, resulting in Mississippi's financial needs being left to the discretion of large out of state banks (McNew, Tr. 804, Lines 11–15 and Tr. 805, Lines 1–9, 13–16). Almost all large industries which are interested in locating in Mississippi desire the availability of large banks which have the large amounts of capital necessary for industrial operations and expansion (Burt, Tr. 854, Lines 20–24). Yet not one of Mississippi's banking institutions approaches the size of institutions in other states or areas which have contributed to the economic development and betterment of those states (McNew, Tr. 825, Lines 18–20). The only manner in which to achieve a system of large strong commercial banks in Mississippi is through branching, either by merger or de novo (McNew, Tr. 804, Lines 16–18).

Despite the above inadequacies, Mississippi's banks nevertheless, and particularly FNB Jackson and Deposit Guaranty National Bank of Jackson, have aided the Mississippi A & I Program to a limited degree by providing private capital to industry for working capital needs, financing inventory and moving expenses. These banks have likewise been of help to a limited degree in increasing the salability of Mississippi's municipal bonds by participating with other bond buyers in the sale of smaller issues (Burt, Tr. 839, Lines 4–8, 9–15, 20–22).

The State of Mississippi has recognized its economic problems and has made official efforts to solve them through the creation of the Mississippi Agricultural and Industrial Board (A & I Board) and the Mississippi Research and Development Center (R & D Center) and the sponsoring of the "Colonel MIM Program" ("Money in Mississippi").

The Mississippi legislature in 1936 established the State's Balance Agriculture with Industry bond program (BAWI), in an effort to bring needed industry into the State. This is a municipal or political subdivision industrial bond program designed to help procure or supply the necessary funds for capital investment and for working capital in Mississippi (Burt, Tr. 840, Lines 15–25). The A & I Board, which is the State agency mainly responsible for the economic development of Mississippi, has attempted to promote the purchase of Mississippi products for use in other in-State manufacturing concerns by publishing a directory of all the manufacturing firms in Mississippi showing what they purchased and in which products they have surplus production capacity (Burt, Tr. 838, Lines 8–25 and Tr. 846, Lines 16–21). This Board has also established local development committees in each section of the State which is composed of leading businessmen, including one banker in each area, who can inform potential industrial prospects about local conditions, including the availability of financing (Burt, Tr. 852, Lines 14–21).

Of course, Mississippi is in competition with every other state in the nation in its attempt to attract new industry (Burt, Tr. 850, Lines 5–7). In the last two years there have been more expansions of previously established industries within Mississippi than the establishment of new industries therein—in 1968 there were approximately 90 expansions and 70 new industries (Burt, Tr. 840, Lines 1–6). The Industrial Revenue Bond issues under the BAWI Program have helped somewhat to satisfy the capital needs of the State but the need for additional capital has not nearly been met (Burt, Tr. 848, Lines 11–13). Although permanent financing of the construction of new industrial plants for private use has been accomplished under the Mississippi BAWI Program through various local governmental units, nevertheless private interim financing of the construction or expansion of these plants over the three or four month periods necessary to so build or expand is necessary. It is in this interim financing area in which banks, particularly large banks, are invaluable (Burt, Tr. 843, Lines 13–25 and Tr. 844, Lines 1–14). In the future, the success of the BAWI Program will be even more dependent upon the availability of loans and financing from banks because the Securities and Exchange Commission has adopted a regulation requiring the registration of all industrial revenue bonds issued after January 1, 1969 with the exception of totally intra-state issues and the so-called private placement exception where bonds are offered to a very limited number of investors, usually 20 to 25 in number. This requirement has had an adverse effect on the establishment of new industries and will continue to do so because of the additional time and expense required to complete such registration, thereby depriving the industry of available bond money which it could normally get within 60 to 70 days under the BAWI Program. Also Congress enacted legislation in 1968 which took away the tax exempt status of the interest on the larger bond issues, imposing a fairly simple $1,000,000 limitation and a fairly complicated $5,000,000 limitation (Burt, Tr. 841, Lines 4–25 and Tr. 842, Lines 1–5, 10–25 and Tr. 843, Lines 1–2). The A & I Board has had only two bond issues since January 1, 1969 both of which have been private placement bonds not requiring SEC registration (Burt, Tr. 843, Lines 1–2).

In many instances banks participate in the underwriting of the A & I Bond issues and FNB Jackson has been a major influence in financing new industry either through private capital or through the acquisition of bonds through private placement, thus rendering a very needed service to promote industrial development (McNew, Tr. 821, Lines 1–7; Burt, Tr. 843, Lines 9–12).

The Research and Development Center is another agency created by the Mississippi legislature for the basic purpose of improving economic conditions in Mississippi by developing a comprehensive economic program through research and technical services. The R & D Center, which has a full time staff of 128 persons, works very closely with the A & I Board by serving as its technical arm in the State's development effort, performing research which the A & I Board then uses in the promotion or sales efforts. The purpose of this Center is to develop a comprehensive economic development program for the State and to upgrade per capita income within the State. The Center constantly seeks programs for the development of home-grown businesses and industrial operations (Lampton, Tr. 578, Lines 1–11; Wagner, Tr. 901, Lines 12–20 and 23–24; Tr. 902, Lines 2–6, 12–14).

The R & D Center, with the assistance of the special analyses made by an employed firm in Cambridge, Massachusetts, recently completed a comprehensive analysis of the agricultural sector of the Mississippi Delta's economy, including that of Leflore County and Greenwood. It concluded that the agri-

cultural economy currently existing in the Delta offers no real economic future for that area in terms of the total economic problems and needs that exist there. It found that employment in the Delta area has progressively declined in the agricultural sector, previously the primary source of employment, because of the encroachment of synthetic fibers on the cotton market (Wagner, Tr. 903, Lines 2–15). As a result, the R & D Center has now recommended that there should be an attempt to develop a whole new type of industry which would take advantage of national changes in the food industry and technical innovations occurring therein so that within the next twenty years a billion dollar a year industry could be developed in the Mississippi Delta. This new industry would involve producing entire menus and reaching not only the consumer market at the supermarket but also the larger and rapidly expanding institutional market (Wagner, Tr. 904, Lines 3–18). In order to develop this new technological food industry, it will be necessary to organize a new type corporation in the area which must be supported by developing a complex of container packaging plastics and chemical companies all of which would add a new dimension to the existing economy of the Delta area (Wagner, Tr. 904, Lines 19–22).

The State has further promoted an additional effort to bolster its economy and raise the per capita income of its citizens in the "Colonel MIM" Program (the letters MIM denoting "Money in Mississippi"). This program is sponsored each September by the Mississippi A & I Board through the Mississippi Marketing Council and its purpose is to encourage Mississippians to buy products made in Mississippi in order to prevent the flow of sales dollars out of the state. This program is designed to help correct Mississippi's capital deficiency and to create additional governmental revenues from the State which in turn derives its chief revenues through sales taxes (Burt, Tr. 845, Lines 1–25 and Tr. 846, Lines 1–16).

## THE ECONOMIC STATUS OF LE-FLORE COUNTY

In view of the fact that it is stipulated and agreed by and between all of the parties hereto that the relevant geographic market, insofar as the allegations of a violation of Section 7 of the Clayton Act are concerned, is Leflore County, Mississippi, it is important and essential to determine the economic status of Leflore County and the surrounding Mississippi Delta area of which Leflore is an integral and composite part, although this Court also felt it necessary to first look at the economic milieu of the entire State.

The area or section of the State of Mississippi which is referred to as the "Mississippi Delta" encompasses 18 counties in Northwest Mississippi, eleven of which are entirely in the Delta and seven of which are partly in the Delta and in the hill section (Newton, Tr. 1344, Lines 1–4). The soil of the Mississippi Delta (hereinafter referred to as "Delta") is rich and fertile, having always been able to produce much more profitably in proportion to other lands. It is difficult to purchase such land, which sells between $350 and $875 an acre or at an average price of $500 an acre (Miller, Tr. 653, Lines 20–25 and Tr. 654, Lines 1–4, 7–11). In view of the relative decline of cotton as a major source of income in Leflore County and the Delta because of competition from synthetics, foreign exports of cotton, and the probable discontinuance of the Federal Price Supports Program, it is essential that new sources of income be developed in Leflore County and the Delta in order to replace both the jobs and the revenue which that area expects to lose (Miller, Tr. 651, Lines 1–25; Wagner, Tr. 903, Lines 20–25). The seasonality facet of the agricultural industry also creates severe unemployment problems because workers cannot make a living by working only during the two sea-

sonal peaks and therefore must look elsewhere for a means of earning a continued living (Sayre, Tr. 1009, Lines 1–7). The new minimum wage law has displaced approximately 1,000 persons per county in the Delta area who were formerly employed in agriculture. Statewide, it is estimated that about 40,000 or 50,000 people are left with no source of income because of displacement from agricultural employment because of the minimum wage law (Wagner, Tr. 914, Lines 3–12). The low money flow, caused by, or in combination with, the changes in agriculture, has caused many small towns in the area to virtually die because of the lack of business (Newton, Tr. 1344, Lines 14–25).

Although farmers in the Delta at one time were reluctant to let industry come in for fear that it might deprive them of their labor supply, they have now come to the realization that industrialization is one of the main solutions to this surplus of labor which can no longer be supported by the agricultural industry (Newton, Tr. 1345, Lines 1–21).

In Leflore County there is little available adequate housing, particularly in the suburbs of Greenwood, and this makes it very difficult for workers to follow an industry into a community, thus presenting a deterrent to the attraction of industry into the area (Newton, Tr. 1347, Lines 14–25 and Tr. 1348, Line 1).

In the last twenty years the capital requirements of the Delta farms, including Leflore County, have increased almost ten-fold per farm primarily because of breakthroughs during that period in mechanization, technology and chemicals (Sayre, Tr. 993, Lines 18–25 and Tr. 994, Lines 1–2). The Staple Cotton Discount Corporation and the Greenwood Production Credit Association are two of the Federally financed financial agencies in Leflore County whose purpose and function it is to finance farm operations (Eason, Tr. 1056, Lines 8–10; Sayre, Tr. 987, Line 25 and Tr. 988, Lines 1–2). The former does an annual volume of financing in the Mississippi Delta in amounts varying from thirty to thirty two million dollars (Sayre, Tr. 993, Lines 17–18), and the latter's loan volume has been increasing over the last few years, having reached a peak of slightly over $15,000,000 in 1968 (Eason, Tr. 1055, Lines 3–5). The increase in loan volumes of the Production Credit Association has come about because of an increase in capital needs of the farmers who substitute capital for labor, rather than an increase in membership of the association (Eason, Tr. 1056, Lines 2–3). Both of these Federally owned organizations compete with the local banks in the area in the financing of agricultural activity, purchase of farm land and the construction of farm dwellings (Eason, Tr. 1056, Lines 8–10; Haywood, Tr. 1460, Lines 9–20).

Other needs of Leflore County and the Delta area are better highways, better air transportation facilities, more capital and more speculative money to be invested and spent therein (Newton, Tr. 1347, Lines 5–8); however, the greatest need in the Delta area is the creation of more jobs, and particularly jobs for unskilled people. The corollary of this job need is the very great need for a better industrial program to be established throughout the area (Newton, Tr. 1347, Lines 1–5).

The population of Leflore County is "rather mixed," some people in the community being rather wealthy but a much greater percentage being poor in that they do not have or possess those things that people generally expect in a growing community (Miller, Tr. 650, Lines 6–12). For example, a farmer who once had 150 families on his plantation now, because of mechanization, has only five or six who are machine operators. The displaced workers either had to leave Leflore County altogether or move into Greenwood to find a place to live, although in some instances through the

kindness of the plantation owner such persons were permitted to remain in their run-down shacks (Miller, Tr. 655, Lines 13–23). This Court judicially notices that by far the great percentage of these people are unskilled Negro laborers.

The housing situation in Greenwood and Leflore County constitutes a major problem, because many are substandard and practically uninhabitable, although there are some very elaborate homes in Greenwood (Miller, Tr. 650, Lines 16–22).

As discussed, the decline of the cotton market has been a great blow to the economy of Leflore County. The technological revolution in the agricultural industry has also caused serious problems. In order to be competitive, farmers in Leflore County and the Delta have had to switch from manpower to the use of machinery in crop production. This has resulted in an increased need for capital resources in the acquisition of necessary machinery. For example, some of the mechanical cotton pickers cost from $26,000 to $28,000 each (Miller, Tr. 654, Lines 1–25). All of the above has resulted in the financing of cotton entailing much more risk than in the past. The loan price, that is, the price stabilized by the Federal government, is very much the floor in the cotton market, and some of the banks have cotton in their possession that they cannot now sell at any price (Miller, Tr. 652, Lines 2–9).

BANKING CONCENTRATION IN MISSISSIPPI AS COMPARED TO OTHER STATES AND THE NATION

Although this Court must and will assess the anti-competitive effects, if any, of the proposed merger of the Defendant banks in the agreed relevant geographic market of Leflore County, it nevertheless deems it necessary and beneficial to note, and not ignore, the general Mississippi banking situation in perspective, including (1) the concentration ratios as to total deposits held by the largest, the two largest and the five largest of the banks in Mississippi as compared to like categories of banks in other states in the United States; (2) the size, number and growth of banks in Mississippi compared with that of banks in the United States as a whole; (3) the growth of Mississippi banks in comparison with other state banks; and (4) the question of correspondent bank balances. In the absence of such a consideration, this Court would be ignoring a substantial and essential part of the banking picture which would result in a false portrayal of the hard economic facts of banking in the relevant market. In so doing, the Court would not be fulfilling the obligation to clarify and establish the entire picture with certainty.[4]

Although more detailed consideration will be hereinafter given to the question of concentration ratios, it is at this time informative and enlightening to note that Mississippi ranks as follows compared with other states and the District of Columbia in connection with the share of deposits held by the largest one, two and five commercial banks as of December 30, 1967: 24th as to the two largest, 26th as to the largest and 35th as to the five largest banks in Mississippi compared with banks in the other states and the District of Columbia, as more fully shown by the following table admitted in evidence as DX60:

---

4. *See* United States v. Crocker Anglo National Bank, 277 F.Supp. 133, 153 (N.D. Calif.1967); United States v. Manufacturers Hanover Trust Company, 240 F. Supp. 867, 881 (S.D.N.Y.1965), in which the Court stated: "We think that if ever there were a field requiring administrative expertise to unravel the tangled threads of the evidence and weave them into a meaningful fabric, this is it. This case involves a multitude of technical, intricate and complex problems in the field of money and banking, a subject within the special competence of the Board (Comptroller) and outside the conventional experience of judges."

SHARE OF DEPOSITS HELD BY LARGEST ONE, TWO, AND
FIVE COMMERCIAL BANKS IN EACH STATE, RANKING
BY STATES, AND NUMBER OF BANKS AND
BRANCHES IN EACH STATE
DECEMBER 30, 1967

| STATE | Share of Deposits Held By | | | States Ranked By | | | Number of Banks-Branches | |
|---|---|---|---|---|---|---|---|---|
| | Largest 1 | Largest 2 | Largest 5 | % of 1 | % of 2 | % of 5 | | |
| Rhode Island | 53.2% | 87.4% | 97.3% | 1 | 1 | 1 | 14 - | 149 |
| Nevada | 49.3% | 64.6% | 93.1% | 2 | 6 | 3 | 9 - | 75 |
| California | 46.3% | 58.7% | 86.0% | 3 | 8 | 9 | 178 - | 2692 |
| Arizona | 45.3% | 71.2% | 92.6% | 4 | 4 | 4 | 17 - | 265 |
| Oregon | 42.6% | 82.8% | 87.4% | 5 | 2 | 7 | 50 - | 285 |
| Hawaii | 42.1% | 74.8% | 93.7% | 6 | 3 | 2 | 11 - | 123 |
| Delaware | 36.4% | 57.1% | 91.7% | 7 | 9 | 5 | 19 - | 74 |
| Idaho | 34.9% | 66.2% | 86.4% | 8 | 5 | 8 | 26 - | 141 |
| Washington | 32.9% | 53.0% | 73.2% | 9 | 10 | 11 | 94 - | 452 |
| Alaska | 32.7% | 58.8% | 83.6% | 10 | 7 | 10 | 12 - | 54 |
| Massachusetts | 32.4% | 42.1% | 60.8% | 11 | 13 | 16 | 159 - | 647 |
| Dist./Columbia | 30.5% | 52.8% | 88.3% | 12 | 11 | 6 | 14 - | 96 |
| Utah | 30.2% | 47.0% | 71.6% | 13 | 12 | 12 | 55 - | 112 |
| So. Carolina | 22.8% | 35.2% | 55.3% | 14 | 18 | 18 | 125 - | 328 |
| No. Carolina | 21.2% | 38.4% | 66.8% | 15 | 15 | 14 | 128 - | 859 |
| New York | 20.5% | 40.3% | 69.5% | 16 | 14 | 13 | 327 - | 2136 |
| Georgia | 19.9% | 32.6% | 53.1% | 17 | 20 | 19 | 426 - | 227 |
| Maryland | 19.9% | 33.0% | 63.2% | 18 | 19 | 15 | 122 - | 442 |
| Connecticut | 18.7% | 37.2% | 57.0% | 19 | 16 | 17 | 67 - | 357 |
| Illinois | 18.4% | 35.8% | 47.5% | 20 | 17 | 23 | 1067 - | 18 |
| Michigan | 18.1% | 28.0% | 48.9% | 21 | 22 | 21 | 341 - | 1049 |
| New Mexico | 16.8% | 29.4% | 43.8% | 22 | 21 | 25 | 64 - | 109 |
| Colorado | 14.8% | 27.4% | 44.0% | 23 | 23 | 24 | 256 - | 7 |
| Maine | 14.5% | 25.5% | 49.0% | 24 | 26 | 20 | 44 - | 194 |
| Alabama | 14.2% | 21.6% | 34.8% | 25 | 28 | 31 | 266 - | 211 |
| MISSISSIPPI | 13.9% | 25.8% | 32.8% | 26 | 24 | 35 | 188 - | 281 |
| Pennsylvania | 13.9% | 21.9% | 39.8% | 27 | 27 | 27 | 522 - | 1421 |
| Vermont | 13.4% | 25.8% | 47.7% | 28 | 25 | 22 | 46 - | 67 |
| Wisconsin | 12.8% | 18.2% | 25.0% | 29 | 38 | 42 | 599 - | 171 |
| Nebraska | 11.6% | 18.2% | 34.6% | 30 | 39 | 32 | 439 - | 33 |
| So. Dakota | 11.3% | 19.6% | 36.2% | 31 | 33 | 30 | 166 - | 87 |
| Oklahoma | 11.0% | 19.6% | 37.6% | 32 | 34 | 28 | 422 - | 46 |
| Ohio | 10.9% | 17.4% | 29.8% | 33 | 41 | 39 | 531 - | 1069 |
| Louisiana | 10.9% | 18.0% | 32.5% | 34 | 40 | 36 | 226 - | 305 |
| Kentucky | 10.7% | 20.5% | 33.8% | 35 | 31 | 33 | 346 - | 268 |
| Minnesota | 10.6% | 21.3% | 33.3% | 36 | 29 | 34 | 723 - | 9 |
| Tennessee | 10.6% | 20.8% | 41.2% | 37 | 30 | 26 | 299 - | 404 |
| Missouri | 10.1% | 18.5% | 30.9% | 38 | 36 | 38 | 664 - | 78 |
| Virginia | 10.0% | 19.8% | 36.3% | 39 | 32 | 29 | 250 - | 656 |
| Indiana | 9.4% | 18.6% | 28.2% | 40 | 35 | 40 | 417 - | 542 |
| Wyoming | 9.2% | 18.3% | 32.3% | 41 | 37 | 37 | 69 - | 1 |
| New Hampshire | 7.3% | 13.0% | 27.3% | 42 | 42 | 41 | 76 - | 37 |
| Arkansas | 6.6% | 11.8% | 21.5% | 43 | 44 | 46 | 248 - | 130 |
| Texas | 6.6% | 12.8% | 24.6% | 44 | 43 | 43 | 1149 - | 59 |
| Florida | 6.4% | 9.0% | 15.6% | 45 | 49 | 51 | 450 - | 21 |
| Kansas | 6.1% | 9.4% | 17.0 | 46 | 48 | 49 | 601 - | 58 |
| New Jersey | 6.0% | 11.1% | 22.8% | 47 | 45 | 44 | 228 - | 757 |
| Montana | 5.9% | 10.5% | 22.1% | 48 | 46 | 45 | 133 - | 5 |
| West Virginia | 5.7% | 10.5% | 19.4% | 49 | 47 | 47 | 194 - | 0 |
| Iowa | 4.8% | 8.3% | 16.2% | 50 | 50 | 50 | 674 - | 260 |
| No. Dakota | 4.2% | 8.0% | 17.8% | 51 | 51 | 48 | 169 - | 64 |

Source: American Banker, "1968 Directory and Banking Who's Who," March 20, 1968;
FDIC, "Report of Call No. 82; FDIC, Annual Report, 1967.

Of the 23 states whose two largest banks are more heavily concentrated than the two largest banks in Mississippi, 16 permit statewide branch banking, five permit limited area branch banking as does Mississippi, and two are unit banking states where branching is prohibited (Haywood, Tr. 1389, Lines 11–25 and Tr. 1390, Lines 1–2).

The foregoing table shows California, a growth state, with 178 unit banks therein or ten less than the 188 unit banks in Mississippi, with a concentration ratio in its two largest banks of 58.7% of all deposits within the state, or more than double the concentration ratio of 25.8% of total Mississippi deposits held by its two largest banks (Lampton, Tr. 583, Lines 8–25 and Tr. 584, Lines 1–6). Dr. Charles F. Haywood, the Defendants' outstanding expert witness who qualified as a specialist in economics and banking, testified that he was intimately familiar with the banking and economic scene in California, having lived there for a period of eight years and having received his Ph.D. in Economics from the University of California at Berkeley. During four of Dr. Haywood's years in California he had been an officer of the Bank of America, first in the capacity as financial economist and later as Director of Economic Research (Haywood, Tr. 1393, Lines 23–25 and Tr. 1394, Lines 1–18). It was his undisputed testimony that the level of banking services in California is excellent, and yet if a simplistic approach were taken with reference to concentration ratios one would say that California banking is highly concentrated and that this portends the exercise of market power and all the adverse things that gradually go with it in terms of poor quality of banking services at high cost, etc. Yet quite the opposite is true (Haywood, Tr. 1393, Lines 23–25 and Tr. 1394, Lines 1–18).

The two largest banks in North Carolina, another growth state with a very low unemployment, have a concentration ratio of 38.4% as compared with Mississippi's two largest banks which have 25.-

8% of the banking deposits. The largest bank in North Carolina, Wachovia, is domiciled at Winston-Salem, where Dr. Gaines M. Rogers, Defendants' qualified expert in the field of economics and banking, resided for 20 years as Dean and Professor of Finance at the School of Business of Wake Forest University (Tr. 860 and Tr. 861, Lines 23–25 and Tr. 862, Lines 1–4). This bank is shown in DX60 to have 21.2% of the total deposits of that state whereas the largest bank in Mississippi, Deposit Guaranty National, holds only 13.9% of the total deposits in Mississippi (Lampton, Tr. 582, Lines 1–21; DX60).

If the present merger was consummated, and the share of Mississippi's deposits held by GB, 1.02%, were added to the 25.8% of the State's deposits which the two largest banks in Mississippi, Deposit Guaranty National and FNB Jackson, presently hold, there would be no change in the ranking of Mississippi on the deposit concentration table or chart (DX60), that is, Mississippi would still be ranked 24th behind Colorado just as it presently is (Haywood, Tr. 1406, Lines 1–19).

The 137 largest banks in the United States in terms of deposit amounts (Mississippi not having a bank within the top 137) comprise 1% of the total number of banks in the United States for the years 1966–1968 and hold approximately 55% of the total deposits in the United States (DX27; Haywood, Tr. 1400, Lines 8–21), whereas 14.05% of the number of banks in Mississippi hold a corresponding 55% degree of concentration within the State (Haywood, Tr. 1401, Lines 10–25).

Mississippi, as shown by PX201, has 187 unit banks (although other exhibits and testimony refer to the total number as 188). As of June 30, 1968 the average size of a Mississippi bank was only 45.4% of the average size bank in the United States. That is, 13.1 million dollars in deposits was the average for a Mississippi bank, whereas 28.9 million dollars in deposits was the average for banks in the United States as a whole

(DX39). Although the average size bank in Mississippi has been growing relative to the national trend, this has been a very modest growth (Haywood, Tr. 1381, Lines 13–25). For example, in 1968 the average size of a bank in Mississippi was still less than the average size of a bank in the United States as of the mid 1950's (Haywood, Tr. 1382, Line 12).

The loan deposit ratio for Mississippi banks for 1950, 1960, 1965 and 1968 has consistently been below the loan deposit ratio for United States banks on the average. This reflects the smaller size of the banks in Mississippi, since smaller banks tend to have lower loan deposit ratios because they cannot risk the same degree of exposure that large banks can (DX38; Haywood, Tr. 1381, Lines 3–13).

The population per bank in the United States in 1966 was 14,237; in Mississippi, 12,316; and in Leflore County, the agreed relevant geographic market herein, 10,600 (Haywood, Tr. 1386, Lines 19–25 and Tr. 1387, Lines 1–3; DX55). The last column on DX55 entitled "Personal Income Per Bank" is of even more significance than the population per bank statistic because the depth of a banking market depends not just on population but on the income which that population represents. Personal income per bank in the United States in 1966 was 42.4 million dollars; in Mississippi 21.8 million dollars (about one-half the national average); and in Leflore County, only 17.9 million dollars, considerably less even than the Mississippi average (DX55; Haywood, Tr. 1387, Lines 3–17).

DX60 reflects that there are 22 states plus the District of Columbia where the degree of concentration in the two largest banks is greater than it is in the State of Mississippi. Oregon for example has 82.8% of its deposits in the hands of its two largest banks. Thus the degree of concentration in Mississippi banking is modest compared to what it is in various other states.

Mississippi has no banks in the $500,000,000 and over deposit category. In the next category, $100,000,000 to $500,000,000, only 1.1% of Mississippi banks are represented as opposed to 2.6% of the banks in the United States. In the $50,000,000 to $100,000,000 category Mississippi has 1.1% representation compared to 3% in the United States, or about three-eighths as many banks on a percentage basis in that category. In the $25,000,000 to $50,000,000 category Mississippi is close to the national distribution (DX46; Haywood, Tr. 1385, Lines 4–20).

Deposit Guaranty National Bank of Jackson, the largest bank in Mississippi, as of December 31, 1968 ranked 166 in the nation in deposit size with FNB JACKSON, second largest in Mississippi, ranking 183rd. Significantly, Deposit Guaranty declined 11 places and FNB Jackson declined eight places in this ranking between December 31, 1967 and December 31, 1968 (DX27; Lampton, Tr. 580, Lines 9–25 and Tr. 581, Lines 1–3). It should be noted that Mississippi law permits branch offices in a bank's home county and contiguous counties and permits branch banks up to a total of 15, within a hundred mile radius of the head office or main office.[5] The branching law in Mississippi thus almost equates a statewide branching law, and yet, in terms of the size of its largest banks, Mississippi ranks far below two unit banking states, Colorado and Illinois, and below at least three other states where limited area branching is more restricted than in Mississippi.

In connection with the growth of banks in Mississippi and in comparing them with each other, PX202, titled "Concentration of Total Deposits in the Five Largest Banks in Mississippi, Year End 1949–1967," it is seen that the five largest banks did not remain the same over this 18 year period. They were lo-

---

5. Miss.Code Ann. sec. 5229 (1942).

cated in seven cities in Mississippi, Biloxi, Cleveland, Greenville, Gulfport, Jackson, McComb and Tupelo (Haywood, Tr. 1397, Lines 1–25 and Tr. 1398, Lines 1–24). DX43, a table or chart titled "Population of Incorporated Places of 10,000 or more in 1960" which also shows populations for 1940, 1950, and 1965, gives a far better perspective to PX202. It lists 18 cities with populations of 10,000 or more in 1960 which grew at a somewhat faster pace than the state as a whole, namely an average growth of 28.53% from 1950 to 1960. Four of these cities, Biloxi, Cleveland, McComb and Tupelo, grew at a faster pace than the average for the whole 18 cities from 1960 to 1965. The banks located in the rapid growth cities in comparison to the rest of the state grew faster than the banks in the state as a whole, so the increase in concentration shown in PX202 primarily reflects the structure of growth in the state so far as population, personal income and related matters are concerned. Looking at DX43 we find that between 1940 and 1950 Greenwood, which is not one of the "rapid growth areas" noted above, showed an increase in population of 22.-31%, whereas the 18 "rapid growth areas" altogether showed an increase of 41.02%. From 1950 to 1960 Greenwood showed an increase of 13.1% compared to 28.53% for these 18 other cities. From 1960 to 1965 Greenwood had an increase of 12.55% compared to 16.54% for the 18 cities as a whole. In summary, throughout this period Greenwood grew at a somewhat slower pace than the 18 other cities, which shows it to be a growing area but not a rapidly growing area. DX65 shows the same picture of growth for the counties in which the cities shown in DX43 are located, and the general picture is the same (DX43; DX65; PX202; Haywood, Tr. 1397, Lines 1–25, Tr. 1398, Lines 1–25 and Tr. 1399, Lines 1–14).

There were only three cities in Mississippi as of December 31, 1967 which had as many as four banks, namely, Jackson, Biloxi and Greenwood. Biloxi's population was more than twice that of Greenwood and Jackson's more than twice that of Biloxi so that Greenwood is the smallest town in the state which has four banks. Moreover, Biloxi has only two head offices or main offices, the other two being branches of banks with head offices in Gulfport. Two banks in Jackson have branches outside that city and county, so Greenwood is the only city in the state where there are four head bank offices with no branches outside Greenwood, drawing from and relying on the business in Leflore County alone. Therefore, we have in sharp focus the fact that there is a relatively large number of banks in Greenwood in relation to its economic base as compared with other communities in the State (DX29; Haywood, Tr. 1408, Lines 14–25 and Tr. 1408, Lines 1–25 and Tr. 1409, Lines 1–8).

FNB Jackson maintains correspondent bank relationships with all banks in Mississippi with the exception of ten or twelve (Hearin, Tr. 547, Lines 5–12). Banks in Jackson have competed for many years with Memphis and New Orleans banks in the maintenance of correspondent bank balances with other Mississippi banks and this is one of the reasons for the cliche that "Mississippi has helped to build two cities, Memphis and New Orleans." This cliche points up the fact that by virtue of the close proximity of Memphis and New Orleans to the northern and southern boundaries of Mississippi, respectively, banks in these cities have drawn heavily from Mississippi business because of the insufficient size of Mississippi's largest banks to provide the services required (Lampton, Tr. 570, Lines 15–25 and Tr. 571, Lines 1–10). There are more correspondent bank balances of Mississippi banks in Memphis banks, and in New Orleans banks, than there are in Jackson banks (Hearin, Tr. 529, Lines 1–12). Mr. Horace Steele, Mississippi State Bank Comptroller, testified that because Mississippi is a capital deficit state it has to go outside the state to obtain its necessary capital, which results in more

money *going outside the state than is* coming in, as depicted in the cartoon admitted in evidence as IX7. FNB Jackson, according to its last statement, had approximately $40,000,000 in correspondent bank balances, while banks in Memphis have approximately $40,-000,000 in reserve from Mississippi banks alone (Steele, Tr. 475, Lines 4–16 and Tr. 476, Lines 1–25 and Tr. 477, Lines 1–25 and Tr. 478, Lines 1–25).

With the above necessary background *information in mind, we will now turn* to the issue at hand. Keeping in mind the proper test to be utilized, as found in the appropriate and hereinabove discussed statutory law and regulations, as well as *the established case law, we will* attempt to determine the ultimate question of whether the proposed merger between the Defendant banks would constitute a violation of Section 7 of the Clayton Act now or within the reasonably foreseeable future, having the effect substantially to lessen competition, actual or potential, or tend to create a monopoly.

## THE APPROPRIATE AND RELEVANT "GEOGRAPHIC MARKET"

All of the parties have stipulated and agreed that Leflore County, Mississippi is the appropriate or relevant geographic market or *"section of the country"* within which to appraise the anti-competitive effects of the proposed merger (Agreed Contested Issues of Fact and Law; The Court, Tr. 37, Lines 2–6 and Tr. 82, Lines 13–17; Roache, Attorney for Intervenor, Tr. 4, Lines 8–10 and Tr.

20, Lines 1–4; Stipulation, Tr. 347, Lines 20–24).

## THE RELEVANT OR APPROPRIATE "LINE OF COMMERCE" OR "PRODUCT MARKET"

■ In view of the fact that the relevant geographic market is Leflore County, the next matter to be considered and resolved in determining whether the merger is one in violation of Section 7 of the Clayton Act is the appropriate line of commerce within which to measure the probable anti-competitive effects, if any, of the proposed merger.

This Court is mindful of the fact that in United States v. Philadelphia National Bank, 374 U.S. 321, 356, 83 S.Ct. 1715, 1737, 10 L.Ed.2d 915 (1963), the Supreme Court held under the particular circumstances of that case at the time it was decided, that "the cluster of products (various kinds of credit) and services (such as checking accounts and trust administration) denoted by the term 'commercial banking' * * * composes a distinct line of commerce." The Court in *Philadelphia* also stated as did Plaintiff's witness, Dr. Golden,[6] that among all financial institutions the demand deposit and check clearing functions of commercial banks are unique and entirely free of effective competition from products or services of other financial institutions. Id. 356, 83 S.Ct. 1715 (Golden, Tr. 178, Lines 1–20). The Supreme Court in *Philadelphia* placed great significance on the fact that

* * * there are banking facilities which, although in terms of cost and

6. Dr. Golden is an associate professor of Banking and Finance at the University of Tennessee. He holds a law degree from the University of Tennessee and M.A. and Ph.D. degrees from George Washington University, in the District of Columbia. From 1949 to 1958 Dr. Golden served on the faculty at Tennessee Technological University, and from 1960 to 1966 he served on the faculty at the University of Tennessee, where he now teaches. His teaching experience has encompassed the fields of money and banking. During the years 1958 through 1960 Dr. Golden was on leave from Tennessee Tech and served on the staff of the Senate Antitrust and Monopoly Subcommittee. In 1961 he served as a trial attorney in the merger division of the Federal Trade Commission. During the years 1966 to 1968 Dr. Golden was employed as senior economist with the Federal Reserve Board in Washington, in the Banking Markets section of that agency. He has done "some writing" for periodicals in the field of commercial banking and co-authored a text book in that field. (Tr. 174–177)

price they are freely competitive with the facilities provided by other financial institutions, nevertheless enjoy a settled consumer preference, insulating them, to a marked degree, from competition; this seems to be the case with savings deposits.[34] In sum, it is clear that commercial banking is a market "sufficiently inclusive to be meaningful in terms of trade realities (citing Crown Zellerbach Corp. v. Federal Trade Comm'n, 296 F.2d 800, 811 C.A. 9th Cir. 1961). 374 U.S. at 356–357, 83 S.Ct., at 1738

In Footnote 34 the Court quoted from the testimony of a witness for the Defendant who stated that, although savings banks offered one-half percent or more higher interest than commercial banks on savings accounts, nevertheless the rate of increase in savings accounts in commercial banks had kept pace with and in many banks exceeded the rate of increase of the mutual banks paying three and one-half percent * * * because "there isn't anybody in Philadelphia who would take the trouble to walk across Broad Street to get ½ of 1 percent more interest. If you ask me why, I will say I do not know. * * *" Certainly this is not the case today because there has been a large increase in the savings deposits of savings and loan associations and other savings institutions which now offer a substantially higher interest rate than do commercial banks on savings deposits, as will be more extensively discussed below. The "Philadelphia situation" thus has changed, if in fact such situation ever existed, in the Mississippi money market.

But to conclude that commercial banking is a distinct "line of commerce" be-

cause banks are in the check-clearing business is erroneous in view of the fact that savings and time deposits have become a more important source of funds to commercial banks today than demand deposits. During the last decade, for example, savings and time deposits in commercial banks increased by about $126 billion dollars and demand deposits increased by only $66 billion dollars, or, in other words, time and savings deposits are now almost twice as important to commercial banks as a source of funds as demand deposits. It must also be observed that reserve requirements are lower on savings and time deposits than on demand deposits and therefore banks derive more lendable funds dollar for dollar out of savings and time deposits than from demand deposits (Haywood, Tr. 1501, Line 16 and Tr. 1502, Line 11).

While it is well established that commercial banking is unique among financial institutions in that banks may accept demand deposits,[7] it does not necessarily follow that under the BMA–66 (12 U.S.C.A. sec. 1828(c) (5) (B)), the *totality of financial activities* carried on by *commercial banks and their competition* in a particular market can be ignored in determining the appropriate line of commerce within which to measure the anti-competitive effects of a bank merger in local markets.

The Supreme Court in United States v. Third National Bank in Nashville, 390 U.S. 171, 182, 88 S.Ct. 882, 19 L.Ed.2d 1015 (1968) said that the omission of the phrase "in any line of commerce" from section 5(b) of said act evidenced no intention on the part of Congress to alter the traditional methods of defining relevant markets within which to ap-

---

7. See United States v. Crocker Anglo National Bank, 277 F.Supp. 133, 153 n. 13 (N.D.Calif.1967): " * * * checking accounts are sort of a loss leader. * * * As a matter of practical experience, time deposits in a savings and loan association or commercial bank are the equivalent of demand deposits in that both are paid on demand. The only practical difference between demand deposits in a commercial

bank and a time deposit in commercial banks and savings and loan associations relates to the procedure by which those deposits are withdrawn. In the case of a demand deposit in a commercial bank the procedure consists in the use of checks, whereas with a savings and loan or time deposit, the intervening procedure consists in presenting the necessary documents at the place of deposit.

praise the anti-competitive effect of a merger, and agreed with the District Court in that case that commercial banking in Davidson County was the relevant market for appraising the merger in question therein. This Court finds that the above statement by the Supreme Court was an affirmation of the trial court's determination that, under the *particular* facts and circumstances of that case, commercial banking was the appropriate line of commerce within which to measure the impact or anti-competitive effects, if any, of the proposed merger therein. This Court does not believe that the Supreme Court would disagree with this Court's opinion that commercial banks must not be placed in a distinct and separate category to the exclusion of any and all other financial institutions which *actually* are competing *substantially* with commercial banks in various important or integral activities within the relevant geographic market. This would be completely contrary to the intent and purpose of the Clayton Act and would be contradictory and contrary to many of the decided cases such as United States v. Provident National Bank, 280 F.Supp. 1, 9 (U.S. D.C.E.D.Penn.1968). In that case, the Court considered the relevant line of commerce as including not just commercial banking, but other financial institutions (mutual and savings and loan associations), because they offered *direct* and *meaningful* competition to commercial banks. In reaching such a conclusion, the *Provident* Court relied upon the Supreme Court's ruling in United States v. Continental Can Company, 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964).[8] In the instant case, the same reason exists since commercial banks experience actual competition in Leflore County from other financial institutions which is *actual, fierce, direct* and *meaningful*. As the Court stated in *Provident*:

> If such interchangeability can be used negatively in antitrust jurisprudence, surely the same concept can be used positively. The underlying question remains the same in each instance, i. e. to construct reasonable product markets in which to measure probable competitive effects realistically.

Despite this Court's finding of fact that certain other hereinafter mentioned non-banking financial institutions have been and are actually, directly, realistically, meaningfully and fiercely competing with commercial banks in the Leflore County market, and particularly Greenwood, leading it to conclude as a matter of law that the relevant line of commerce in this particular geographic market is broader than commercial banking, nevertheless this Court emphasizes that were it to confine its consideration of the facts in this case to commercial banking as the sole, relevant line of commerce or product market, and thus accept Plaintiff's interpretation of subparagraph (B) of 12 U.S.C. section 1828(c) (5), it would still make the same basic findings herein made and reach the same conclusion that it hereafter reaches with reference to whether the proposed merger now or within the reasonably foreseeable future will probably have the effect of substantially lessening competition, actual or potential, and thus tend to create a monopoly.

The Court finds as a fact that in the relevant geographic market there have been and are other financial institutions competing for the savings or investment dollar and extension of credit, two essen-

---

8. In the *Continental Can* case, the nation's second largest producer of cans decided to merge with the third largest producer of glass containers. There the Court found that Section 7 is not limited to identical products and lumped together the glass and container industries into one product market. It did so realizing the only actual competition between these two industries was primarily in the beer market, although potentially, they were competitors in broader markets. The Court emphasized cross-elasticity of demand and interchangeability of use as its reason for doing so.

tial activities or functions of the commercial bank.

Plaintiff's expert, Dr. Joseph Carroll Golden, testified that in his opinion commercial banking is the sole relevant line of commerce in Leflore County. Upon this opinion, two of Plaintiff's other expert witnesses, Drs. Samuel Richardson Reid [9] and Kenneth Gerald Elzinga,[10] premised their conclusions and opinions (Reid, Tr. 91, Line 25 and Tr. 92, Lines 1–3; Elzinga, Tr. 277, Lines 3–4). However, not one of these experts called by Plaintiff had visited Leflore County or Greenwood, Mississippi, nor had they talked to any bankers or other businessmen or customers of the banks in Leflore County. Rather, than formed their opinions and conclusions from an examination of the documents submitted to them by Plaintiff's attorneys and subsequently admitted in evidence in this case. On the other hand, all of Defendants' experts, including its principal expert witness, Dr. Charles Foster Haywood,[11] were personally familiar with the Leflore County area. While at the University of Mississippi from 1958 to 1963, Dr. Haywood served on various committees of the Mississippi Economic Council and made a thorough study of the State's resources and its outlook from the standpoint of economic development (Tr. 345, Lines 8–19). Within the past year he has, for the National Association of Supervisors of State Banks, completed a study of banking regulation at the State level and how such regulation might be strenthened (Haywood, Tr. 345, Lines 23–25 and Tr. 346, Lines 1–2). He has been in the Greenwood and Leflore County area "a number of times", has talked to bankers and is personally acquainted with the top one or two officers of each of the banks in Leflore County (Haywood, Tr. 364, Lines 19–25 and Tr. 365, Line 1). In addition, he has talked to many customers, including businesses served by the Leflore County banks (Haywood, Tr. 365, Lines 2–7). Dr. Haywood has impressed this Court with his knowledge of the Leflore County area and its banking structure, and with his expertise in the fields of economics and banking. This witness testified intelligently, clearly, forcefully and without equivocation and knows whereof he speaks.

Dr. Haywood rejected the argument advanced by Plaintiff's experts that commercial banking is a unique or distinct line of commerce in the particular relevant geographic market of Leflore County, and was of the firm opinion that the appropriate or relevant line of commerce in this particular relevant geographic market is broader than commercial banking because of the hereinafter stated reasons. The generalization about the "line of commerce" or "prod-

9. Dr. Reid is assistant professor of finance at the University of Illinois. He gained his Ph.D. in economics and administration at Amherst University, having done graduate study at the University of Minnesota. Since graduation he has done post-graduate work at the University of Chicago and at Carnegie Institute in banking. Prior to his affiliation with the University of Illinois, he was a professor at Connice College in Buffalo, New York and a lecturer in graduate work at Parks College, University of Missouri. His teaching has been in the fields of money and banking and business finance. He is the author of a book published last year by Mc-Graw-Hill Book Company entitled *Mergers, Managers and the Economy*, a publication which was rated by McKenzie Publications as one of the best five books written in that field last year. He has also authored several articles appearing in banking and economics journals.

10. Dr. Elzinga is assistant professor of economics at the James Wilson Department of Economics at the University of Virginia. He received his M.A. and Ph.D. degrees in economics from Michigan State University, where he was a Woodrow Wilson Fellow. He at one time was an employee of the Senate Antitrust and Monopoly Subcommittee and was in residence at the Federal Trade Commission under a Ford Foundation grant, though not an employee there. He has published writings in the areas of antitrust and economics, including a recent article entitled "Mergers, Their Causes and Cures" in the Antitrust Law and Economics Review.

11. See Note 3, *supra*, for Dr. Haywood's qualifications.

uct line" as it may relate to commercial banking is not meaningful unless it is related to a specific geographic market. In order to determine the appropriate or relevant line of commerce it is necessary to look at the economic characteristics of the market, who the lenders are therein, etc. Then, and only then, can it be determined what the *actual* line of commerce or product line in that market is by determining who *in fact* are the competitors therein. This is a matter that cannot be determined in the abstract.

In so considering a broader line of commerce than commercial banking, if in fact the true picture in Leflore County evidences substantial and real competition between commercial banks and other non-banking financial institutions, this Court is aware of the fact that commercial banks are the only financial institutions permitted by law to accept demand deposits and transfer legal title to the deposits upon the written order of the depositor. However, the interrelationship of all these services is not so tightly bound or localized to preclude meaningful and direct competition from other financial institutions within or without the relevant geographic area. United States v. Provident National Bank, *supra*, 280 F.Supp. at p. 8.

As substantially stated in the competitive factors report of the Federal Reserve Board on the application to merge of FNB Jackson and GB, which report Plaintiff's expert, Dr. Golden, examined and helped formulate, Dr. Golden agreed that competition for the commercial banks in the Greenwood area is afforded by three savings and loan associations, a credit union, five sales finance companies and six personal loan companies (Golden, Tr. 252). He also agreed in this report that the Staple Cotton Cooperative Association and affiliated companies, the Staple Cotton Service Association, and the Staple Cotton Discount Association, all located in Greenwood, compete with commercial banks in the field of agricultural credit, including production loans and cotton loans (Golden, Tr. 252–253).

There has been a considerable decrease in the ratio of demand deposits to time or savings deposits in commercial banks, and specifically, in GB there now exists roughly a 50–50 ratio between savings and demand deposits (Miller, Tr. 659, Lines 3–15), which indicates an increase in savings deposits or time deposits in GB. Therefore, one half of its total deposits are subject to competition not only from other commercial banks, but also from non-banking financial institutions. It should be noted that GB exacts a minimum service charge which falls far short of covering the cost incurred in handling demand deposits. Thus demand deposits cost GB, just as savings or time deposits do (Miller, Tr. 659, Lines 10–15 and Tr. 660, Lines 1–16), despite the fact that the law forbids payment of interest on demand deposits (Miller, Tr. 659, Lines 20–21).

Since there is a *reasonable* interchangeability and meaningful competition for the savings dollar and credit extension in Leflore County, including mortgage loans, such competition from other financial institutions must be considered in order to get a true picture of the competitive situation. The factor of convenience, which predominates in retail banking, does not alter this conclusion because offices of non-banking financial institutions are as widespread and convenient as commercial banking offices are today, and in some cases they are even more convenient. *Cf.* United States v. Provident National Bank, *supra*, 280 F.Supp. at pages 8–9.

The testimony of Dr. Haywood and Defendants' Exhibits—26, 57, 58 and 66 (publications of the Federal Reserve System (known as "FED") for the third quarter of 1968) give the best insight of any available data into the nature of our national financial system and the structure of financial markets in this country which are pertinent to the question of "line of commerce" in this case.

## STRUCTURE OF FINANCIAL MARKETS IN THE UNITED STATES

Many of the above exhibits are titled "Flow of Funds" (Haywood, Tr. 1445, Lines 13–25 and Tr. 1446, Lines 1–2; DX5–26, 57, 58 and 66). The Flow of Funds tables were referred to by Dr. Golden on cross examination when he testified for Plaintiff, and he admitted that commercial banks in Leflore County experienced competition in the Greenwood area from non-bank financial institutions, although he tried to explain his admission concerning this competition by stating that it was a question of the degree thereof. Many years were spent by the "FED" developing these tables which serve as a means of analyzing financial developments in this country and which are responsible for the paragraph concerning "Other competition" from non-bank financial institutions appearing in the FED's Report (Haywood, Tr. 1466, Lines 11–25 and Tr. 1467, Lines 1–12).

The Flow of Funds tables indicate that commercial banks compete with many other financial institutions, including savings and loan associations, mutual savings banks, life insurance companies, credit unions and pension funds (Haywood, Tr. 1446, Tr. 1454–1455; DX5, 8, 13).

DX5 was taken from the February, 1969 issue of the Federal Reserve Bulletin prepared by the Board of Governors of the Federal Reserve System, whose research staff attempted to obtain as broad a view of the financial system of this country as possible. This exhibit establishes that households in the third quarter of 1968 distributed 55.1 billion dollars to financial uses upon an annual rate basis, of which 15.7 billion dollars went to increase their holdings in demand deposits and currency; 31.9 billion dollars were placed into time and savings accounts which was split 18.3 billion dollars to commercial banks and 13.6 billion to savings institutions including mutual savings banks, savings and loan associations and credit unions; 4.8 billion dollars went into life insurance reserves; and 15.9 billion dollars went into pension fund reserves (DX5; Haywood, Tr. 1447, Lines 10–25, Tr. 1448, Lines 1–17). These tables indicate that commercial banks compete with many other financial institutions, including savings and loan associations, mutual savings banks, life insurance companies, credit unions and pension funds (Haywood, Tr. 1454). On Lines 16 and 20 in the "Uses" column of DX5 it is seen that businesses reduced their holdings of demand deposits and currency by 6.3 billion dollars and increased their holdings in time and savings deposits in commercial banks by 9.9 billion dollars, a substantial substitution on the part of businesses of holdings of demand deposits for holdings of savings and time deposits because of the availability of higher interest rates. Line 25 illustrates that businesses increased their holdings of credit market instruments by 7.8 billion dollars and also shows that they increased their extensions of consumer credit by three billion dollars, an interesting fact because it shows that even non-bank financial businesses compete in the consumer credit market. Line 35 shows that non-bank financial businesses increased their holdings of open market paper (commercial paper used when a business sells paper in the open market trying to raise funds) by 5.2 billion dollars and thus we note that non-bank financial businesses lend in the open market to other businesses. Therefore, one would have to ignore vast statistical evidence to the contrary if one says that commercial banks are the only source of short-term credit.

Next, in the "Commercial Bank" column and "Non-Bank Finance" column of DX5 a comparison is made of how commercial banks and non-bank financial institutions compete in the purchase of various securities in the credit market. Line 25 shows that commercial banks put 51.3 billion dollars into the credit markets, while non-bank financial institutions put 52.3 billion dollars in such markets. Line 26 shows that both types of institutions increased their

holdings of U.S. Government securities and Line 27 shows that both types of institutions increased their holdings of state and local government obligations. On the "Sources" side it is seen that in almost every category commercial banks competed against non-bank financial institutions for the purchase of bonds, in making loans and in various other kinds of credit extensions. Line 33 or "Bank Loans N.E.C." (not elsewhere classified), which includes loans to businesses, points out that "Bank Loans N.E.C." are competitive to a considerable extent with open market paper, shown on Line 35. All of this gives us a picture of how commercial banks interrelate with other financial institutions in the very complex financial system existent in this country. The third page of this Exhibit (Page 69.2) illustrates that most commercial banks compete with savings institutions for savings and time deposits, with various kinds of holdings in the purchase of U.S. Government securities, and with other agencies and institutions in the purchase of other types of securities. The last column on page 5 (1968 III) for the third quarter of 1968 shows bank loans to financial institutions increased by 5.7 billion dollars, whereas Line 18 shows that other loans from sources other than banks increased by 9.5 billion dollars. Line 19 points out that trade credit (where a supplier sells to another business on credit), increased by 13 billion dollars. It is to be noted that trade credit increased by twice as much as bank loans in this particular quarter. Line 9 in the 1965 column shows that at the end of 1965 trade credit was about a third greater than bank loans so far as sources of short-term credit to businesses are concerned. It can easily be seen that small businesses, and particularly small retail businesses, rely heavily upon the trade credit. In view of the foregoing statistical data, it is this Court's opinion that when Dr. Golden testified for the Plaintiff that commercial banks are the only source of short-term credit to business, he was absolutely mistaken.

DX8–13 provide further statistical information on the existence and extent of competition between commercial banks and non-bank financial institutions (Haywood, Tr. 1457, Lines 14–16).

DX14, titled "Open End Investment Companies", or mutual companies, shows the extent of the growth of non-bank financial institutions, which is often overlooked. They are competitive with commercial banks in several respects, competing for the savings dollar and time money of households, competing with trust departments of commercial banks, and competing with the latter in the purchase of government securities, corporate bonds and mortgages (Haywood, Tr. 1458, Lines 1–3 and Lines 22–25 and Tr. 1459, Lines 1–11). This exhibit also shows that in twelve years these open end investment companies, or mutuals, increased their size by five times—from $9,046,000,000 in 1956 to $52,677,000,000 in December, 1968, a fantastic rate of growth. Dr. Haywood is of the opinion that commercial bankers should be worried more about competition from open end investment companies in the next fifteen years than about competition from savings and loan associations. (Haywood, Tr. 1458, Lines 1–25 and Tr. 1459, Lines 1–11 and Tr. 1460, Lines 1–6).

DX15–17 provide further information on the range of competition facing commercial banks, particularly in the field of installment credit. DX18 is of particular importance because it lists federal credit agencies which compete with private institutions in the financing of agricultural activity, purchase of farm lands, construction of farm dwellings and purchase of other type residences. The last three major columns in DX18 show the total credit outstanding of banks for cooperatives, the federal intermediate credit banks, and the federal land banks of between eleven and twelve billion dollars. These institutions are under the direction of the Federal Credit Administration, an independent agency of the federal government, and are of particular significance in this case be-

cause the largest financial institution in Greenwood is the Staple Cotton Discount Corporation, which obtains approximately 80 per cent of its funds from the Federal Intermediate Credit Bank in New Orleans. The latter bank is also the major source of funds for Greenwood Production Credit Association. Both the Discount Corporation and the Production Credit Association are major competitors of commercial banks within the relevant line of commerce in Leflore County.

DX19 indicates that commercial banks in Mississippi engage in the same general types of activities as commercial banks generally. DX22 lists insurance companies authorized to do business in this state, which are very important competitors of commercial banks. DX23 is a letter to Dr. Haywood from Mr. Hawkins, Deputy Secretary of State of the State of Mississippi, indicating that there are 221 investment companies in the State of Mississippi offering mutual type funds or securities.

DX57 lists the financial institutions doing business in Leflore County, namely, five commercial banks; four savings and loan associations; one credit union; several financial companies including the giants in the finance company business, Universal C. I. T., Commercial Credit Corporation, and General Motors Acceptance Corporation; several life insurance companies; and securities brokers and dealers. Although there are no open end investment companies, shares thereof can be bought through brokers. Additionally, there are the federal credit agencies and affiliated organizations, Federal Land Bank, Farmers Home Administration, Greenwood Production Credit Association, and Staple Cotton Cooperative Association (Haywood, Tr. 1464, Lines 16–25 and Tr. 1465, Lines 1–8).

DX58, which shows the count of chattel mortgages recorded in Leflore County from July 1968 to January 1969, indicates that Leflore County banks recorded chattel mortgages on automobiles, farm equipment and crops as did other competitors. For example, finance companies recorded 1282 chattel mortgages on automobiles, compared to 449 for the five Leflore County banks, which is good evidence of competition between the banks and finance companies and other types of lenders in the Leflore County area. Production Credit Association in Leflore recorded 56 chattel mortgages on crops, whereas Leflore County banks recorded six such mortgages (Haywood, Tr. 1465, Lines 9–25 and Tr. 1466, Lines 1–2).

DX26 indicates that the banks in Leflore compete in essentially the same markets as banks in the State of Mississippi and the nation, or, in other words, the above analysis of the market structure or line of commerce nationally is generally applicable in Leflore County, because the banks there face much the same kind of competition as they do nationally (Haywood, Tr. 1464, Lines 7–15).

GB has had primary competition in Leflore County for savings or investment dollars and credit extensions from the Federal Savings and Loan Association at Greenwood, which is the largest of two or three savings and loan associations operating there and which has deposits of approximately ten to twelve million dollars (Miller, Tr. 657, Lines 7–14).

Mr. W. C. Neill, President of Leflore Bank and Trust Company, testified that the other three banks in Greenwood, including GB, the savings and loan associations, and insurance companies compete with Leflore Bank and Trust Company for time deposits in Leflore County (Neill, Tr. 1212, Lines 15–18). Also GMAC, CIT, all the other local banks, and other banks in the area, compete with Leflore Bank and Trust Company in making automobile loans (Neill, Tr. 1213, Lines 23–25).

Commerical paper for financing John Deere Implements goes partly to John Deere Company, partly to GB and is partly handled by Wade Incorporated,

the John Deere Implement dealer in Greenwood (Wade, Tr. 1192, Lines 20–25 and Tr. 1193, Lines 1–2).

Competitors for the commercial paper generated by credit sales of International Harvester Implements at Greenwood sold by the Johnson Implement Company are First National Bank of Greenwood, GB, the International Harvester Credit Corporation and the Commercial Credit Equipment Company (Johnson, Tr. 1163, Lines 6–12).

DX66, titled "Agricultural Loans by Major Types of Lenders, Amounts Outstanding, January 1966–68 for the United States and Mississippi", shows that agricultural loans by commercial banks in Mississippi equal 14.2% of the total loans as compared to only 5.3% nationally, but even with this high proportion of loans in the agricultural field, the banks in Mississippi have been accounting for only approximately 25% of the total credit made available to agriculture. The Government lending agencies and their affiliated organizations, beginning with Production Credit Association and going on down to the Farmers Home Administration, have accounted for approximately 52% of the agricultural loans in Mississippi (Haywood, Tr. 1468, Lines 1–24 and Tr. 1469, Lines 1–2).

Generalizations about the "Product line" are not meaningful unless related to a *specific* geographic market. Unless we look at the market and its economic characteristics, we cannot ascertain the actual product line or line of commerce as compared to some abstract definition thereof. It is necessary to look at the *specific* market in the relevant geographic area to find out who *in fact* are the competitors therein. GB competes in the extension of agricultural loan credit with the agricultural lending agencies of the Federal Government. According to Mr. Miller, Executive Vice President of GB, these agencies have "just about put us out of the agricultural lending business." (Miller, Tr. 657, Lines 15–25 and Tr. 658, Lines 1–13). Leflore Bank and Trust Company competes with the Staple Cotton Discount Corporation and the Greenwood Production Credit Association for the making of agricultural production loans (Neill, Tr. 1213, Lines 12–15). The Staple Cotton Discount Corporation, an affiliate of Staple Cotton Cooperative (Sayre, Tr. 987, Line 25, and Tr. 988, Line 2), does an annual volume of financing in the area of the Mississippi Delta of approximately thirty to thirty-two million dollars (Sayre, Tr. 933, Lines 17–18). Both the Staple Cotton Discount Corporation and the Greenwood Production Credit Association obtain the major portion of their funds from The Federal Intermediate Credit Bank in New Orleans. The Federal Land Bank makes funds available to the Federal Land Bank Association in Leflore County for financing the purchase of farm land. The Bank for Cooperatives in New Orleans makes loans through the Staple Cotton Cooperative Association to help finance the marketing of cotton. The Court finds that these are very important elements in the relevant line of commerce in Leflore County (Haywood, Tr. 1461, Lines 11–24). Furthermore, Dr. Haywood expressed the opinion that the expert witnesses called by Plaintiff took no note of the special problems of financing agricultural activities in Leflore County, the major industry there, with the exception of Dr. Golden, who admitted that he did not understand how cotton loans were made by GB (Haywood, Tr. 1467, Lines 11–16). Yet, these cotton loans account for approximately half the total loans made by GB, "and if you take those cotton loans out of the Bank of Greenwood, you don't have much of a bank." (Haywood, Tr. 1469, Lines 17–21).

The Leflore County economy thus has many characteristics which set it apart from other geographical areas wherein it may be that commercial banking is a distinct line of commerce (Haywood, Tr. 1470, Lines 12–18). For instance, the largest financial institution in Greenwood is in fact the Staple Cotton Discount Corporation, an affiliate of the Staple Cotton Cooperative Association

(Haywood, Tr. 1470, Lines 15–18) which had a peak loan volume last year of approximately $41,000,000. Production Credit Association in Greenwood had peak loans last year of approximately $15,000,000; and the Federal Land Bank Association has been lending somewhere between $500,000 and $2,000,000 a year in new loans in the Leflore County area. In addition, many loans are being made by First Federal Savings and Loan Association and the finance companies competing with commercial banks in Leflore County (Haywood, Tr. 1472, Lines 1–5).

In conclusion, the appropriate or relevant product market or line of commerce in Leflore County includes the five commercial banks, the Staple Cotton Discount Corporation, the Staple Cotton Cooperative Association (in terms of financing of marketing of cotton), the Production Credit Association, the Federal Land Bank Association, the finance companies, and the savings and loan associations, particularly First Federal Savings and Loan Association of Greenwood.

The various non-bank financial institutions operating in Leflore County, the relevant geographic market, make loans in the range of $80,000,000 as compared to about $60,000,000 in bank loans in Leflore County. The appropriate line of commerce, in Dr. Haywood's opinion, would include approximately $140,000,000 in assets in Leflore, $80,000,000 of which is in non-bank financial assets and competing institutions with $60,000,000 in commercial bank assets. This greatly dilutes the concentration ratio of GB to, in Dr. Haywood's opinion, approximately 19%.

We reiterate and re-emphasize that were the Court to confine its consideration of the facts of this case to commercial banking as the sole relevant line of commerce or product market, closing our eyes to actual, real, existing and fierce competition from the above non-banking financial institutions in Leflore County, and thus accepting the Plaintiff's interpretation of 12 U.S.C. section 1828(c)

(5) (B), we would still make the same basic findings herein and reach the same conclusions which we hereafter make in our determination of whether or not the proposed merger of the Defendant banks is proscribed by Section 7 of the Clayton Act, that is, whether it now or within the reasonably foreseeable future will have the effect substantially to lessen competition, actual or potential, or tend to create a monopoly.

Now having determined the relevant geographic market in this case to be Leflore County and having determined that the relevant and appropriate line of commerce or product market in this case is not only commercial banking but also the foregoing non-bank financial institutions which are substantially, realistically and actually competing with commercial banking for savings and credit extension in the relevant geographic market, it devolves upon us to decide the crucial question of whether or not the proposed merger between FNB Jackson and GB is anti-competitive within the meaning of Section 7 of the Clayton Act.

### ACTUAL COMPETITION BETWEEN FNB JACKSON AND GB IN THE RELEVANT MARKET

The parties have admitted and agreed through stipulation that the Defendant banks are not engaged in business in the same geographic market and that there is no substantial actual competition between them (Tr. 7, 9, 11), and that FNB Jackson is not a competitor in the Leflore County market with GB or any other bank therein (Tr. 212–214, 220, Lines 21–25 and Tr. 221, Lines 1–3, 348, 801, 871, 975).

### CONCENTRATION IN THE GEOGRAPHIC AND PRODUCT MARKET

Concentration is a function of a market, and is to be gauged by its effect on competition generally in an economically significant market. Brown Shoe Co. Inc. v. United States, 370 U.S. 294, 335, 82 S.Ct. 1502, 1529, 8 L.Ed.2d 510 (1962). Unless they relate to a market,

both in the geographic sense, figures purporting to show concentration ratios are meaningless. Bank performance is not a simple one-dimensional concept to define and measure in operational terms, since there are a number of different groups interested in various aspects of bank activity (Reid, Tr. 100–100a).

 A merger has an anti-competitive effect if it confers market power upon or augments market power of existing firms in the relevant market. Market power is defined as control over price, resulting in higher prices to the consumer.

There is no free entry into banking, a highly regulated industry, so that some of the conventional market place tests of business firms are not directly applicable, according to Dr. Reid, an expert witness for Plaintiff (Reid, Tr. 103–104). The term "regulated industry" has a precise meaning in the language of economists. It means industry that is highly concentrated or tends to monopoly and which must be regulated to prevent monopoly from developing or to control any monopoly which should develop. In that sense, the term is not applicable to commercial banking since commercial banking does not tend to monopoly, if free market forces are allowed to prevail. This is borne out by the long history of banking (Haywood, Tr. 1363). The tools of analysis applied to industries that tend to monopoly cannot be applied in a simplistic way to the commercial banking business. Specifically, concentration ratios, that is, the market shares held by a certain number of businesses in an industry are crude indicators of market power in banking. Concentration ratios therefore must be applied to banking with great circumspection, with particular appreciation of the history of commercial banking and the nature thereof. There is

considerable disagreement among economists as to the significance of concentration ratios in the field of banking and it is highly speculative to attempt to apply concentration ratios to "potential *competition*" (Haywood, Tr. 352, 1376–7, Line, 1498–9; Reid, Tr. 105–6). Dr. Reid admitted that the number of banks that should be in a particular town would depend on pricing and services, and that bank regulatory agencies would have to make this type judgment; that is, after considering concentration ratios, there is the necessity for more investigation or study, and a look at the area involved, to determine the financial status of a particular bank, whether it is healthy, and whether other banks seem to be growing. Concentration ratios tell nothing about the health of a particular bank because concentration ratios and banking health are two separate and distinct things (Reid, Tr. 171–2). An example of the inapplicability of concentration ratios to commercial banking is the existence of towns having but one or two banks, of which there are many in Mississippi.[12] Obviously the concentration in such towns is high, but in order to determine whether an additional bank is needed, a close look must be taken at the community, its economic base, the likelihood that the economic base would expand, the extent of any likely increase, and whether a projected increase in the economic base would be sufficient to support an additional bank without weakening the existing bank or banks in the community. In other words, it is necessary to take the same kind of look at the banking market that is taken by the regulatory authorities, which means an on-the-scene investigation, as well as a review of all the secondary source information which can be obtained (Haywood, Tr. 1376–1379). The concentration ratio in the abstract cannot be tak-

12. According to Dr. Haywood, in Mississippi there are 244 banking places, that is, cities, towns and urban areas where there are banks or banking offices, and of these, there are 177 one-bank areas and 53 two-bank areas. It would be foolish to say that these one-bank towns which have 100% concentration need additional banking facilities unless an on the spot analysis has been made in each case. (Haywood, Tr. 1377)

en as an indicator of the existence of actual or potential market power in any case, but it is necessary to closely examine the particular and relevant geographic and product market in order to make this important evaluation.

There are five types of mergers recognized today. The first is the "horizontal merger" which is a merger between two firms who are in direct competition, that is, producing the same product lines and operating in the same geographic markets. The second is the "vertical merger" which is a merger between two firms that have a buyer-seller relationship, that is, one produces a product that is then sold to the other. The third is the "product extension merger" which is a merger between two firms that are not direct rivals but each produces a product that is functionally related either in marketing or in production to the other. The fourth is a "geographic market extension merger" which is a merger between two firms that produce the same product line but do so in separate geographic markets and are not direct rivals. The fifth is a "pure conglomerate merger" which is a residual category in which all mergers are placed that do not fit anywhere else and in which there seems to be no functional or meaningful relationship between the firms involved (Elzinga, Tr. 275–277).

The proposed merger between the Defendant banks in this case is a *"geographic market extension merger"* (Elzinga, Tr. 278, Lines 20–25 and Tr. 279, Lines 1–9), in which, according to Dr. Elzinga and apparently agreed to by the Defendants' and Intervenor's witnesses, "the concentration in both of the markets involved remains the same after the merger" because this type merger "doesn't change the concentration of the market." (Elzinga, Tr. 278, Lines 20–25 and Tr. 279, Lines 1–9, and Tr. 290, Lines 9–10). The geographic market extension merger does not alter the number of competitors that are in the relevant market or their specific locations and the same number of banking alternatives exist after the merger as

before. Therefore, the present restraint upon undue use of market power which exists in this market is going to continue to exist for some time after this proposed merger, that is, as long as there are five banks operating in this area, and until such time as this area might justify a new entrant which, with the exception of Dr. Reid, all witnesses agreed was not likely in the foreseeable future (Haywood, Tr. 142, Lines 1–18 and Tr. 1424, Lines 10–20). The manager of the Greenwood Production Credit Association, W. B. Eason, testified that in his opinion the merger of FNB Jackson with GB would not prevent other banks from merging into the Greenwood-Leflore market, and that this proposed merger would stimulate business and competition (Eason, Tr. 1057, Lines 12–19).

■ According to Dr. Elzinga, the type of merger involved here is of significance and interest to economists for three different reasons: (1) the immediate effect is nil upon concentration, number of firms, size and distribution of the firms in either market, that is, the concentration in both of the markets for the two firms involved remains the same after merging and in this respect this type of merger differs substantially from the horizontal merger in which one firm in the market is removed; (2) this type of merger may remove one of the firms or both of them as important potential competitors in the market of the other one; and (3) it can result in a firm of substantial size, both absolutely and relative to the industry involved, that is, the firm resulting from such a merger is not as dependent upon its performance in any particular geographic market as its more localized rivals might be, and this is the most important and significant aspect of this type merger, namely, its possible effect on potential competition (Elzinga, Tr. 278, Lines 20–25 and Tr. 279, Lines 1–24). Thus it is necessary for this Court to factually determine whether Plaintiff has proved by a preponderance of the evidence that FNB Jackson is a probable *potential*

competitor of the Defendant GB, *see* United States v. Provident National Bank, *supra,* 280 F.Supp. at page 14; United States v. El Paso Natural Gas Co., 376 U.S. 651, 659, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1963), inasmuch as one purpose of Section 7 of the Clayton Act is to arrest the trend toward concentration or monopoly, before the consumer's alternatives disappear by mergers. United States v. Penn-Olin Chemical Co., 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964); U. S. v. El Paso Natural Gas Co., *supra.*

It is necessary to analyze the specific banking market area of Leflore County and thereby arrive at a meaningful answer as to whether undue market power is present, whether it is actual or potential, and what the restraints on the market are (Haywood, Tr. 1483). The financial history of Leflore County is an important consideration in determining whether concentration ratios in this geographic market, as contended by Plaintiff, constitute undue market power. Before GB was organized in 1933, Greenwood had one bank with 100% concentration ratio. Between the time of its organization in 1933 and the formation of Leflore Bank and Trust Company in 1944, GB had 63% of the banking market in Leflore County. In that year, however, its share began to decline: to 56% in 1950; went to 50.7% in 1957; to 50.9% in 1962. After the organization of First National Bank of Greenwood in 1965, GB's share began to decline again: to 48.1% in 1965; to 47.2% in 1966 and to 46.4% in 1967. These figures show that GB's share of the Leflore market has been declining in the last several years, and, according to Dr. Haywood, it is probably going to continue to lose relative position in the relevant market because the full impact of the entry of First National Bank of Greenwood has not yet been felt. It is his opinion that the proposed merger herein will accelerate this trend away from concentration in this market, which was the case in Greenville when FNB Jackson merged with Commercial National Bank there, said merger causing First National Bank of Greenville to grow at a much more rapid rate. (Haywood, Tr. 1411–1413).

Furthermore, between December 1964 and December 1967 there was an increase of approximately 12.4 million dollars in total deposits in Leflore County. It is helpful to note the following marginal concentration ratios or marginal penetration ratios of the five banks doing business therein. First National Bank of Greenwood obtained 53% of the additional or increased deposits; GB obtained 26% thereof; Grenada Bank branch at Itta Bena, 14%; and Leflore Bank and Trust Company, 10%, which adds up to a total of 103%, so therefore the Bank of Commerce lost 3%. This very clearly illustrates that GB lost position over this period, and it is probably going to continue to lose relative position in Leflore County, because the full impact of the entry of First National Bank of Greenwood has not been felt. The proposed merger, if approved, will probably accelerate this trend away from concentration in the relevant market as it did in Greenville after the merger of FNB Jackson and Commercial National Bank of Greenville (PX168). GB's percentage share of total deposits in commercial banks in Leflore County as of June of each year declined from 1966 to 1968 (PX169), and its percentage share of savings deposits in commercial banks in Leflore County as of June of each year likewise declined from 1966 to 1968 (PX171). All of the above is illustrated by the testimony of Dr. Haywood (Haywood, Tr. 1413–1416). Clearly, therefore, GB's past market shares have, vis-a-vis the banking history of the area, shown no evidence of market power or even an appreciable potential for exercise of market power.

Dr. Samuel Richardson Reid,[13] who testified for Plaintiff after qualifying as an expert on the subject of commer-

13. See Note 9, supra.

cial banks and banking market analysis, was of the opinion that the degree of concentration of commercial banking in Leflore County is very high, assuming that the relevant line of commerce or product market is commercial banking alone. He said that this high concentration, in terms of market analysis, signifies that GB is the dominant large bank in the area and a rather powerful unit in that market (Reid, Tr. 90, Lines 17–25 and Tr. 91, Lines 1–20). It was his opinion that mergers benefit management but produce no advantages for the public, bank customers, or stockholders of the banks. On cross examination he stated that concentration ratios in themselves are not determinative of exercise of market power, but it is necessary to look at the prices banks charge, including the price schedule on demand deposits. He said that mergers produce higher price charges to regular customers. However, he agreed that some of the conventional market-place tests of business firms are not directly applicable to banking because it is a regulated industry. Furthermore, all that concentration ratio tells is the relative market power of the components that make up the market, and it is necessary to make a further study and investigation of the particular financial status of the relevant market and the health and growth of the banks therein in order to make an intelligent determination of the probable effect of any proposed merger. (Reid, Tr. 104, Lines 2–16; Tr. 131, Line 25; Tr. 132, Lines 1–14).

In contrast to the testimony of Drs. Reid, Golden and Elzinga, the three experts on whose testing Plaintiff relies, is that of Dr. Haywood and other experts who testified for Defendants. The Court notes that none of Plaintiff's witnesses had been to Leflore County nor had they talked to any of the bankers or customers therein. They had no real personal familiarity with the Leflore County market other than having examined the documents prepared by Plaintiff. On the other hand, Dr. Haywood and other experts called by Defendants, including Dr. Ben McNew, Dr. Kenneth Wagner and Mr. Horace Steele,[14] have visited Leflore County, talked to bankers and customers therein and made a detailed examination of the banking business of Leflore County. It is the testimony of the latter witnesses which the Court, as the finder of fact and judge of the weight of the testimony of witnesses in this trial, finds to be the more reliable, accurate and correct.

Dr. Haywood testified that Dr. Reid was incorrect in his assessment of the significance of the concentration ratio in Leflore County because Dr. Reid presented no evidence or substantiation that the present relative market share held by GB constitutes undue market power in the actual sense and presented no basis or framework for assessing the

---

14. Dr. Ben McNew is Dean of the School of Business Administration at the University of Mississippi and also Professor of Economics and Banking there. He holds a Ph.D. degree from the University of Texas with a major in the field of finance. He holds the Chair of Banking at the University of Mississippi and has held such position since 1961. His work experience includes a position as Assistant National Bank Examiner for the Comptroller of the Currency, serving in the Eighth Federal Reserve District which extends into the State of Mississippi. He held that position for two years and also worked for two years in the Industrial Research and Extension Center at the University of Arkansas, where he was an industrial specialist. His teaching experience has been in the area of banking and finance. He has written a book entitled Fraud Control for Commercial Banks with Dr. Charles Prather of the University of Texas and was a contributing author to The Commercial Bankers Handbook. He has also published various articles and monographs in the field of banking, and is Assistant Director of the School of Banking at Louisiana State University, which is a school for practicing bankers operating during the summer months. Dr. Kenneth C. Wagner is the Director of the Mississippi Research and Development Center. He holds a Ph.D. in sociology and anthropology from the University of Wisconsin. Mr. Horace Steele is Comptroller of Banks for the State of Mississippi.

extent of potential market power. In fact, the studies of the Federal Reserve of the market area of Appleton, Wisconsin; Elkhart, Indiana; and Cedar Rapids, Iowa, which were referred to by Dr. Reid as indicating undue market power or high concentration ratios, indicate that the vast majority of customers in those areas were satisfied and that such areas possessed a healthy banking situation. (Haywood, Tr. 419, Lines 1–6).

Although Dr. Haywood agreed with Drs. Reid and Elzinga that in order to properly assess the competitive impact of the proposed merger it was necessary to look to the future or "scan the horizon" as the Court stated in United States v. Provident, *supra*, 280 F.Supp. at page 19, to determine the probable effect thereof in the reasonably foreseeable future, he nevertheless illustrated to and convinced this Court that the proposed merger would not "unleash the Bank of Greenwood from the restraint of potential competition" to the extent that the merged bank would be able to use or make use of, now or in the reasonably foreseeable future, the market power that it would possess, in violation of Section 7 of the Clayton Act.

When compared to other areas in Mississippi, Greenwood and Leflore County have a highly competitive banking structure. The financial history of Greenwood and Leflore County indicates that the market position of GB has been in a long period of decline, thereby negating the idea that GB has undue market power, either actual or potential. It is the Court's opinion that, in this context, the concentration ration in Leflore County has very little significance. Thus, even assuming that Plaintiff has proved that FNB Jackson is a likely potential entrant into Leflore County, of which the Court found overwhelming proof to the contrary, such potential competition is a redundant force so far as restraining the exercise of market power by GB. The number of competing banks in Greenwood alone poses an effective restraint upon the use of market power by GB or any other bank that would be operating there in the foreseeable future. There are four banks in Greenwood alone which are located within a three block area so that none has a locational advantage from the competitive standpoint. Any attempt by a bank in Greenwood to exploit market power could thus be very effectively checked by the other three banks there or by any one of them. In addition, the Leflore County branch of the 80 million dollar Grenada Bank (at Itta Bena) occupies an advantageous position. It is only nine miles away from Greenwood and readily accessible by a four lane highway. No bank in Greenwood is permitted to branch into Itta Bena because of a state law setting the minimum population required for putting in another branch.[15] On the other hand, the Bank of Grenada could legally, if permitted, open a branch in Greenwood in the event that the Bank of Greenwood attempts to raise its rates on loans or its service charges on demand deposits, assuming that the other three Greenwood banks were unable to thwart such an attempted exercise of market power by GB. So there are in this market very strong competitive restraints upon the exercise of market power by GB. As noted, it is not potential competition which restrains GB, but the *actual* competitive situation in the relevant market itself. Potential competition therefore is a redundant force. And since FNB Jackson is only one of five potential entrants according to the standards put forth by Plaintiff's expert, Dr. Elzinga, it is really only part of a redundant force. The effect of the eliminations of this force would be de minimis and would not result in an adverse competitive effect. In summary, the specific forces which effectively nullify any market power that might theoretically be assigned to GB are at least three: (1) the other three banks located in Greenwood; (2) the presence of the Grenada Bank in Itta Bena in Leflore

15. Miss.Code Ann. Sec. 5229 (1942).

County only nine miles away from Greenwood via a four lane highway; (3) the threat that the Grenada Bank if legally permitted, might branch into Greenwood, the home office and only location of GB. These three forces can be identified as forces already in the market, actually competing therein, and they effectively nullify any market power that might be assigned GB. Thus, it is not potential competition from outside Leflore County that holds GB in check, if such is required, but it is the actual competitive situation in the market that is the effective restraining force. The same situation would prevail in the reasonably foreseeable future if we project the development of this market. The proposed merger would not alter the number of competitors that are in the market, so that the present restraint upon undue use of market power that exists in Leflore County is going to continue to exist in the foreseeable future. After the merger, a customer in this market will have the same number of banking alternatives as before (Haywood, Tr. 1418–1426).

The circle of banks around Leflore County, listed on PX167 as being within 45 miles of Greenwood are the front-line potential competitors in Leflore (Haywood, Tr. 406). There are 27 banks or branches of banks within 45 miles of Greenwood, of which ten are within 30 miles of Greenwood, with one branch bank within 10 miles thereof, which are alternative sources of banking services to which customers of Leflore County banks could turn if the prices for banking services in Leflore County did go higher than the competitive level (Haywood, Tr. 350, PX167). There are 11 banks on the periphery of the Leflore County market which are potential de novo entrants in the market if the prices for bank services therein became higher than the competitive level, namely, the

Bank of Clarksdale; Bank of Inverness; Bank of Ruleville; Bank of Winona; Citizens National Bank of Belzoni; First National Bank of Lexington; Grenada Bank and Trust Company, Guaranty Bank and Trust Company, Belzoni; Holmes County Bank and Trust Company, Lexington; Peoples Bank of Indianola; Planters Bank and Trust Company of Ruleville. (Haywood, Tr. 349–350, 380–390; PX167). However, it is not potential competition which constitutes the effective restraint on the Leflore County market but the *actual* competitive situation in the market, as stated above (Haywood, Tr. 1412–1423, 1425).

██ The Court therefore finds and concludes that the proposed merged bank would not now have undue market power in Leflore County nor is it likely to have undue market power therein in the reasonably foreseeable future. (Haywood, Tr. 1445, Lines 13–18).

One other factor which this Court has considered in arriving at the above conclusion is that since 1944 three additional banks have entered the relatively small Leflore County market, which, according to the overwhelming testimony in this case, is probably overbanked, all four of the Greenwood banks having no branch office outside of Greenwood or Leflore County and, together with the Itta Bena branch Bank of Grenada, exclusively derive their business from Leflore County. This is in marked contrast to the significant findings of the Courts in United States v. Philadelphia National Bank, *supra*, and United States v. Provident National Bank, *supra*, that there had been a long and continuous trend toward concentration in the areas involved there in that the number of competitors in the relevant geographic markets steadily decreased over the years, necessarily increasing the concentration ratio among the leading banks.[16]

16. Justice Harlan in his dissenting opinion in the *Philadelphia Bank* case noted that demand deposits alone represent approximately ¾ths of the money supply in the

United States, citing Samuelson on Economics, 5th Edition, 1961, page 311. 374 U.S. at 374, 83 S.Ct. 1715, 10 L.Ed.2d 915. This is not the case today as seen

In *Philadelphia* the Court stated: "The present size of both PNB and Girard is in part the result of mergers. Indeed, the trend toward concentration is noticeable in the Philadelphia area generally in which the number of commercial banks has declined from 108 in 1947 to the present 42." 374 U.S. at 331, 83 S. Ct. at 1724.

In Provident National Bank the Court stated: "In 1945 there were 115 commercial banks in the four county area (relevant market). In 1960 there were 45. In 1965 the number of commercial banks was reduced to 37." In the next paragraph, the Court noted: "* * * Thus, there has been a substantial reduction of the independent commercial banks, most of which have disappeared through the merger route. * * *" 280 F.Supp. at 5. And again at page 20: "Therefore, even if we did find that competition would be improved by this merger, as it probably was in *Von's*, the inescapable fact is that the number of competitors in the four-county area has been steadily decreasing over the years, and necessarily increasing the concentration ratios among the leading banks. Since this merger falls within this trend toward merger and toward more concentration, it must be ruled anticompetitive under the existing antitrust laws."

The above situation in Leflore County is an important factor which runs directly contrary to Plaintiff's theory of reduction of consumer choice in this case, which Plaintiff not only failed to prove as required, but which is completely overwhelmed by the evidence to the contrary.

EFFECT OF THE PROPOSED MERGER THROUGH THE ELIMINATION OF POTENTIAL COMPETITION IN THE RELEVANT MARKET

█ In reaching the above conclusions, the Court assumed, arguendo, that FNB Jackson was probably a potential de novo entrant into Leflore County, but such is not the finding of fact by this Court or the conclusion of law reached by this Court based upon any finding of fact. On the contrary, Plaintiff not only failed to carry its burden of proving this point, but the evidence to the contrary clearly convinces this Court that FNB Jackson is not now nor in the reasonably foreseeable future a probable potential entrant into the relevant geographic market, Leflore County.

Plaintiff does not contend that GB is likely to establish offices in Hinds County or in any other of the four counties in which FNB Jackson maintains banking offices (Clark, Tr. 7, Lines 15–18).

It is not possible in a free enterprise economy to identify all potential entrants; the best that can be done is to identify all *likely* potential de novo entrants. Economists provide certain criteria to assist in making this determination and they are as follows: (1) financial capability to enter the particular market; (2) firms already producing the same product in another geographic market or markets; (3) growing firms outside the market that have already demonstrated either by de novo expansion or by expansion through merger that they are on the move and growing; (4) firms that have already tried to merge into the market: (5) firms that have the capability to produce the same product—that are growth oriented—that have some peculiar interest in the hypothetical market; (6) the legality of the entry; and (7) whether the market is an economically viable or growing market or is a stagnant or declining market (Elzinga, Tr. 281, Line 23–Tr. 285, Line 16).

Dr. Elzinga further testified that the possible effects of a "geographic market extension merger" between *potential* competitors are as follows: (1) the removal of one or both of them as an important restraining influence on the hypothetical market, the potential competi-

---

from the Flow of Funds table and certainly this is not the case with GB where

there's a 50–50 ratio between time and demand deposits.

tor restraining the other by threat of entering; (2) completely removing the possibility that this potential competitor will ever enter the market de novo—as a new independent center of initiative—thus conferring upon firms in the hypothetical market a monopoly power or augmenting their existing market power. Monopoly, as the Supreme Court defines it, is control over price whatever the product may be, which is generally used at the expense of a higher price to the consumer since he has limited alternatives (Elzinga, Tr. 287, Line 6–Tr. 288, Line 21). Economists have devised an interesting proxy measure for use in measuring the state of competition, and this is the concentration ratio, or the concentration in the market, considering the number of firms and their size distribution. So the first step in analyzing whether a merger of this type will have anti-competitive effects is to determine the level of concentration in the market. If it is very low then this type of merger is likely to have no adverse or anti-competitive effect, because it would remain unconcentrated after the consummation thereof; however, if the market is concentrated and the merger is consummated, it removes the potential competitor as a restraining influence on the market and thus is likely to have an adverse competitive effect (Elzinga, Tr. 290, Line 1–Tr. 291, Line 21).

Dr. Elzinga stated that the factor of potential competition in general is not going to be as great in commercial banking as it would be in most manufacturing industries or most service or trade industries simply because it is more difficult to enter commercial banking, which requires a charter and approval of regulatory authorities. Thus it is important in applying this type of analysis to commercial banking to recognize that, in general, potential competition is going to be less than in non-bank industries (Elzinga, Tr. 292, Lines 10–25).

Although Dr. Elzinga has never visited Leflore County nor talked to any of the bankers, bank customers or businessmen there, after studying numerous Plaintiff's Exhibits and assuming that Leflore County was the appropriate geographic market and that commercial banking was the appropriate line of commerce, he concluded that five banks were likely potential entrants into Leflore County, namely, Deposit Guaranty National Bank of Jackson, The Bank of Mississippi in Tupelo; The First Citizens National Bank of Tupelo; The Planters Bank and Trust Company in Ruleville; and FNB Jackson. (Tr. 300, Lines 10–18; Tr. 304, Lines 12–15). He arrived at these conclusions by applying the following identifying criteria to determine the likely potential entrants: (1) firms engaged in commercial banking outside of Leflore County that are not at a distance greater than 100 miles therefrom; (2) commercial banks that have the financial capability to expand into Leflore County and in this regard he felt total assets of at least 15 to 20 million dollars would be required; (3) banks that might have some particular interest in the Leflore-Greenwood area; and (4) the economic viability of Leflore County (Elzinga, Tr. 296, Lines 9–25 and Tr. 297, Lines 1–4). It is his opinion that the level of concentration in Leflore County is heavy, that is, that it is a highly concentrated market. In Dr. Elzinga's opinion there are only five potential de novo entrants and the proposed merger would eliminate the most likely potential entrant, FNB Jackson. The consummation of the merger would have an adverse competitive effect by removal of a substantial restraining influence on the Leflore County market. (Elzinga, Tr. 305, Lines 7–17).

Assuming that the five banks named by Dr. Elzinga are actually likely potential entrants into Leflore County, there are other banks which are just as likely potential entrants therein, namely, Bank of Clarksdale, approximately 50 miles from Greenwood with resources of 36 to 37 million dollars and the Grenada Bank of Grenada, Mississippi, which is within a 40 mile radius of Greenwood with a branch already in Leflore County at Itta Bena (Lampton, Tr. 601, Line 20; Tr.

602, Line 25), and both of whom have already demonstrated prior branching experience either de novo or by merger (Lampton, Tr. 603, Lines 8–9). Still other potential entrants would include Bank of Inverness, Bank of Ruleville, Bank of Winona, Citizens National Bank in Belzoni, First National Bank of Lexington, Grenada Bank and Trust Company, Guaranty Bank and Trust of Belzoni, Holmes County Bank and Trust Company, and Peoples Bank of Indianola, all of which are within a 45 mile radius of Greenwood (Haywood, Tr. 380, Line 20, Tr. 381, Line 6). The loss of any one of these large number of potential rivals would have a de minimis effect and would not adversely affect competition in the relevant market.

On cross examination it was established that Dr. Elzinga had made no personal study of the Leflore County market other than by reviewing the documents prepared by the Plaintiff, and had not projected the cost of FNB Jackson or any bank branching de novo into Leflore County. It was also established that he knows very little about banking and has never studied concentration ratios or concentration of the market in the money or banking field. He further admitted that he is aware that FNB Jackson has never branched de novo except in its home county or counties adjoining its home county, other than in Tylertown, Mississippi. (Elzinga, Tr. 333, Lines 8–14).

This Court is of the opinion that the 100 mile criterion and the financial capability criterion merely indicate a *possible*—rather than a *probable* or *likely* —potential de novo entrant, in the absence of proof that the subject bank, here FNB Jackson, otherwise meets the other criteria or qualifications, namely, that of legality, economic feasibility and particular interest in entering de novo. The Court will now examine these latter three criteria together with FNB Jackson's branching history in order to make a reliable determination of the likelihood or probability of FNB Jackson's enter-

ing Leflore County de novo now or in the reasonably foreseeable future.

## BRANCHING HISTORY AND DESIRE OR PARTICULAR INTENT OF FNB JACKSON

FNB Jackson operates 21 banking offices and has approval to operate three additional offices. Its head office and ten of its branches are in the City of Jackson, and it has approval to operate an additional office there. It also operates ten offices in areas outside Hinds County, including four offices in the Greenville-Leland area of Washington County, about 90 miles Northwest of Jackson; three offices in the Gloster-Crosby-Liberty area of Amite County, about 90 Southwest of Jackson; two offices in the McComb-Fernwood area of Pike County, about 75 miles South of Jackson; and one office in Tylertown, Walthall County, about 80 miles South of Jackson. It also has approval to operate two additional offices in Pike County and it has applied for approval to operate an additional office in Walthall County. In addition, FNB Jackson operates three computer centers: one in Jackson, one in Greenwood and one in Columbus (Hearin, Tr. 540–543, 557, 560; PX17, Page 14).

FNB Jackson has never established a branch bank de novo; nor has it ever established a branch office de novo, other than in its home county of Hinds or in adjoining counties (Hearin, Tr. 520, Lines 11–18) with the exception of opening a drive-in branch facility in Tylertown. This latter facility is located three-quarters of a mile from the branch office there and was opened for the convenience of its customers because of inadequate parking facilities (Lampton, Tr. 594, Lines 22–25 and Tr. 595, Lines 1–13).

According to its President, Mr. R. B. Lampton, the bank has consistently rejected the idea of branching de novo anywhere outside of the area in which the main office is located or in which one of the branch offices is located

(Lampton, Tr. 594, Lines 7–10). Accordingly to Mr. Lampton: "We have consistently rejected the idea of branching de novo, that is, gaining access into a completely new market area by de novo." (Lampton, Tr. 595, Lines 18–20).

The Executive Vice-President of GB, Mr. C. A. Miller, further testified that in his opinion FNB Jackson was not a likely de novo entrant into Leflore County now nor in the reasonably forseeable future (Miller, Tr. 591, Lines 1–4). He said that even if it were permitted by the regulatory authorities to enter de novo and even if such entry were economically feasible, Leflore County does not need another separate bank because some of the banks already in that area are not doing as well as they should. To bring in another bank would "split the pie one more time." (Miller, Tr. 688, Line 21 and Tr. 689, Line 10; Sayre, Tr. 1000, Line 25 and Tr. 1001, Line 5).

The President of FNB Jackson emphatically stated that, even if permitted, FNB Jackson would not branch de novo into any new area, including Leflore County, because (1) the costs of de novo branching are prohibitive; (2) a de novo branch requires starting from scratch, whereas merger permits the resulting bank to be immediately competitive; (3) deposits in a de novo branch would have to be derived from existing banks; (4) de novo branching would result in the alienation of correspondent bank relationships which are extremely important to FNB Jackson since about 15% of its deposits mix, or about 42 million dollars, is in correspondent bank balances; and, (5) branching de novo alienates not only banks in the area in which a branch is established but also other banks throughout the State (Lampton, Tr. 596, Line 3–Tr. 597, Line 12).

The Plaintiff apparently relied on the establishment by FNB Jackson in May, 1967 of a computer center in Greenwood and on FNB Jackson's present desire to merge with GB to establish an intention or desire on the part of FNB Jackson to enter Leflore County de novo. This Court considers the establishment of the computer center as merely a scintilla of evidence and certainly insufficient in itself to constitute that evidence necessary to sustain its burden of proof. This is especially so in view of the fact that computer centers were also established by the Defendant bank in Jackson and Columbus, Mississippi, Columbus being outside of the 100-mile permissible branching area. The computer system in Columbus was established by FNB Jackson because of the geographic location of Columbus and the presence of industry there (Hearin, Tr. 560, Lines 8–19), although FNB Jackson may not legally branch or merge into that area, which the Court finds to be a reasonable explanation and basis therefor, as well as a reasonable explanation for the placing of such a center in Greenwood.

The next argument advanced by the Government is that FNB Jackson's desire to merge with GB proves its ability and desire to enter de novo into the Leflore County market. This position merely amounts to begging the question and was very succinctly and emphatically answered by the Court in *Crocker-Anglo*, Paragraph No. 43 at page 184, of 277 F.Supp., when it correctly observed that if this line of reasoning were followed all mergers would be illegal. The Government's proposition is true only if the words "by merger" are added to its allegation that FNB Jackson has shown interest into moving into the Leflore County area. If the line of reasoning advanced by Plaintiff were followed, the fact of merger or contemplated merger in all cases would constitute evidence of desire or intent to enter de novo, which would completely ignore the advantages of market entry via merger.

The next proposition advanced by the Plaintiff is a novel one, that is, since the Chairman of its Board, Mr. Robert M. Hearin, stated that the bank expects to make a profit in Leflore County, it follows that this indicates that it would branch de novo therein. Once again, we find the Plaintiff begging the question.

Certainly if FNB Jackson did not expect to make a profit in Leflore County it would not be seeking to effect the merger in question, but as pointed out above and hereafter, there are many advantages of branching by merger over branching de novo. Certainly a bank would not desire to merge with another unless it thought it would be a profitable undertaking, and it is preposterous to assert that because a bank feels that it will make a profit by merging with another in a new market such fact indicates a desire to enter de novo.

Finally, there has been no application filed with the Comptroller of the Currency, the appropriate regulatory authority, by FNB Jackson, for permission to establish a de novo branch bank in Leflore County (Brezinski, Tr. 412; and 430), and this fact further evidences the lack of desire on the part of FNB Jackson to branch de novo into Leflore. Even had it desired to do so, this "desire" did not produce action and as the Court stated in the Crocker-Anglo case, 277 F.Supp. at page 185:

"That in itself tends to negative the claim that (Crocker would have entered Los Angeles de novo)."

Furthermore, if "potential competition" is defined as in *El Paso*, then the Government's case clearly fails because in that case the Government proved potential competition by showing actual negotiation by Pacific Northwest with an El Paso *customer for its business* in the relevant market with tangible results. But in this case, as in *Crocker-Anglo*, it is clear that Plaintiff has failed to produce a single customer in the relevant market for whose business both Defendant banks compete. As a matter of fact, it has been established by stipulation in this case that there is no competition whatsoever between the Defendant banks, either in the Leflore area or in any other area. This is further strong evidence negating any intent or desire of FNB Jackson to enter the relevant market de novo.

## REGULATORY AUTHORITIES' PERMISSION TO ENTER LEFLORE COUNTY DE NOVO, i. e., THE LEGALITY THEREOF

It goes without saying that in the absence of permission from the appropriate regulatory authority, namely the Comptroller of the Currency, a national bank may not branch de novo. A denial of such permission absolutely removes an applying bank as a potential de novo entrant into a market area, at least until such change of circumstances as to warrant a reconsideration by the Comptroller. Thus all firms can be excluded as potential entrants whose request for entry would be denied, because it is impossible to be a potential entrant if the appropriate permission therefor is not forthcoming. (Elzinga, Tr. 284, 286, 312, 317–319).

Mr. Thaddeus M. Brezinski, Director of the Bank Organization Division, Office of the Comptroller of the Currency, whose division oversees applications for bank mergers, bank chartering, do novo branches, capital financing of national banks, relocation of main offices of national banks, and relocation of branch bank offices of national banks, testified that, although no application has been made by FNB Jackson to branch de novo into Leflore County, he is familiar with the Leflore County and Greenwood area based upon his review of First National Bank of Greenwood's application for charter in late 1964 and based upon his thorough review of the investigation following the application for merger of the Defendant banks herein. Although the investigation attendant upon the latter application is not identical to the investigation made concerning a proposed de novo entry, it is a more thorough and complete investigation. Based upon his review of the investigations in Leflore County, Mr. Brezinski said that he would recommend to the Comptroller of the Currency, who makes the final decision, against the approval of either a branch office or a new branch for Greenwood or Leflore County because it

is his opinion, based upon his experience and the above information, that no de novo entry should be allowed in Greenwood or Leflore County now or within the reasonably foreseeable future. He said that his best guess would be that it would be a minimum of ten years before Greenwood or Leflore County could possibly accommodate additional competition for services in the banking market. (Brezinski, Tr. 408–409, 441–442, 420–421, 450). The office of the Comptroller of the Currency has maintained a policy over the past several years that, once a new national bank is chartered in any given market, a protective attitude should be taken to withhold more competition until such bank has established itself on a firm footing in the market and until there has been some adequate return to the stockholders on their investment. The First National Bank of Greenwood, which was chartered in 1965 in Leflore County, has not reached the point where it has established itself on a firm footing and made a reasonable return to the stockholders on their investment, having paid only one 10% stock dividend in the fiscal year 1968 and no cash dividends. Any new bank entry de novo into Leflore County would be detrimental to First National Bank of Greenwood, in view of the population of Greenwood and Leflore County and the number of banks now operating there. (Brezinski, Tr. 421–422, 442; Sayre, Tr. 1001; Miller, Tr. 736).

Mr. Horace Steele, the State Comptroller of Banks in Mississippi, who has been an employee and officer of banks much of his adult life (Steele, Tr. 462, Lines 1–5), has the duty and right to regulate and supervise Mississippi's 145 state banks, and the State's credit unions, brokers, lenders, motor vehicle sales companies, and check sales companies. He passes on mergers, chartering and de novo branching by State banks. (Steele, Tr. 450, 455–460). He is familiar with the Greenwood and Leflore County area from years of examining banks in that area as an Examiner in the State Banking Department and personally knows all of the officers of these banks. (Steele, Tr. 452–453). All of the banks in the relevant geographic market are under his jurisdiction with the exception of First National Bank of Greenwood.

Upon receiving an application for a de novo branch from a State bank, Mr. Steele said that he asks for an economic and legal brief from the applicant and one from any contestant of such application. He also assigns a technician to go into the area and study the application first-hand. He considers all of the economic factors involved in the particular area and the banking history and, based thereon, makes a decision as to whether an application should be allowed. He recently made the same type of investigation and examination in Leflore County that would have been made by his office if an application had been made for the establishment of a de novo state bank entry there. Based upon his review of this study, Mr. Steele said that he would not permit a de novo entry of a state bank into the Leflore County market (Steele, Tr. 458, Lines 16–21). He said that a bank must have excess reserves. After it starts lending it soon reaches its lending limits and if another bank should come into the same area de novo, some of the deposits of the community and city would be acquired by it at the expense of other existing banks, thus depleting some of their deposits and making it necessary for them to start calling their loans. This of course would cause a great deal of foment among the bank's customers and stockholders (Steele, Tr. 459, Lines 21–25; Tr. 460, Lines 1–15).

De novo branching into Leflore County would not only weaken the four existing banks in Greenwood because of the above reasons, but it would be years before a profitable operation could be expected by the branching bank (Hearin, Tr. 530–531; Lampton, Tr. 596). The State Bank Comptroller emphatically stated that if the Comptroller of the Currency should grant a national bank permission to branch de novo into Greenwood-Leflore County area, he

would make a serious effort to enjoin the Comptroller of the Currency from granting such entry. Although he noted that there has been some growth in Leflore County in the past two years, he testified such growth does not justify either another de novo branch or a new bank charter (Steele, Tr. 496, 501–502). However, Mr. Steele was of the opinion that the proposed merger "would be helpful to the Greenwood-Leflore County area and I think it would be helpful to Mississippi as a whole." Steele, Tr. 466, Lines 13–15).

In conclusion, although the testimony of Mr. Brezinski and of Mr. Steele is not absolutely determinative of the issue of legality of entry by FNB Jackson de novo into the relevant geographic market, it is very strong and convincing evidence (especially that of Mr. Brezinski because of his position and the weight that his recommendation would probably carry with the Comptroller of the Currency) that no bank, including the Defendant bank, FNB Jackson, would be permitted to branch de novo into Leflore County now or in the reasonably foreseeable future. Thus this Court finds as a fact that FNB Jackson would probably not be given permission by the appropriate regulatory authorities to branch de novo into the Leflore County market now or in the reasonably foreseeable future, and concludes as a matter of law based thereon that such an entry would be illegal.

## THE ECONOMIC FEASIBILITY OF DE NOVO BRANCHING INTO LEFLORE COUNTY

As already stated, there are five commercial banks in Leflore County, including GB (Miller, Tr. 645–646; Rogers, Tr. 873–874). As also previously noted there are only three cities in Mississippi that have as many as four banks, namely, Biloxi, Jackson and Greenwood, Greenwood being the smallest of the three with a population less than half of Biloxi's and less than one-sixth that of Jackson. It is to be remembered that only two head offices are among Biloxi's four banks, two offices being branches of Gulfport banks, and that two of the Jackson banks have branches outside the home office county of Hinds. Thus, of the three cities with four banks operating therein, Greenwood has the largest number of banks in relation to its economic base (Haywood, Tr. 1406–1409; Lampton, Tr. 600; DX29). Furthermore, none of the four banks in Greenwood have branches outside Greenwood or Leflore County and rely entirely upon the Leflore County market for their business, whereas the four banks in Jackson and Biloxi are not relying solely on those cities for their market (Haywood, Tr. 1408–1409; DX29). The total 1967 personal income by broad industrial section for Leflore County was 95.5 million dollars, whereas 1967 personal income in the Jackson standard metropolitan area was 682.4 million dollars. This clearly points out that Greenwood has more than its share of banking facilities. (Haywood, Tr. 1409–10; PX176; DX190).

From a banking standpoint it is not feasible to establish a fifth bank in Greenwood, because the four banks in Greenwood, with a total of five in Leflore County, in view of the relatively small population thereof, (25,000 population in Greenwood) constitute a barrier to a de novo entry into this particular geographic market. (Lampton, Tr. 600–601; McNew, Tr. 813–814; Rogers, Tr. 873–874; Haywood, Tr. 1406–1409; DX29). If the area had a new bank, it would simply divide the market into smaller shares, to the detriment of all banks therein (McNew, Tr. 811). No bank would enter the Greenwood-Leflore County market in the immediate or reasonably foreseeable future for the above and following reasons, irrespective of the merger of FNB Jackson and Bank of Greenwood (Rogers, Tr. 874–875), because the population and economy there will not support a de novo branch bank.

Several witnesses testified concerning the economic feasibility and probability of any bank entering the Leflore County market now or in the reasonably fore-

seeable future, and all of them, including the bank officials called as witnesses by Plaintiff, testified without dispute or contradiction, except from Dr. Reid, Plaintiff's expert who has never visited Leflore County nor talked to any one there concerning this matter, that there is no room in the Leflore County banking market for a de novo branch of another bank, and that it would not be economically feasible to branch de novo therein. They said that a de novo branch would result in harm to the other banks in the market depleting their deposits and putting an undue strain on their lending limit. Among the witnesses so testifying were: J. I. McBrayer, Vice President of Grenada Bank (Tr. 73–75); J. B. Yates, Chairman of the Board of First National Bank of Lexington (Tr. 62–66; Aubrey Boone, President of the Bank of Winona (Tr. 55–59, 61); R. W. Holladay, President of the Bank of Ruleville (Tr. 45–49, 51, 53); F. H. Hamilton, Jr., Executive Vice President of the Peoples Bank, Indianola (Tr. 39–40, 43) (all of the foregoing are top management officials of the five banks on the periphery of Leflore County and in adjoining counties); Dr. Charles R. Sayre, L. C. Spencer, Jr., and J. E. Johnson, three directors and organizers of two of the other three banks located in Greenwood (Tr. 999–1000; Tr. 1021–1022; 1158); and W. C. Neill, President of Leflore Bank and Trust Company in Greenwood (Tr. 1215, 1217–1218). Each one of these witnesses testified, without qualification or reservation, in favor of the proposed merger of the Defendant banks, recommending the approval thereof on the basis that it would have no anti-competitive effect whatsoever in the Leflore County banking market. Several of these individuals testified that, in fact, the proposed merger would have a pro-competitive effect, just as the merger of FNB Jackson into Greenville, Mississippi did.

To accurately and reliably assess the economic feasibility of establishing a bank, the first step is to determine the economic base of the area, that is, to determine: "industries which produce for sale outside the trade area," thereby bringing money "into the area causing it to grow due to the intake of money." A second aspect of an area's economy is its "locally market-oriented business," that is, the remaining economy which tends to rest on its economic base and will grow as the base grows. Agriculture continues to be the dominant component of the economic base of the Greenwood-Leflore County area and this is confirmed by PX175 which shows that in 1968 manufacturing employment was 2,650, whereas agricultural employment was 3,100 (Haywood, Tr. 1428, Lines 1–21 and Tr. 1429, Line 5; PX175). Plaintiff's Exhibit 179 shows existing industries in Leflore County and of these there are six firms which have approximately 2,000 employees which produce products for sale outside the Leflore County area. Therefore, 80% of the manufacturing employment shown in Table 1 of PX175 is basic employment, the rest being either agriculturally oriented or locally oriented in their productive activities so that the economic base of this area continues to be dominated by agriculture. Basic employment in Leflore County is about 5,750 persons, and agriculture and related activities constitute at least 60% of this total, manufacturing about 35%, and government employees and non-agriculture wholesaling about 5% (Haywood, Tr. 1430–1432, Line 16).

The agricultural base of the Leflore County economy is unstable and there is serious concern regarding its future growth (Haywood, Tr. 1434, Lines 1–18; DX33). The combined market value of the five principal crops in Leflore County declined consecutively in the years 1964, 1965 and 1966 with a very slight increase in 1967. This demonstrates that the major base of Leflore County has been declining over the past several years (Haywood, Tr. 1434, Line 22, Tr. 1435, Line 11; PX178). Several reasons for this decline are shown in Defendants' Exhibit 42 titled "Indexed Numbers of Prices Received by Farmers

in Mississippi—1960 to 1966." The top line of this exhibit shows that the average price of farm crops in Mississippi was 5% lower in 1966 than it was in 1959, the base year. The average price of cotton line in 1966 was only 80% of what it was in 1959.

In addition, Plaintiff's Exhibit 178 shows that consumer retail prices in Leflore County declined in 1966 and 1967, that wholesale sales declined in 1966 and 1967, and that there was also a decline in new housing units in 1967. This demonstrates that, when the economic base declines, shortly thereafter the whole economy starts to decline. (Haywood, Tr. 1435–1437; PX178). The growing, ginning and wholesaling of cotton is the dominant part of the agricultural sector in Leflore County, and though there has been quite an expansion in soybeans which has taken up some of the slack caused by the declining cotton market, soybeans are in trouble too because the support price has been adjusted down for next year (Haywood, Tr. 1437, Line 9–17). The declining posture of the agricultural base of the Leflore County market caused Dr. Haywood to comment that anyone planning to branch de novo into the area "would have to be gamblers and more of a gambler than the Comptroller of the Currency and the State Bank Comptroller would probably allow to go in." (Haywood, Tr. 1439, Lines 1–12, Tr. 1441, Lines 11–25).

A further necessary consideration regarding de novo entry is the labor situation in Leflore County. In the past five years there has been only a modest growth of industries in the county, with little increase in employment (from 2,304 at manufacturing jobs in 1963 to 2,650 manufacturing jobs in 1968. There has actually been a decline since 1966, when 2,860 people were employed in manufacturing. Thus the most that can be hoped for in the expansion of the existing manufacturing base is very modest growth (Haywood, Tr. 1441, Line 25 and Tr. 1442, Line 22).

The hope for the future in Leflore County is not the expansion of the existing industries but the attraction of new industries, which is highly speculative. A bank entering this market de novo cannot be started on speculation. (Tr. 1443). There has been some controversy involved in predicting what is going to happen in the future in this economic market. But in making such a prediction, a person needs to know what the pattern of development has been in recent years, not just what the increase has been over a given period. Thus Dr. Haywood was of the opinion that many of Plaintiff's Exhibits were misleading at first glance and obscured the pattern of economic growth in Leflore County, since they failed to show the pattern of development in this area. It is necessary to know whether the economy is in an upswing over the entire period, whether it has experience fluctuations over the entire period, or whether it has leveled off or is declining. (Haywood, Tr. 404; PX194). The significant economic factor about Leflore is that it had some growth in the early sixties, followed by a leveling off and subsequently an aggressive decline of economic growth over the past couple of years (Haywood, Tr. 368). Thus, to take a percentage over an entire period and say it is indicative of the pattern of growth in this area is misleading (Haywood, Tr. 403).

The economic viability of an area, that is, its health and ability to grow, is an essential factor to be considered in determining whether there are any potential de novo entrants into that market. The factors regarded as important in determining economic viability of an area are: employment in the area, the trend of employment, total income, per capita income, retail and wholesale sales, new housing units authorized, and whether plants are expanding or adding capacity (Elzinga, Tr. 298). A close examination of many of Plaintiff's Exhibits shows the declining economic factors in the Leflore County market area dur-

ing the past few years. These exhibits, by ranking areas by absolute change rather than percentage change, omission of salient data, and including statistically invalid averages of plus and minus figures for successive years, attempt to obscure such decline (Haywood, Tr. 367–377; PX175–178 and PX183–199). In view of the factors pointing to economic decline in Leflore County, this Court cannot say that such area is economically viable.

Plaintiff's Exhibit 175 does not fairly represent the trend of population and labor force in Leflore County which it pretends to do. The exhibit portends to show 13.2% increase in manufacturing employment over the entire period of time it depicts, but on closer examination, it is seen that manufacturing employment has in fact decreased in the last two years in Leflore—3.8% in 1967 and 3.6% in 1968. There had been relatively large increases in such employment from 1960 to 1963 and a leveling off thereafter. It can also be seen that total employment in 1968 was lower than in any other year since 1964 and declined in 1967 and 1968 (Haywood, Tr. 367; PX175).

Plaintiff's Exhibit which shows manufacturing earnings in Leflore County shows an increase from 1959 to 1962 after the Baldwin Piano Company moved to Greenwood. But it also reflects that earnings since then have been slowing down; in fact, in the last year shown, there was a 2% decrease in such earnings (Haywood, Tr. 369–370; PX176).

Plaintiff's Exhibit 178 purports to show an increase in consumer retail sales by 3.9% a year over the period 1960 to 1967 in Leflore, but closer examination reveals that retail sales have de-clined in the last two years and not since 1963 have consumer retail sales been less than those in 1967, the last year shown in the exhibit (Haywood, **Tr.** 373–374; PX178).

Although Plaintiff's Exhibit 183 shows that employment in Leflore County increased by 46.9% from 1960 to 1967, a close look shows that it grew 50.-4% from 1960 to 1966 and that there was a decline in employment from 1966 to 1967. (Haywood, Tr. 376–377, 401–402; PX183).

Subsequent to the filing of this suit, the Vice President and Comptroller of FNB Jackson, who was its former auditor for several years, made a requested study of the costs and estimated costs of establishing a de novo branch bank in the Greenwood area of Leflore County. His study revealed that the projected first twelve-months cost of operation would be $169,995, while the estimated income for that same period would be $66,500, resulting in a net loss of approximately $103,000.[17] The cost projections reflected that a de novo branch entry by FNB Jackson into the relevant geographic market would require seven to ten years to show a profit, whereas entry by merger would immediately add to the income of FNB Jackson. (Bailey, Tr. 782–785). Furthermore, the above cost estimation and projection does not include salary expenses of specialists whose services would be available to the Leflore County market through de novo branching only after a period of years, whereas through merger entry, the full services of FNB Jackson would be immediately available (Bailey, Tr. 785).

Dr. Haywood visited Greenwood and Leflore County to determine the economic

17. The breakdown of the projected operating costs for the first twelve months was: total salaries, $53,400; employee fringe benefits, $16,020; rent, $11,250; depreciation, $4,000; service and utilities, $6,000; janitorial expenses, $1,200; insurance, including federal deposit insurance, liability, and blanket bond, $6,-500; interest on time deposits, $26,250; communications, $5,000; fees, $5,000; advertising, $12,000; federal taxes, $3,-000; stationery and supplies, $10,000; personal assessment taxes, $6,875; and miscellaneous expense, $3,500. The income from the first year's operation would include the following: interest income from investments, $63,000; rent of safety deposit boxes, $500; service charge income, $1,000; and miscellaneous income $2,-000.

feasibility of de novo bank entry, as he had done in several other states for the same purpose in the last fifteen years. He also had been in the banks in Leflore County a number of times over the past several years and knows the key one or two men in the Greenwood banks and has talked to them and with customers and businessmen served by these banks.

He concluded that if another bank were allowed to enter the Leflore County area de novo, its entry would create a very high probability that within a few years there would be a failure or voluntary liquidation in the Leflore County-Greenwood banking market in view of the limited nature of the existing base, the uncertain future thereof, and the speculation attendant upon the obtaining of new industry. He thus concluded that a de novo branch in Leflore County would create a potentially unstable situation, probably the most unstable that this witness has seen in his widespread banking experience. Therefore, it was his considered opinion, with which this Court agrees, that a de novo entry by a bank into the relevant geographic market of Leflore County at this time or in the reasonably foreseeable future is not economically feasible (Haywood, Tr. 1445).

## ULTIMATE FINDINGS AND CONCLUSIONS OF THE COURT CONCERNING THE EFFECT OF THE PROPOSED MERGER ON POTENTIAL COMPETITION IN THE RELEVANT MARKET

The Court finds as facts the following: (1) FNB Jackson has never intended to, nor desired to, enter the Leflore County market de novo, and there has been no positive substantial action or activity on its part in this regard, which negatives the claim of Plaintiff that it would have so entered; (2) its history and prior activity show that FNB Jackson has never established a branch bank de novo, and has never established a branch office de novo other than in its own county or in an adjoining county, with the exception of the drive-in office in Tylertown, and that FNB Jackson has never intended to do so which negatives the argument that it was a likely potential entrant de novo into the relevant market; (3) that it is not now, and will not be in the reasonably foreseeable future, economically feasible for FNB Jackson to enter the Leflore County market de novo; (4) that the evidence is undisputed that FNB Jackson has never entertained the thought of entering, nor intended to enter, the Leflore County market de novo; (5) that the appropriate regulatory agency, the Comptroller of the Currency, would probably not have permitted and will probably not permit in the reasonably foreseeable future any entry of any bank into the Leflore County market area de novo; (6) Plaintiff's evidence that eventually FNB Jackson would have established a de novo branch in the relevant geographic market of Leflore County consists of speculation by experts who have never visited the market, talked to any of the bankers, their customers or businessmen therein: thus Plaintiff's claim that Defendant bank would have eventually established a de novo branch in this area is highly speculative and carries little weight and does not nearly equate the required proof; (7) Plaintiff has failed to produce any evidence whatsoever that FNB Jackson has ever attempted in the past to compete with GB in the Leflore County market, but to the contrary, it is stipulated that there has been no actual competition between the defendant banks in the past in Leflore County or any other place and thus Plaintiff's case clearly fails within the framework of *El Paso*; (8) even assuming argumentatively that FNB Jackson is a likely potential entrant into the Leflore County banking market, it is just one of many potential entrants and its elimination as such would have a de minimis effect, if any, because of the large number of potential competitors on the periphery of the Leflore County market, and especially since the other banks located in Leflore County and in actual competition with GB therein are

an effective restraining force, if any is actually required to prevent GB from raising its charges at the expense of its customers.

Based upon the foregoing findings of fact, this Court concludes as a matter of law that the proposed merger of the Defendant banks will not adversely affect potential competition now or in the reasonably foreseeable future in the relevant market of Leflore County.

## ENTRENCHMENT OF GREENWOOD BANK AND CREATION OF BARRIERS TO ENTRY INTO LEFLORE COUNTY

The Plaintiff contends that the proposed merger between the Defendant banks is likely to entrench and augment GB's position of dominance in the Leflore County commercial banking market and to raise or increase the barriers to new entry into this market for other potential entrants because: (1) it will substantially increase the lending limits of GB by $140,000 (Hearin, Tr. 524; Maloney, Tr. 947; PX76); (2) it would result in GB's being the only bank in Leflore County offering certain specialized kinds of loans and service; (3) it will substantially increase the bank's loan-deposit ratio; and (4) it will increase its deposits, loans and discounts substantially as a result of all of the above.

This Court has already concluded, for the reasons previously discussed (which will not be repeated here in view of the length of this opinion) that GB's share of total deposits in Leflore County is not evidence of the exercise of any market power or of any potential for the exercise of market power (Haywood, Tr. 1415–1416, 1418–1419). If the proposed merger is consummated, the customers in the market area will have the same number of banking alternatives as they presently do. GB's share of total deposits in the last three years has been declining, as has its relative share of savings deposits held by commercial banks in Leflore County. In addition, it has obtained only 26% of the 12.4 million

dollar increase in total Leflore County deposits between December 1964 and December 1967, compared with 53% thereof obtained by First National Bank of Greenwood. This negates Plaintiff's unfounded contention that GB has market power, either actual or potential. Furthermore, the merger of FNB Jackson and GB will probably produce a still more marginal penetration for GB than it has had over the past several years, which would constitute the same trend away from concentration in the market area which occurred in Greenville after FNB Jackson merged with the Commercial National Bank of Greenville. In that case the First National Bank of Greenville has grown at a more rapid rate than the merged bank (Hearin, Tr. 532; Haywood, Tr. 1414–1415).

One factor which must be considered in making a determination of this kind is the opinion and attitude of the bankers in the relevant geographic market concerning the proposed merger and their opinion as to whether any anticompetitive effect will result therefrom to the detriment of their banks. These bank officials are in a better position to know or hypothesize such effects than are the Plaintiff's experts whose testimony, in the opinion of this Court, was highly speculative, especially since such witnesses never visited Leflore County, talked to any of the bankers, businessmen or other customers of the banks therein, nor did they investigate personally the economy thereof. It is extremely significant that Plaintiff evidently was not able to find, and certainly did not produce, one single witness, outside of the above mentioned experts—not a single banker, businessman, official or other citizen of Leflore County—who opposed the proposed merger or had any qualms or doubts whatsoever concerning any anti-competitive effects which would result therefrom. Each of these many bankers and businessmen who were asked about the proposed merger favored it, and anticipated no anti-competitive effect in the banking market in Leflore County. Thus Plaintiff wholly

failed to convince this Court of the validity of this contention because of a complete lack of credible factual evidence.

The next question which arises is whether the proposed merger would tend to create a monopoly or restrain trade, which Plaintiff's expert witness, Dr. Reid, equated to an increased cost to the banking customer. He testified that subsequent to the four mergers that were effected by FNB Jackson in 1966 that there was an increase in service charges by all four of the banks with which FNB Jackson merged "right down the line." (Reid, Tr. 133).

A "service charge" is that charge assessed by a bank against the expense of maintaining a customer's demand deposit or checking account, and is calculated on the basis of a formula whereby the bank's cost of maintaining the account for the customer is determined (Tullos, Tr. 744, Line 23 and Tr. 745, Line 4). The service charge rates were last changed in the main office of FNB Jackson on November 1, 1967 some twenty two months after its merger with the other four banks on January 1, 1966, and the last change of said charge before that time was made on September 1, 1959. (Tullos, Tr. 745, Line 24–Tr. 746, Line 9–Tr. 747, Lines 9–13). The service charge changes effected by the Commercial National Bank branch of First National Bank in Greenville subsequent to the merger were made on December 1, 1967, approximately two years after the merger. This was the first change of service charges in that bank since April 1, 1962 (Tullos, Tr. 746, Lines 16–19 and Tr. 747, Lines 17–20). There was an increase in the charges of the Amite County branch bank of FNB Jackson located in Gloster, Mississippi on May 1, 1966, the last change having occurred in 1943. There was no change or increase in service charges in either the Tylertown branch bank or the McComb branch bank of FNB Jackson after their mergers with FNB Jackson on January 1, 1966, despite the fact that the last change in these charges had been made in 1940 in the former bank and in 1964 in the latter and despite the fact that the Tylertown bank is the only bank doing business in its particular market. It was further established without dispute that service charges for checking accounts at the various branch banks of FNB Jackson are not set by the main office in Jackson, but each branch independently studies at own particular conditions, costs and activities as a result of which its own rates are established (Tullos, Tr. 746–749). Where increases in service charges have been made by FNB Jackson or its branch banks, these changes have not even kept up with, or been in proportion to, increases in the minimum wage of $1.00 an hour in 1956 to $1.60 per hour at the present. Furthermore, this Court takes judicial notice of the fact that there has been a substantial rise in the cost of living within the last decade.

Thus the fear of Dr. Elzinga concerning increased service charges to customers as a possible result of the proposed merger is, based upon the past history of the service charge adjustments made by FNB Jackson and the branch banks with which it merged in 1966, purely speculative and conjectural, without foundation in fact, and is actually contradicted by the above discussed past history. In any event, as stated previously in some detail, there are present in the Leflore County banking market four other banks which effectively restrain any increase in service charges by GB as a result of the proposed merger, as well as many other banks on the periphery of Leflore County and located within 100 miles thereof, which banks act as a secondary restraining force.

The simple answer to Plaintiff's contention that the proposed merger would constitute a barrier to other banks entering the Leflore County market is that it has been overwhelmingly established that this market has an optimum number of banks located therein, in view of the relatively low population of Leflore, its declining economy, and the grave uncertainty of the future of its economic

base. These factors in conjunction with the testimony of Mr. Brezinski and Mr. Steele, as representatives of the banking authorities of the Federal Government and the State of Mississippi, respectively, serve as the effective and significant barrier to any de novo branching in Leflore County now or in the reasonably foreseeable future, not the presence of FNB Jackson in that market as a result of merger.

Assuming regulatory approval in the future and economic feasibility due to the increase of viability of the economy of Leflore following the proposed merger, it is quite likely that some of the many potential de novo entrants, who would then become likely potential de novo entrants, would consider entry into Leflore County and, if so, it has been shown by history rather than by speculation, conjecture, or guesswork that the presence of FNB Jackson in the Leflore County market through the proposed merger would not deter entry of another bank into this market. In Greenville, where both FNB Jackson and Deposit Guaranty National Bank, the largest bank in the State of Mississippi, merged three years ago, there was no deterrent to new bank entry as a result of the mergers: the Planters Bank of Ruleville recently received a permit to open an office in Greenville and is presently building this facility (Hearin, Tr. 531–532; Lampton, Tr. 588; Reid, Tr. 168; Mc-New, Tr. 814), and, as previously pointed out, the First National Bank of Greenville has grown at a much more rapid rate than either of the merged banks subsequent to the merger. In addition, Progressive State Bank at Summit branched into and located its home office in McComb after FNB Jackson merged into McComb in 1966 (Reid, Tr. 168–169; Hearin, Tr. 532).

Plaintiff has failed to produce any evidence whatsoever which proves or tends to prove that the proposed merger would in any way constitute a barrier to the entry through merger of another bank in the relevant geographic market herein, assuming that it were economically feasible to do so and that bank regulatory approval could be obtained. Rather, the only evidence before the Court on this question is to the contrary (Johnson, Tr. 1169; Rogers, Tr. 874–876; Eason, Tr. 1058–1059).

■ The Court finds that the proposed merger not only will not have any substantial anti-competitive effects, but to the contrary, will have the following pro-competitive effects: (1) it will increase the range of financial services available in Greenwood, which will in turn stimulate the other banks to extend their services and to improve them; (2) it will increase competition in the area of construction, real estate mortgage lending and installment lending between the banks and non-bank financial institutions; (3) it will increase competition along the "broad spectrum" wherein commercial banking competes with non-bank financial institutions in general; (4) it will increase competition with the Memphis banks and other large banks now interested in and deriving correspondent and participating business from the Delta area; and (5) it will strengthen the competitive posture of the cotton industry in the Delta thus generating and causing an increased flow of funds and increased business for all other commercial banks located in Leflore County (Haywood, Tr. 1479, Lines 22–24, and 1480, Lines 2–23).

The last finding and conclusion of this Court is supported not only by the testimony of Dr. Haywood but by that of Mr. Miller, Executive Vice-President of GB (Miller, Tr. 632, Lines 16–25), by L. C. Spencer, Jr., Director of the Leflore County Bank and Trust Company, (Spencer, Tr. 1019, Lines 20–22 and Tr. 1029, Line 24–Tr. 1030, Line 1) and by Messrs. George K. Wade and J. E. Johnson (Wade, Tr. 1195, Lines 9–18; Johnson, Tr. 1165, Lines 5–16).

It is very significant also that the Federal Reserve Board's report concerning the proposed merger reflects that in response to its written inquiry to 13 banks competing in the general Green-

wood and Jackson areas, ten indicated that they did not feel that the proposed merger would have any significant competitive effects on their banks; two indicated there would be no adverse effect on their banks; and one indicated that the expanded service to be offered by FNB Jackson in Greenwood would make competition more severe (Golden, Tr. 259, Lines 8–18).

## CONVENIENCE AND NEEDS OF THE COMMUNITY TO BE SERVED

■ Although the Court has concluded that the proposed merger between FNB Jackson and GB does not have anti-competitive effects violative of Section 7 of the Clayton Act, nonetheless it is incumbent upon the Court to consider, assuming arguendo that the anti-competitive effects alleged by the Justice Department are present, and weigh such anti-competitive effects against the public interest represented in the convenience and needs of the community to be served by the merged banks. If such convenience and needs to be served clearly outweigh any anti-competitive effects, the merger, even though having anti-competitive effects, may nonetheless stand. This is the affirmative defense afforded to merging banks by BMA–66, 12 U.S.C. section 1828(c) (5) (B). That such a balancing of convenience and needs served against anti-competitive effects was intended by Congress in its enactment of BMA–66 is evident from an examination of the legislative history. In its favorable report of BMA–66 the House Committee on Banking and Currency stated:

The Bill acknowledges that the general principle of the antitrust laws— that substantially anti-competitive mergers are prohibited—applies to banks, but permits an exception in cases where it is clearly shown that a given merger is so beneficial to the convenience and needs of the commu-

nity to be served that it would be in the public interest to permit it.[18]

The Supreme Court acknowledged that such a balancing process was contemplated by Congress in United States v. First City National Bank of Houston, 386 U.S. 361, 87 S.Ct. 1088, 18 L.Ed.2d 151 (1967), and discussed the balancing process further in United States v. Third National Bank in Nashville, 390 U.S. 171, 88 S.Ct. 882, 19 L.Ed.2d 1015 (1968):

It is plain that Congress considered both competition in commercial banking and satisfaction of "the convenience and needs of the community" to be in the public interest. It concluded that a merger should be judged in terms of its overall effect upon the public interest. If a merger posed a choice between preserving competition and satisfying the requirements of convenience and need, the injury and benefit were to be weighed and decision was to rest on which alternative better served the public interest.

The necessity of choosing is most clearly posed where the proposed merger would create an institution with capabilities for serving the public interest not possessed by either of the two merging institutions alone and where the potential could be realized only through merger. 390 U.S. at 185–186, 88 S.Ct. at 891.

Both United States District Courts which have ruled on bank mergers since the passage of BMA–66 have followed the two-stage determination process contemplated by that Act and as discussed in the Supreme Court decisions subsequent thereto. In United States v. Crocker Anglo National Bank, 277 F. Supp. 133 (N.D.Calif.1967), the Court first discussed the anti-competitive effects of the proposed merger and found none. But the Court went on to take up the convenience and needs question, first assuming the presence of anti-competitive effects, and then balancing such

18. House Committee on Banking and Currency, Bank Merger Act Amendment, H.R.Rep. No. 1221, 89th Cong. Second Sess., 3–4 (1966).

anti-competitive effects against the public interest inherent in the convenience and needs of the community served by the proposed merger. In United States v. Provident National Bank, 280 F.Supp. 1 (E.D.Pa.1968), the Court found that the proposed merger had anti-competitive effects violative of Section 7 of the Clayton Act. The Court then went on to determine whether such anti-competitive effects were outweighed by the convenience and needs of the community to be served by the proposed merger.

 In light of the foregoing authorities, this Court feels that the proper procedure, although having determined that no anti-competitive effects are produced by this proposed merger, is to assume that such anti-competitive effects as alleged by the Plaintiff are present, and then to apply the balancing technique or process contemplated by BMA–66 and determine whether, assuming proscribed anti-competitive effects, the public interest is served by the convenience and needs satisfied by the merger to such an extent that such convenience and needs "clearly outweigh" any anti-competitive effects.

In undertaking this balancing process, this Court is well aware of the caveat inherent in the Supreme Court's opinion in United States v. Third National Bank in Nashville:

> Because the District Court erroneously concluded that the merger would not tend to lessen competition, its conclusion upon weighing the competitive effects against the asserted benefits to the community is suspect. To weigh adequately one of the factors against the other requires a proper conclusion as to each. 390 U.S. at 183, 88 S.Ct. at 890.

In light of this statement, the Court has divorced itself from its opinion as to the anti-competitive effects of this merger. For the purposes of balancing the convenience and needs of the community served by the merger against any anti-competitive effects thereof, it has ascribed to the merger the anti-competitive effects alleged by the Plaintiff. In so doing, the Court hopes that, in the event of an appeal, a piecemeal litigation of this lawsuit can be avoided.

 Assuming arguendo then that this merger has the anti-competitive effects alleged by the Justice Department, the Court will proceed to consider the benefits to the community which the Defendants allege will result from this merger. This Court will consider separately each of the conveniences and needs of the community served by the proposed merger.

1. THE MERGER FULFILLS THE NEED FOR GREATER LENDING LIMITS IN THE LEFLORE COUNTY AREA

The lending limit of GB, a State bank, is computed by taking 15% of its capital and surplus. The lending limit of FNB Jackson, a national bank, is computed by taking 10% of its capital and surplus. As of December 31, 1968 GB had assets of only 29.1 million, whereas FNB Jackson had assets of 379.8 million dollars. It is thus readily apparent that the merger of FNB Jackson and GB would substantially increase the lending limits available in the Leflore County area.

Several witnesses testified that the lending limits presently available at the Greenwood banks are inadequate to meet the needs of that community. One of the exhibits (PX224) introduced by the Plaintiff itself indicated that in the four-year period from January 1, 1965 to December 31, 1968 GB alone had 36 requests for loans or lines of credit in excess of its lending limit. It is therefore apparent that the present lending limits in Greenwood are inadequate, not to speak of the adequacy of such limits for future needs.

As to the need for increased lending limits, several businessmen from the Greenwood area testified that they had a present need and would have an increased need in the future for larger loans than are now available in the

Greenwood area. For example, Mr. C. L. Hall, Secretary-Treasurer of Stribling Brothers Corporation, a Greenwood caterpillar dealer, testified that his corporation had increased greatly in size and volume of business and that if the proposed merger were not consummated this corporation would be compelled to leave the Greenwood area in order to establish a line of credit to meet its needs. (Tr. 1047, Lines 1–16). Likewise, George K. Wade, President of Wade, Inc., a farm equipment dealer, testified that his corporation maintains an inventory of 1½ million dollars with an even larger inventory in the fall months of the year. With GB's current lending limit of $210,000, it is impossible to finance such inventory through the resources of GB alone (Tr. 1188, Lines 24–25, Tr. 1190, Line 15).

Increased lending limits available in the Greenwood area would also be highly beneficial to real estate developers, allowing them to obtain necessary finances from one local source rather than securing such financing piecemeal by acquiring partial financing locally while seeking larger credit lines outside the Greenwood area (Tr. 1149, Lines 17–20). This would assist in fulfilling one of Greenwood's pressing needs, which is that of more housing. At present, the local Greenwood banks do not have a line of credit sufficiently large to permit the construction of more than a very limited number of houses at one time (Tr. 1149, Lines 5–7). Thus the Greenwood banks do not have lending limits large enough to allow the financing of a subdivision or similar land development, nor is the credit line available locally large enough to finance a project such as a shopping center. James S. Henderson, President of Henderson Building & Supply Co., who engages in land development in the Greenwood area, testified as to the difficulties he encountered in establishing a line of credit in the financing of shopping centers and that the sums of money he needed were larger than the present lending limits of the Greenwood banks (Tr. 1204, Lines 11–16).

There was also testimony from individuals in the construction industry who indicated that the present lending limits in Greenwood were inadequate to meet their needs. For example, J. J. Ferguson, a part owner of the J. J. Ferguson Sand and Gravel Company, testified that his businesses employed between 400 and 700 people and were compelled to borrow sums of money from $500,000 to $700,000 on a short-term basis anywhere from three to five times per year to meet necessary day to day expenses. These amounts, of course, far exceed the lending limits of any of the Greenwood banks. Mr. Ferguson testified that on one occasion when he was in need of $350,000 he was forced to suffer delay of receipt of such funds while participations with a bank in Memphis and a bank in Jackson were sought. Even after that delay he was unable to secure the entire sum which he required and was forced to rely on his creditors for credit on the amount which he was short, thereby damaging his credit.

Another businessman, Earl W. Fisher, owner of Fisher Stationery Company, testified that on two occasions within the past five years he had been forced to seek loans from the Small Business Administration to expand his business because neither GB nor Leflore Bank and Trust Company would make a loan to him for a period long enough to satisfy his needs.

The increased lending limits would also be beneficial to the Greenwood area in its efforts to attract industry. A. F. Summer, Attorney General of Mississippi and formerly Executive Assistant to the Governor, testified that one of the first questions asked by industrial prospects was the banking structure in a prospective locality and its ability to furnish the capital necessary in that particular industry. Other persons who had participated in seeking industry for the Greenwood area testified to the same effect, including Mr. George K. Wade and John Frasier, Jr., County Attorney of Leflore County. As discussed

above [19] the Greenwood-Leflore County area is experiencing an economic change and has a very definite need to attract industry into the area in order to provide needed jobs for displaced agricultural workers. Increased lending limits, since such are attractive to industrial prospects, would therefore greatly benefit the community by fulfilling this particular need.

Another area in which increased lending limits would greatly benefit the Greenwood-Leflore County area is that of agricultural loans. For example, the Staple Cotton Cooperative Association, which makes production loans to farmers, must meet the credit demands created by the production of cotton. In an extended period of good weather it may find itself faced with a demand for as much as $600,000. As Dr. Charles R. Sayre, President and General Manager of the Association testified, such money is needed in a hurry. Of course, such a sum far exceeds the present lending limits of any of the Greenwood banks. If the proposed merger between FNB Jackson and GB were consummated, however, this sum would be available locally and could be dispatched within the time required by the cotton industry (Tr. 1009, Line 19, Tr. 1010, Lines 5, 13–17). Corroborating Dr. Sayre was H. L. Hodges, Vice President and Treasurer of the Staple Cotton Discount Corporation, which also is in the market of agricultural production loans. The main source of funds for this organization is the Federal Intermediate Credit Bank in New Orleans. The Intermediate Credit Bank requires at least two days notice from the Discount Corporation before funds requested can be transferred. Thus, as Mr. Hodges noted, there are at times a severe need for short-term loans which can only be obtained from commercial banks. The sums of money necessary, Mr. Hodges said, approach $500,000, a sum which is far in excess of the present lending limits of any

bank in the Greenwood area (Tr. 1079, Lines 21–25, Tr. 1080, Lines 1–22).

Aside from the necessity for greater lending limits to meet the needs of present Greenwood businesses, such increased lending limits are desirable from the standpoint of service to future industries which may locate in the Greenwood-Leflore County area. Mr. Thurman E. Henry, former Executive Manager of the Mississippi Malt Beverage Association, for instance, testified that the present lending limits in Greenwood were not adequate to handle the type of industry that would be desirable to attract into the area (Tr. 1181, Lines 17–20). Likewise, Horace Steele, State Comptroller of Banking for Mississippi, noted that a "bank with larger resources can do more than the banks that are presently" in Greenwood (Tr. 468, Lines 19–21).

This need for greater lending limits in the Greenwood area would not be satisfied by participations between Greenwood banks and out-of-town banks. J. H. Stanton, President of O. J. Stanton & Co., Ltd. in Greenwood, for example, testified that his experience with participation loans had been that there was a differential in the interest rate that his construction company paid in connection with a half million dollar purchase of heavy equipment, and that the lowest rate of interest was paid at local banks (Tr. 1337, Lines 24–25, Tr. 1338, Lines 1–6). Aside from the problem of interest rates, however, it is to be noted that participations by out-of-town banks are not automatically accepted by such banks so that the bank seeking a participation might have to go to more than one such bank before gaining acceptance. This of course entails delay, and in some instances time is of the essence. In the case of a participation loan of course, the decision of whether or not to loan the money cannot be made locally. From the borrower's standpoint, processing of participation loans can be timely and troublesome, and, of course,

---

19. See heading entitled "Economic Status of Leflore County" *supra.*

borrowers would generally prefer to deal directly with the man or agency who would lend him the entire amount of money. The testimony of R. B. Lampton, President of FNB Jackson, indicated that the problem currently is compounded because of the "tightest money in credit situations" ever experienced causing correspondent banks to become today "increasingly reluctant to accommodate the correspondents in the extension of credit." (Tr. 640, Lines 3–10).

If the borrower does not seek to go to a local bank to obtain a loan by its participation with an out-of-town bank, he may choose to personally go to an out-of-town bank with adequate lending limits. Of course this is undesirable to the borrower because it requires time and expense in personally travelling to the out-of-town bank. In some instances, for example in the real estate development loan area, the out-of-town bank will be reluctant to loan money to the borrower because of the desired and necessary supervision of the loaned funds and their use. Out-of-town banking also occasions communication problems. The borrower would much prefer to be able to call the lending bank on the telephone or walk down the street to see the person with whom he is dealing rather than travel several miles or make a long distance telephone call. C. L. Hall, Secretary-Treasurer of Stribling Brothers Corporation, testified that the low lending limits available in Greenwood, which forced his corporation to go out of town for financing, prevented it from engaging in the practice followed by heavy equipment dealers in large cities of depositing commercial paper in a large bank, from which it could buy back the paper if it were one year old and had equity and then sell it without recourse to one of the banks. He stated that the proposed merger, if consummated, would allow Stribling Brothers to follow this practice of putting commercial paper directly in the bank, since the lending limit available locally at the merged bank would be sufficient to meet his corpora-

tion's needs (Tr. 1043, Line 6; Tr. 1044, Line 3).

If the proposed merger is consummated, very direct benefits will result in the Greenwood area by the presence of a branch bank with increased lending limits: decisions to make large loans can be made on a local level, quickly, efficiently and positively without a borrower having to go out of town or suffering the delay and expense occasioned in securing loan participations. Borrowers in need of relatively large lines of credit will be able to secure such credit by dealing with only one creditor, and at reasonable interest rates. The benefits locally available because of increased lending limits cannot be adequately satisfied by participation loans, out-of-town banking, or by other non-bank financial institutions.

2. **THE MERGER FULFILLS THE NEED IN THE LEFLORE COUNTY AREA FOR INCREASED TRUST SERVICES**

The testimony indicated that there had been an ever-increasing demand in the Greenwood-Leflore County area for various trust services which GB and other Greenwood banks are not equipped to provided. For instance, several businessmen and representatives of corporate businesses in the area testified that they either need or are attempting to establish profit and pension sharing plans for the benefit of their employees. These businessmen testified that such programs were necessary in order for them to be competitive with other employers. The Delta Electric Power Association and Johnson Implement Company, for instance, recently established employee retirement benefit programs or pension plans with the Deposit Guaranty National Bank in Jackson. They did so because the Greenwood banks were not equipped to assist them in the establishment of such programs (Tr. 1023, Lines 10–19; Tr. 1165, Lines 16–25).

Mr. Thurman Henry, retired manager of the Mississippi Malt Beverage Asso-

ciation, testified that he has approximately $800,000 to $850,000 in investment equities, securities, preference stock and government bonds for which he requires the services of a trust department, but that he does not think the banks in Greenwood can provide him adequate service in this regard. J. H. Stanton, President of O. J. Stanton & Co., Ltd., testified that both he and his brother are attempting to establish their own personal estates and that they require the services of a trust department in their estate planning projects. A local attorney, John Frasier, Jr., testified that several residents of the Greenwood-Leflore County area have gone to banks in Jackson and Memphis for consultation about trust matters.

Greenwood Utilities requires the services of a trust department for the handling of bond issues used to finance its operations. Its general manager, Charles M. Matthews, testified that currently such bonds had to be delivered to banks in either Jackson or Memphis for necessary trust services, but that if an adequate trust department were available in Greenwood such bonds could be delivered there, thus saving the utility company the expense of delivering them elsewhere.

From this testimony, it is readily apparent that trust services in the form of advice on pension and profit sharing plans, estate planning, investments, and the handling of bond issues is currently needed in the Greenwood-Leflore County area. The present banking structure in the Greenwood area is inadequate to handle these trust needs. No Greenwood bank has a full-time trust officer or expert who can provide the trust services necessary to fulfill the current needs of the area. The local banks simply lack of expertise necessary to deal with the problems faced in this particular area. Nor can banks the size of the banks in Greenwood afford to install and staff trust departments capable of offering the services offered by FNB Jackson or capable of handling the needs of the Greenwood area. Such banks, for

instance, do not have sufficient trust funds available to establish a common trust fund for which the testimony indicated approximately one-half million dollars was necessary (Tr. 767, Lines 11–19). In contrast to the inadequate trust services now available in the Greenwood area, the proposed merger would, by establishing a branch of FNB Jackson in the Greenwood area, make such services available. For instance, FNB Jackson now has a trust department of 22 officers and employees including three attorneys, one of whom has prior service with the Internal Revenue Service. The trust department staff also includes two investment specialists. The department offers services in: (1) estate planning; (2) will review; (3) investment services; (4) retirement, pension and profit sharing plans; (5) general fiduciary services such as serving as trustee or executor and (6) corporate agent for stock transfer bond payments, etc. (Tr. 759, Line 24; Tr. 760, Line 10). Whereas the Bank of Greenwood has insufficient assets in its trust department to establish a common trust fund, the FNB Jackson trust department operates three separate trust funds of that type.

All of these services of the FNB Jackson trust department would be available immediately in the Greenwood-Leflore County area if the proposed merger is consummated. Similar services were made available immediately upon merger between FNB Jackson and the banks in McComb, Gloster, Tylertown and Greenville. The results of these mergers included a number of accounts opened and wills filed with the First National branch in these particular areas. FNB Jackson has also serviced these areas by sending personal representatives into the particular localities to consult with and advise persons in those areas as to trust matters. If the proposed merger is consummated, such services will be similarly available in the Greenwood area, and will fulfill the need for trust services which now exists in that area and which is not being met by the Greenwood banks.

It should be noted that trust services are not the type of service which can be handled on a correspondent basis. A trustee cannot delegate to another his responsibilities, so that a bank serving as executor or trustee could not designate FNB Jackson as its agent to perform certain trust functions. Nor would such a relationship, if possible, be satisfactory because of the confidence required between the customer and the bank itself as trustee. Nor is it desirable that the person requiring trust services go to an out of town bank to acquire such services. Aside from the time and expense involved in so doing, the advantage of being able to deal with a local bank which is familiar with local operations and aware of local needs is sacrificed.

3. THE MERGER FULFILLS THE NEED IN THE LEFLORE COUNTY AREA FOR VARIOUS SPECIALIZED SERVICES NOT FURNISHED BY THE GREENWOOD BANKS

The proposed merger, if consummated, will serve the convenience and needs of the Greenwood-Leflore County area by affording to that area several specialized services not now available at the banks in the Greenwood area, but which would become available through the presence of a branch bank of FNB Jackson in the area. These specialized services, for which there is present demand in the Greenwood area, include consumer loan expertise, commercial loan expertise, a foreign services department, petroleum department, public housing assistance, municipal bond expertise, qualified business advice, student loans, farm services, and broad nationwide contacts.

(A) *Commercial loan services.*—The testimony at trial clearly indicates that the banks in the Greenwood area take very little part in floor planning financing in the area. Valley Volkswagen, Inc. is the only automobile dealer in Greenwood that carriers floor planning with a local bank, which it carries with GB. The volume of inventory carried by other automobile dealers and by heavy equipment dealers is too large for the present lending limits of the banks in the Greenwood area. Not only do the local banks in Greenwood have insufficient lending limits to handle floor planning business, but also have inadequate audit departments for the purpose of successful processing and collection of loans on inventories and accounts receivable, and thus are unable to loan money to businesses in the Greenwood area and take in return their accounts receivable or inventory for security (Tr. 1104, Lines 18–21). Thus the floor planning in the Greenwood area is left to financial institutions such as Universal C.I.T. Corporation, Commercial Credit Corporation, General Motors Acceptance Corporation, Ford Motor Credit Corporation and the like. Yet there was testimony from businessmen in the Greenwood area that they would prefer to floor plan with the local banks because (1) lower rates of interest are available at the banks; (2) the banks are staffed by local people who can give overnight decisions whereas finance companies have home offices located out of the Greenwood-Leflore County area and thus correspondence and red tape must be dealt with; and (3) the local banks can provide dealers with an outlet for their retail sales finance paper, which provides an ultimate lower rate of interest to the consumer (Tr. 1115, Lines 9–21). Despite the advantages of floor planning with local banks, businesses in the Greenwood area have been forced to rely on other financial institutions for such services.

However, if the merger here were consummated, the Greenwood-Leflore County area would be able to take advantage of the experience and resources of FNB Jackson in the handling of such commercial financing. FNB Jackson has sufficient lending limits to accommodate all the businessmen in Greenwood who desire floor planning financial arrangements; it has a large, adequate audit department which is necessary to the successful handling of loans on inventory and

accounts receivable; and it also has wide experience in the inventory and accounts receivable loans field so that it has acquired a degree of expertise which could be passed on to the Bank of Greenwood in the event of the merger's approval.

Aside from the specialized experience and resources which FNB Jackson offers in the floor planning area, FNB Jackson also affords the Greenwood-Leflore County area via consummation of the merger proposed here expertise in the areas of airplane and barge loans. Such loans are unique in that special filing is required to secure the protection of a lien on the plane or vessel involved. Whereas FNB Jackson has acquired expertise in these matters, smaller banks —such as the Greenwood banks—have had inadequate experience in these matters to have gained such expertise.

(B) *Consumer loan services.*—In this area, FNB Jackson has developed the "Yegan Plan" for financing automobiles directly through the automobile dealer. Because this plan increases the volume of automobile financing through FNB Jackson, it accordingly can give the borrower a lower rate of interest on the finance charge. Under this plan automobile sales originate in the dealer's showroom. The dealer calls in a credit application to the autombile finance department of FNB Jackson at which time a bank officer approves or disapproves the loan from the information which he receives from the automobile salesman. If the loan is approved, FNB Jackson purchases the contract from the automobile dealer. By providing the automobile purchaser, the borrower under the Yegan Plan, a lower finance charge, FNB Jackson is able to serve the convenience and needs of the public.

At the present time GB does not offer the Yegan Plan or any other similar plan for consumer automobile financing. It does not have the expertise or experience necessary for the initiation of such a program. As a consequence, GB loses this type of business which it might otherwise have; the consumer loses the advantage of the lower interest rate which is possible through this particular service; and the automobile dealer loses the advantage of financing sales under this program which makes it possible for him to deal in commercial paper which is without recourse as to him. All of the advantages of the Yegan Plan would be made available in the Greenwood-Leflore County area by consummation of the proposed merger. For example, after FNB Jackson branched into the Greenville, Mississippi area and made the Yegan Plan available in that area, a Volkswagen dealer's sales improved some 70% within 90 days (Tr. 1124, Lines 8–13). After introduction of the Yegan Plan into the Greenville area, General Motors Acceptance Corporation and Ford Motor Credit Corporation both began offering automobile dealers in that area non-recourse paper, which they had not previously done.

Thus, in the area of consumer loans, the proposed merger would bring the expertise and specialized experience of FNB Jackson into the Greenwood-Leflore County area. Such expertise would serve the convenience and needs of the community, as experienced with the introduction of the Yegan Plan into other areas, by making lower interest rates available to the consumer and more satisfactory financial arrangements available to businessmen. While the banks in the Greenwood-Leflore County area do not have specialists in the consumer loan area, FNB Jackson has an installment loan department of several years standing which is run by men experienced in that field (Tr. 792, Lines 10–11).

(C) *Foreign Department services.*— The proposed merger if consummated would make available in the Greenwood-Leflore County area the services of FNB Jackson's "Foreign Department." Such services are not presently available in the Greenwood-Leflore County area, but are needed. The Staple Cotton Cooperative Association, for example, requires information from foreign countries as to their cotton market, and also requires the performance of such functions as

providing letters of credit, contacts with New York banks, and, in turn, contacts abroad. This Association must also deal with complicated trading operations which govern the sale of cotton or other farm commodities for the foreign exchange of the country in which the cotton is sold. The local banks in Greenwood are not equipped to afford this type of service to the association, while the foreign department of FNB Jackson is.

The size of a bank has much to do with whether its letters of credit will be recognized in other areas of the world. The banks in Greenwood are not of sufficient size to command much respect in international banking circles, while the size of FNB Jackson assures that it has some degree of status throughout the world. Because of its size then, and the services available through its foreign department, FNB Jackson's entry into the Greenwood-Leflore County market would make available to that area foreign services which are needed but not now available from the local banks.

(D) *Petroleum Department services.*—The testimony at trial indicated that there had been a marked increase in oil leasing activity in the Leflore County area, which is approximately 30 miles from Tinsley Field in Yazoo County, Mississippi, the largest oil field in Mississippi in terms of amount of production. In light of this increased oil lands leasing activity, there is a demand for advice as to oil leasing and production matters in the Leflore County area. Whereas the local Greenwood banks have no personnel qualified to give advice on these matters, FNB Jackson does maintain a petroleum department which is under the supervision of a geologist.

The proposed merger would thus serve the convenience and needs of the Leflore County area by affording to the citizens of that area competent counseling as to matters involving petroleum and oil leasing which would not otherwise be available through the local banking structure. This service would assist inquiring persons in the matters of leasing, the buying and selling of minerals, negotiations of seismographic permits, interpretation of division orders when customers receive an interest in oil property, and in credit inquiries concerning businesses involved in the petroleum industry.

If should be noted that production loans in the petroleum industry are not available to correspondent banks of FNB Jackson because these loans must be continuously processed and controlled by experienced personnel in that field. Thus, such loans would be available in the Greenwood area from local banks only through entry of a larger bank into the area via merger.

(E) *Municipal Bond services.*—Thurman E. Henry, retired manager of Mississippi Malt Beverage Association, a former City Commissioner in Greenwood and now Mayor-Elect of that City, testified that the City of Greenwood does not have adequate local advice on the subject of municipal bonds. However, the proposed merger would make such advice available because FNB Jackson has specialized personnel who can handle matters such as bond issues for municipalities. Henry testified that the expertise of FNB Jackson would be of great service to the City of Greenwood in advising and assisting in the issuance of revenue bonds, which are now needed to finance certain necessary improvements in water, electric and sewage facilities; and that such assistance was not presently available from the four local banks. He also testified that within the next few years Greenwood Utilities must float a bond issue of some four or five million dollars for the expansion of its light and water plant. Also, he stated, the City of Greenwood has been ordered to cease emptying its sewage into the Yazoo River which means that the City must construct additional sewage lagoons and disposal plants, all of which would exceed an amount of $3\frac{1}{2}$ million dollars. In the issuance and sale of the bonds necessary to finance these improvements, FNB Jackson would be in a position to get the best possible interest rate for the City of Greenwood and could

also assist in giving counsel to the City in the issuance of such bonds concerning their redemption value, maturities and scheduling (Tr. 1180, Lines 1–25).

Thus, through lending its expertise in municipal bond matters, the entry of FNB Jackson into the Greenwood-Leflore County area by merger would serve the convenience and needs of the community.

(F) *Expert business advice.*—J. J. Ferguson, a general contractor and part owner of J. J. Ferguson Sand and Gravel Company, and James S. Henderson, President of Henderson Building and Supply Company, testified that they were in need of expert business advice which would be available from a bank the size of FNB Jackson but which was not currently available from the local banks in the Greenwood area. The proposed merger, if consummated, would thus serve the convenience and needs of the community by making available such expert business advice to local Greenwood businessmen.

(G) *Public Housing services.*—Housing in the Greenwood-Leflore County area is substandard (Tr. 1150, Lines 19–24; Tr. 942, Lines 21–22). As fully discussed above [20] it is important that Greenwood attract industry into the area to provide jobs for displaced agricultural workers. An important attraction to industry is the availability of housing in an area; therefore, it is important that Greenwood have adequate housing, not only from the standpoint of the attraction of industry, but from the standpoint of simply providing adequate living standards for its citizens. FNB Jackson has extensive experience in the specialized loan area of public housing programs, experience which is not shared by the local Greenwood banks. Such loans involve complexities and technicalities not encountered with ordinary loans and require a certain degree of expertise to handle.

FNB Jackson's expertise in such loans is evident from its participation in the financing of a 13-story home for the elderly in Jackson, Mississippi, whose apartments will rent for less than $50 a month, and from its participation in a project under the National Housing Act in Greenville, Mississippi where 150-unit apartments are being built for minority groups.

This expertise would be available in the Greenwood area if the proposed merger between FNB Jackson and GB is consummated and thus such merger would serve the convenience and needs of the community in this respect. It is to be noted that FNB Jackson participated in the Greenville apartment complex financing shortly after its merger with Commercial National Bank in that city; similar participation in that type of project could be expected in the Greenwood area if the merger is consummated.

(H) *Farm services.*—FNB Jackson has on its staff specialists in the areas of agriculture and forestry, whose advice and services would be available to residents of the Greenwood-Leflore County area if the merger is consummated. A further service in the farm area which is not presently available would result from the entry into the Greenwood-Leflore County area of the increased assets represented by FNB Jackson. Mr. H. L. Hodges, Vice President and Treasurer of Staple Cotton Discount Corporation, which engages in production loans to farmers, testified that the Discount Corporation, to facilitate its service to its customers, maintains 30 bank accounts in small banks throughout the Delta. He said it is necessary to transfer funds to cover loans that have been made in the various areas and to cover possible overdrafts made on the various accounts. At the present time, the Discount Corporation accomplishes these transfers of funds by telephone from one of the larger banks so that the money can be transferred to the various small banks in the Delta area with which it has accounts. Mr.

---

20. See heading entitled "Economic Status of Leflore County" *supra.*

Hodges said that to do this by 9:00 o'clock every morning, as is required by telephone, creates definite problems because of errors and omissions that occur. He testified that if FNB Jackson were in Greenwood through merger with GB, it would only be necessary to hand the list of amounts to be transferred to the branch in Greenwood, and relieve the Discount Corporation of any further work or trouble. The availability of this service to Staple Cotton Discount Corporation and other similarly situated financial institutions in the Greenwood area would further serve the convenience and needs of the community,

(I) *Student loan services.*—FNB Jackson operates a student loan program to students in the Hinds County area with over three thousand such loans on its books at the present time, representing a total amount loaned of approximately $1,300,000. The local Greenwood banks are simply too small to engage in such loans. Thus the merger if consummated would further serve the convenience and needs of the community by making such student loans available to students from the Greenwood-Leflore County area.

(J) *National contacts.*—FNB Jackson maintains a National Affiliation Program through which contacts and calls are made on individuals and businesses in 26 states. None of the local Greenwood banks is able to engage in such a program. The proposed merger if consummated therefore would probably bring outside capital into the Greenwood-Leflore County areas through access to this national affiliations program now conducted by FNB Jackson. The testimony indicated that such national calls have aided the Greenville area to obtain national accounts through the Commercial National Bank after the merger of FNB Jackson with that bank. Not only would the merger give access to such out-of-state accounts to the Greenwood area, but it would also provide entrees at the national level for the local citizenry of Greenwood through the affiliations of FNB Jackson, which maintains broad nationwide contacts. In so doing, the proposed merger if consummated would further serve the convenience and needs of the citizens of the Greenwood-Leflore County area.

4. OTHER BENEFITS PECULIAR TO THE LEFLORE COUNTY AREA RESULTING FROM THE MERGER

Cotton financing has been a large part of the portfolio of the Greenwood banks and the business of financing these cotton loans is a risky one. But if losses were to occur in the financial area of cotton loans, as FNB Jackson Board Chairman Robert M. Hearin testified, a large bank "could certainly absorb losses much better than could a small bank and these are normally large loans." (Tr. 534, Lines 9–18). Thus the proposed merger if consummated would serve the convenience and needs of the Greenwood-Leflore County area by reducing the risk undertaken by cotton financing in the area, thereby guarding against possible bank failures in case of a depression in the cotton industry.

FNB Jackson has a capital-deposit ratio of approximately 10%, whereas Greenwood Bank has a low capital-deposit ratio of only about 6½%. The substantially greater capital-deposit ratio which would be present in the Greenwood area as a result of consummation of the proposed merger would offer greater protection to depositors in the Greenwood-Leflore County area and in so doing it would serve the convenience and needs of the community in this regard.

FNB Jackson encourages its personnel and officers to take an active part in all community service, cultural, civic, religious, and other activities. FNB Jackson Board Chairman Robert M. Hearin, for instance, has served a three-year term on the Board of Directors of the New Orleans branch of the Federal Reserve Bank of Atlanta and is a member of the Board of Directors of the United States Chamber of Commerce. The proposed merger if consummated would

give further impetus to personnel of GB to engage similarly in community services.

That such services would be beneficial to the community was bolstered by the testimony of Dr. Joseph A. Greene, Jr., Dean of the School of Business Administration at the University of Southern Mississippi, who stated that in his opinion a branch bank in Leflore County regulated by FNB Jackson would provide excellent leadership in the Leflore County area and would be beneficial to that county (Tr. 977, Lines 13–15); Tr. 978, Lines 3–5). The Mississippi State Comptroller of Banks, Mr. Horace Steele, expressed agreement with this statement of Dr. Joseph A. Greene, Jr. saying that he thought the merger of FNB Jackson and GB "will be helpful to the Greenwood-Leflore area" (Tr. 466, Lines 13–15).

The proposed merger would be further beneficial to the community in the improvement of bank services available at all local banks in the Greenwood area. Dr. Gaines M. Rogers, Dean of the College of Business and Industry at Mississippi State University, for example, testified that when a large and well-run bank entered a community, the entire banking atmosphere of that community improved because of the resultant alertness on the part of all banks in the community to the needs of the community (Tr. 376, Lines 20–25). Likewise, Mr. C. A. Miller, Executive Vice President of Greenwood Bank said that "I think that a strong bank in the community would reflect itself throughout the community" (Tr. 693, Lines 7–11).

## THE MERGER RESOLVES GREENWOOD BANK'S PRESENT PROBLEM OF MANAGEMENT SUCCESSION

Bank of Greenwood faces a very critical management succession problem. Its President, Robert P. Parrish, is 63 years of age; its Executive Vice President, Mr. C. A. Miller, is 61 years of age; and the next man in line in management succession is Ralph Pettey, who is also 61 years of age. Recognizing the potential problem when these relatively old men are unable to continue in their present management positions, Bank of Greenwood has made attempts to obtain young men to train for future management positions. Within the past few years they have retained the services of three young men who were potential management successors. However, when First National Bank of Greenwood moved into the area, they employed two of these men from Greenwood Bank, one as New President of First National Bank of Greenwood. The third young man upon whom Bank of Greenwood was relying as future management material was killed in a tractor accident.

Because of the high salary and benefit plans which must be offered to young men, GB, as a small bank, is at a very serious disadvantage in the hiring of young personnel who are qualified for potential management positions. Established personnel at GB resent the paying of higher salaries to young men, aside from the financial drain which such a practice imposes on a small bank. Nor is GB able to offer a young employee a funded pension plan, relying instead on an inadequate annuity insurance program for its personnel.

On the other hand, FNB Jackson is able to attract young, top-notch potential management personnel. FNB Jackson has the resources to pay high salaries to such men and has a very thorough training program which is also attractive to young men going into the banking business. FNB Jackson also has a retirement plan which is on an actuarial basis and is completely contributory on the bank's part. In addition, FNB Jackson maintains a profit sharing plan, also wholly contributory on the bank's part. Young men thus are attracted to FNB Jackson, and the proposed merger if consummated would make such young men available for management succession within GB as a branch of FNB Jackson.

The Court finds after considering the testimony of C. A. Miller, Executive Vice

President of Bank of Greenwood, that GB has made very definite and reasonable efforts to attract young men into its system as potential management successors. However, due to the more attractive positions available at larger banks in the State and because of the salary and other benefits which a small bank is not equipped to offer to a relatively young man, GB's efforts to attract executive personnel have not borne fruit. In this regard, the Court feels that Bank of Greenwood has satisfied the strictures of United States v. Third National Bank in Nashville, 390 U.S. 171, 189, 88 S.Ct. 882, 893, 19 L.Ed.2d 1015 (1968) which stated:

> it was incumbent upon those seeking to merge in this case to demonstrate that they made reasonable efforts to solve the management dilemma of Nashville Bank short of merger with a major competitor but failed in these attempts, or that any such efforts would have been unlikely to succeed.

In the Court's opinion, merger with a larger bank is the only sure answer to GB's management succession problem. Short of such a move, GB would have to rely on a stroke of luck to procure young men necessary for adequate management succession in time to properly train them to take over the responsibilities of the bank's management.

## PUBLIC INTEREST IN CONVENIENCE AND NEEDS OUTWEIGHS ANTI-COMPETITIVE EFFECTS ASCRIBED TO THE MERGER

The Court finds that the relevant market area to be considered in weighing the convenience and needs argument includes not only the Greenwood-Leflore County market as contended by the Justice Department, but also includes the Delta region and the State of Mississippi as a whole as is contended by the Defendant banks and the intervening Comptroller of the Currency. However, consistent with the Court's undertaking of the discussion of the convenience and needs of the community after a finding that no anti-competitive effects would result from the proposed merger, the Court will nonetheless assume the Leflore County area to be the relevant market, as contended for by the Plaintiff, and weigh the convenience and needs of the Leflore County area alone against the anti-competitive effects which the Justice Department alleges will result from consummation of the proposed merger.

In United States v. Provident National Bank, 280 F.Supp. 1, 21 (E.D.Pa. 1968) the Court hypothesized a situation in which it might approve a merger although such merger had anti-competitive effects. The Court said:

> In particular cases, a community might need a larger bank which can handle larger loans and provide more sophisticated services. A merger, albeit anti-competitive, might be allowed in this instance if the community's need and convenience for a larger bank clearly outweigh the anticompetitive effects.

In thus making out a theoretical case in which that Court would approve a merger, it is this Court's opinion that *Provident National* foresaw the exact situation now facing this Court in the proposed merger between FNB Jackson and GB. As extensively detailed above,[21] there is a very definite need and demand in the Greenwood-Leflore County area for a larger bank, one with larger lending limits, for a bank with the specialized services furnished through a large bank but unavailable through a smaller bank. Not only do such needs now exist, but the demand for such services and facilities available in a larger bank will undoubtedly increase in the future.

In *Provident National* the Court said:

> Since the community's primary need is for a competitive banking market, an anti-competitive merger, if approved, eliminates one aspect of the

---

21. See heading entitled "Convenience and Needs of the Community to Be Served," *supra.*

**1222**

community's need for banking services. Thus, anti-competitive mergers should be approved only in those few instances where these anti-competitive effects are *overwhelmed* by the more compelling needs of the community. 280 F.Supp. at 21 (emphasis added).

Although this Court feels that the "overwhelmed" standard set out by *Provident National* is stronger than the "clearly outweighed" standard contemplated by BMA–66, nonetheless it is this Court's opinion that the convenience and need served by the proposed merger in this case do overwhelm the anti-competitive effects ascribed to this merger by the Justice Department. The very wide range of benefits introduced into the Greenwood-Leflore County area by this proposed merger far outweigh the anti-competitive effects outlined by the Justice Department. It is this Court's opinion therefore, assuming that Leflore-Greenwood area is the relevant market area as alleged by the Plaintiff, that the benefits to that area alone are sufficient to meet the test contemplated by BMA–66 in the second stage of the two-stage determination contemplated there as the test for determination of whether a proposed merger should be approved.

It is this Court's opinion, however, that the relevant market area to be considered in applying the convenience and needs test is larger than the Greenwood-Leflore County area. This Court feels that the convenience and needs served in the Delta region and the State of Mississippi as a whole, as argued for by the Defendants and intervening Comptroller of the Currency, should also be considered. This Court's opinion is supported by an examination of the legislative history of BMA–66. For instance, in debate on the Bill, Senator Robertson explained: "Community to be served" means the "entire area to which services are or could be supplied" and not "artificial boundary lines, branching areas limited in one way or another by

the different states have little or no significance."[22] If "community to be served" means the "entire area to which services are or could be supplied," it is apparent that in the instant case the entire area to which services are or could be supplied would include the Delta region which will benefit substantially from consummation of the proposed merger, and the State of Mississippi as well, whose economy will be greatly aided by the boost to the development of a strong, big bank such as FNB Jackson.

## THE CONVENIENCE AND NEEDS OF THE MISSISSIPPI DELTA AREA WILL BE SERVED BY THE PROPOSED MERGER

The Mississippi Delta area includes 18 counties bounded on the West by the Mississippi River, on the East by the hill sections, on the South by Vicksburg, and on the North by Memphis, and includes Leflore County. The total population in the Delta area in approximately 610,000, of which only 28,000 persons are employed in industrial jobs. The backbone of the economy in this area thus is agricultural and traditionally has been so. In the Mississippi Delta "Cotton is King."

However, as Dr. Kenneth C. Wagner, Director of the Mississippi Research and Development Center, accurately described at trial, the present agricultural economy existing in the Mississippi Delta offers no real economic future for the area since employment in agriculture due to mechanization continues to decline and since competition from synthetic fibers has greatly weakened the cotton economy (Tr. 902–903). Dr. Wagner also pointed to the probability that the government will cease cotton subsidies within three years thus further weakening the economic base of the Mississippi Delta. The decline in agricultural employment in the Delta area is readily evident from a survey conducted by the Industrial and Community Development Division of the Delta Council

22. Remarks of Senator Robertson, 112 Cong.Record 2549–50 (Daily Ed. Feb. 9, 1966).

which indicated that in a three-county area of the Mississippi Delta there were between 11,000 and 12,000 unemployed persons. This staggering amount of unemployment already existent as a result of the mechanization of the agricultural industry coupled with the dire prospect of future agricultural growth in the area makes it essential that the Delta area develop new sources of income and new sources of jobs.

The Mississippi Research and Development Center foresees a possible solution to this great problem facing the Mississippi Delta area. It envisions a totally new industry for the area involving food growing, processing, and packaging, which in time might result in the Mississippi Delta becoming one of the three major food producing centers in the nation (Tr. 904–907). It is obvious that the need for capital will be particularly great in the development of such an industry. Dr. Wagner testified that the capital needs for this new food industry in the Delta area would reach ten million dollars in its first year; and that two or three years later the need for capital would increase to 100 million dollars. The proposed merger would introduce into the Delta area a bank of sufficient resources to help finance such large capital needs. These needs simply cannot be provided by small local banks. But a larger bank such as FNB Jackson can assist in the mobilization of funds from areas where there is a surplus of deposits to areas such as Greenwood where there is a demand for such resources.

Dr. Haywood also testified as to the need for mobilization of funds in this area. He testified that a moderately large bank would strengthen the area and enhance its chances of being able to make the changes and adjustments necessary to permit it to continue to be a developing part of the economy. He noted that presently the Delta area is receiving help through financial agencies of the Federal Government. He stated that the merger would provide the opportunity for a private institution to move into the area and assume some of this burden of financing. Short of a merger such as this, the area would have to continue to rely upon government assistance at least to the same extent which it now does (Tr. 1475–78).

With the agricultural economy of the Delta area declining, the area must make a transition to fulfill the needs caused by the unemployment attendant upon such decline and must find new ways to meet the economic needs of the area. In this regard, W. E. Eason, manager of Greenwood Production Credit Association, and Dr. Charles R. Sayre, President and General Manager of the Staple Cotton Cooperative Association, both testified that the Mississippi Delta area will be confronted with needs from two to three times the current capital needs of agriculture in the area within the next 15 years (Tr. 994, Lines 4–8; Tr. 1065, Lines 17–19). Relatively large banks with large capital resources are necessary in the Delta area to help meet these capital needs. If the proposed merger is consummated, FNB Jackson would be able to lend its resources to meet this growing capital need.

Within the present agricultural industry itself, there is an increasing need for large capital outlays. Dr. Sayre, for instance, noted that no matter what aspect of the farm problem is dealt with —production, marketing, processing— capital requirements today are many times greater than they were fifteen or twenty years ago. Moreover, he noted the seasonal nature of the agricultural industry produces very high peaks of money needs, such as during the planting and harvesting seasons. This seasonality problem must be dealt with on a day to day basis. If an extended period of good weather, for example, allows continued work in the fields, it is possible that Dr. Sayre's organization, the Staple Cotton Cooperative Association, might find itself needing $600,000 on a single day and needing it quickly (Tr. 1009, Line 19; Tr. 1010, Line 5). The proposed merger would introduce FNB Jackson into the Greenwood area and

make the large capital resources of that bank available for such immediately-arising needs.

The leaders in the Delta area recognize that, as agriculture declines, industry must be brought into the Delta region to fill the void caused by declining agriculture. The local banking structure plays an important part in the attraction of industry into an area, since every industrial prospect wants to know the type and financial depth of the financial institutions in the area in which the prospective plant is to be placed (Tr. 1002, 1004). Moreover, the business philosophy and national contacts of a larger areawide bank such as would be introduced in the Delta area by entry of FNB Jackson into Greenwood are of great benefit to an area in the development of industry. Such a large, strong bank is able to muster capital resources and put them to use in the particular area where need arises. Industries locating in a region must construct plants that cost several thousand dollars and perhaps several million dollars. They must install machinery and equipment and maintain inventory on hand, all of which must be paid for, so that industrial entrants are always interested in the possible means of financing such activities. A large bank such as FNB Jackson affords to such industries the financing necessary for such large scale outlays. In the past, revenue bonds have been widely utilized in the financing of industrial plant construction. However, it is now becoming extremely difficult to finance construction in such a manner because revenue bond issues must now be registered, under most circumstances, with the Securities and Exchange Commission. Such registration involves a great deal of expense and time. The effect of the registration requirement in the Mississippi Delta area has been that no use has been made of such revenue bond financing programs since the stringent SEC requirements were instituted (Tr. 1350, Line 19; Tr. 1351, Line 5).

Since the existing banks in the area are not able to provide necessary capital resources for development, which FNB Jackson would be able to provide, the proposed merger, if consummated, would be of great benefit to the Delta area and would contribute substantially to the convenience and needs of the entire region.

## THE CONVENIENCE AND NEEDS OF THE STATE OF MISSISSIPPI AS A WHOLE WILL BE SERVED BY CONSUMMATION OF THE PROPOSED MERGER

The State of Mississippi is and has historically been a capital deficit area.[23] This is primarily due to the State's low per capita income, the lowest in the nation, which means that people in the State have to consume most of their incomes in order to live leaving little to save, so that savings are not generated, and the State is left with insufficient capital resources for development. Therefore, the State of Mississippi has been forced to go outside to seek the capital needed for its economic and industrial development.

It is primarily because of this fact that the State Agricultural and Industrial Board passed a resolution favoring the proposed merger after discussion of the merger with the Governor of the State of Mississippi, John Bell Williams. The A & I Board took the position that the State of Mississippi needed a stronger bank to attract business and furnish capital so that the State could improve its economic condition. The A & I Board felt that stronger banks were needed in the State to meet the needs of industry and thereby help the economic growth of the State (Tr. 1092–1094). The Attorney General of the State of Mississippi, A. F. Summer, testified that it was the official policy of the State to

---

23. See detailed discussion of this in heading entitled "The Nature and Perspective of Banking in the State of Mississippi and the Economic Milieu in Which It Operates," *supra.*

attract industry and that to do so the State needs strong, sound financial institutions. He said that it was disheartening to discover that good industrial prospects had to go to Memphis, Tennessee, New Orleans, Louisiana or Mobile, Alabama to meet their financial needs. He testified further that it was difficult to convince such a prospect that Mississippi is where it should locate, when it learns that the operating capital necessary for its business is not available within the State (Tr. 1093). The proposed merger would help alleviate this problem by adding to the resources of Mississippi's second largest bank, FNB Jackson, thereby making it more capable of fulfilling industrial needs within the State and thus making the State more attractive to industrial prospects. It would also make available a source of capital necessary for economic growth from within the State, aside from the attraction of industry from outside.

Another very substantial manner in which a strong financial institution will aid the economic development of the State is from the standpoint of capital mobility. Mississippi, being a state of limited resources, must utilize what resources it has in the best manner possible by placing such resources where they will do the most good in increasing output and therefore increasing income. A large, strong bank is able to muster capital resources and put them in use in the particular areas where needs arise. Such an institution, by providing capital mobility, undergirds the financing of economic development. It also assists industrial development by making available larger loan limits than possible with smaller banks and by providing certain specialized services important in the development of industry, such as international financing.

It is to be noted that FNB Jackson's national call program would also be further bolstered by the addition of the resources of the Bank of Greenwood. As a result of the merger FNB Jackson should be more successful in its efforts to attract investors from outside the State. Of course the attraction of such investors to the State helps to alleviate Mississippi's position as a capital deficit state. Thus the merger between FNB Jackson and Bank of Greenwood is a step in the right direction toward the attraction of outside funds, as well as toward the utilization of existing funds in the State more efficiently in order to benefit the State's economic development efforts.

It is to be noted that for many years the Jackson banks have competed with the banks in Memphis, Tennessee, New Orleans, Louisiana and Mobile, Alabama. These banks are able to compete in Mississippi because of their close proximity to the boundaries of the State. Mississippi banks have lost business to these out-of-state banks over the years because Mississippi has not had banks of sufficient size to provide necessary services. These out-of-state banks have, over the years, built up very strong correspondent bank relationships with Mississippi banks. For instance, there are about 140 million dollars more Mississippi bank deposits maintained outside the State of Mississippi than are maintained inside the State. (Tr. 573, 574) This situation could be alleviated somewhat by approval of the merger in question because it would put FNB Jackson as close to the Memphis trade area as the State branching law permits, thus placing FNB Jackson in a position to render service to the small banks north of the 100 mile radius of Jackson in economic development and in seeking industry. Thus the merger would help FNB Jackson to attract some of the Mississippi deposits now in out-of-state banks, giving further relief from the capital deficit problem.

Another problem in the Mississippi banking structure has been the very large number of small banks. Dr. Haywood testified that the State of Mississippi has been overbanked in the sense that it has too many banks in relation to its population (Tr. 391). Dr. Joseph Greene, Dean of the School of Business Administration at the University of

Southern Mississippi, testified that one of the shortcomings of the small bank is that it is unable to give the financial leadership and guidance in economic growth which larger banks are able to do (Tr. 975). The number of banks in Mississippi per population is greater than the number of banks per population in the nation as a whole. Most of these small Mississippi banks are located in rural areas, but Mississippi is and has been for the past several years undergoing a transition with respect to its banking structure. From about 1890 to 1920, according to the testimony of Dr. Haywood, there was a great deal of bank chartering activity in the nation as a whole and in the State of Mississippi. At that time the rural economy was in a much better condition relative to the rest of the economy than it is now. There was much agricultural activity in the State of Mississippi, and banks were located in rural areas where the population and the economy were centered. However, after World War II, population shifts began to affect the State of Mississippi: there was an out-migration of people from the State as the agricultural base became less and less a source of employment, and there was a population shift from rural to urban areas within the State. Yet the Mississippi banking structure has not adjusted to this shift in population, which is expected to continue in the future (Tr. 392). The proposed merger is the type of adjustment of the banking structure which is necessary to meet the changing needs of the State resulting from the population shifts which have occurred since the end of World War II.

As of 1967, Mississippi had relatively more banks in the five to ten million dollar deposit guaranty category than in the United States as a whole. The same thing was true for banks in the 10 to 25 million dollar deposit guaranty category period. This demonstrates that Mississippi has developed banks capable of serving highly localized needs such as checking accounts and savings and time deposits, the services that are particularly important to serving a local market. However, the State of Mississippi lacks a single bank in the very largest category, that is, 500 million and over in deposits. And in the second largest category, 100 million to 500 million in deposits, Mississippi has but 1.42% of the national total. Mississippi is also below the national figure for the next two largest categories, 50 million to 100 million dollars in deposits and 25 million to 50 million in deposits. Thus Mississippi suffers a deficiency in its banking structure insofar as serving regional and state needs is concerned, although it does an adequate job serving the localized needs of its customers. The proposed merger would add to the resources already possessed by FNB Jackson and would therefore place that bank in a position to better serve the statewide needs of Mississippi, while actually improving the localized services available in the Greenwood-Leflore County area.

It is to be noted that the Deans of the business schools at the three major Mississippi Universities [24] agreed that the only method open to the State of Mississippi to achieve a system · of large, strong commercial banks is through branching. The State of Mississippi has no large metropolitan areas to enable a relatively large bank to exist. It does not have cities like Memphis or New Orleans. If its financial institutions are confined to their home cities they will not be as large as these out-of-state institutions and therefore cannot serve the needs of the State, some of whose financial needs would be abandoned to out-of-state institutions. There would be no great need for out-of-state financial institutions to satisfy Mississippi's financial needs if the proposed merger and similar branching efforts by FNB Jackson and other state banks are allowed to be consummated.

In sum, the State of Mississippi is a capital deficit area and needs to attract

24. McNew, Tr. 405; Rogers, Tr. 882; Greene, Tr. 969.

financial resources into the State. This is best done by strong, sound financial institutions. There is a definite deficiency of such institutions in the State of Mississippi at present. The proposed merger, if permitted, would help the State in the development of a strong, sound financial institution able to attract outside resources into the State. It would also help to better allocate resources within the State through the use of branch bank facilities: loans needed in one area of the State could be secured by utilizing resources or deposits from another area of the State which did not need such deposits at that particular time. Of course such allocation of resources, or capital mobility, is not available through the unit bank. In helping to attract resources from outside the State and in better allocating resources within the State, the proposed merger would fulfill two very great needs of the State of Mississippi.

## PUBLIC INTEREST IN CONVENIENCE AND NEEDS OF THE DELTA REGION AND STATE SERVED BY MERGER OUTWEIGHS ANTI-COMPETITIVE EFFECTS ASCRIBED TO MERGER

The Court having concluded above that the public interest in the convenience and needs of the community served by the proposed merger overwhelmingly outweigh any adverse competitive effects of the proposed merger in the Leflore County area alone, it follows, a fortiori, that the convenience and needs of the Mississippi Delta region are served to such an extent as to outweigh any anti-competitive effects within the region, and that the same is true for the State of Mississippi. As discussed above, the Mississippi Delta region is in the midst of an economic transition and it is mandatory that new sources of jobs and resources be secured. The proposed merger, by introducing a bank with the resources of FNB Jackson into the area, would help the Delta meet the demands of its present economic cri-

sis. In so doing, the convenience and needs of the Delta area are served to such an extent as to clearly outweigh, and overwhelmingly outweigh, the anti-competitive effects ascribed to this merger by the Plaintiff.

As noted above, the State of Mississippi is a capital deficit area with a definite need to attract resources from outside the State, to build home-grown industries within the State, and to allocate what resources it does have within the State in such a manner as to best fulfill the State's needs. The testimony in this case unequivocally established that such functions can best be fulfilled by large, sound financial institutions. The proposed merger would thus greatly aid the State of Mississippi by helping to develop FNB Jackson into such a large, sound financial institution, capable of meeting the above needs of the State. The beneficial effect of the proposed merger in accomplishing these functions far outweigh any anti-competitive effects ascribed to this merger by the Plaintiff.

## THE CONVENIENCE AND NEEDS OF THE COMMUNITY CANNOT BE SERVED BY A MEANS SHORT OF THE PROPOSED MERGER

It was suggested in United States v. Third National Bank in Nashville, 390 U.S. 171, 88 S.Ct. 882, 19 L.Ed.2d 1015 (1968), that, even though the convenience and needs of the community outweigh any adverse anti-competitive effect of a proposed merger, such merger might be disapproved if some means short of merger could be resorted to to accomplish the same results. The Court there said:

> But this analysis puts aside possible ways of satisfying the requirement of convenience and need without resort to merger. If the injury to the public interest flowing from the loss of competition could be avoided and the convenience and needs of the community benefited in ways short of merger but within the competence of reasonably

able businessmen, the situation is radically different. In such circumstances, we seriously doubt that Congress intended a merger to be authorized by either the banking agencies or the courts. If, for example, just prior to this merger, an experienced banker with competent associates had offered to take over the active management of the bank or another competent businessman with the willingness to tackle the management problems of the bank had offered to buy out the Weaver interests at an acceptable price, it seems obvious that the Weaver group, which seeks to justify the merger in terms of producing an institution rendering better banking service, should not be permitted to merge and to ignore an available alternative. Otherwise, the benefits of competition, acknowledged by Congress would be sacrificed needlessly. For the same reasons, we think it was incumbent upon those seeking to merge in this case to demonstrate that they made reasonable efforts to solve the management dilemma of Nashville Bank short of merger with a major competitor but failed in these attempts, or that any such efforts would have been unlikely to succeed. 390 U.S. at 189, 88 S.Ct. at 893.

The Court is of the opinion that FNB Jackson and GB were faced with no alternative by which to serve the convenience and needs of the community detailed above short of the merger proposed herein. As noted above, the Greenwood-Leflore County area, if anything, is overbanked. The resources of the area are spread among the five county banks, so that no one of them is in a position to develop the extensive services demanded in this geographic market. Nor is the population of the Greenwood-Leflore County area growing at such a rate as to be able to support an additional large, viable bank, with the ability to furnish the services required, and to develop the necessary loan limits, within even the remotely foresee-

able future. There is simply no way in which the Leflore County banking structure can meet the convenience and needs of the community without the assistance of outside resources.

There are two ways in which an outside bank might enter the Leflore County area: by a merger such as the one proposed herein and by de novo entry. The latter alternative is simply not feasible in Leflore County.[25] As extensively discussed above cotton is the major factor in the Leflore County market. However, competition from synthetic fibers and the uncertainty of the government support program over the next few years make the future of cotton in Leflore County highly speculative. Given this posture of Leflore County's most important product, no bank would think about branching de novo into Greenwood, according to the testimony of Dr. Haywood (Tr. 1440–1441).

In addition, with the agricultural base of Leflore County declining and with the present manufacturing activity in the area in a relatively stagnant position (Tr. 1441–1443), it is apparent that future expansion of the Leflore County economy is dependent upon the attraction of new industry (Tr. 1443). As with the future of cotton in Leflore County, the question of attraction of new industries is also a highly speculative one. With such uncertainty, there is simply no justification for starting a de novo bank in the Leflore County market (Tr. 1443–1445). Moreover, assuming the entry of a sixth bank into that market, it is highly questionable whether such a bank would survive. And even should a sixth bank be able to survive, it is highly probable that within a few years one of the other banks now in Leflore County would be driven to failure or voluntary liquidation (Tr. 1443–1445).

In view of this situation, some witnesses testified that it was highly unlikely that the regulatory authorities

---

**25.** See heading entitled "The Economic Feasibility of De Novo Branching into Leflore County," *supra.*

would even authorize a sixth bank in Leflore County. Dr. McNew, for example, testified that the regulatory authorities would not authorize a new bank since such would be detrimental to the banking structure of Leflore County (Tr. 810–811). Mr. Horace Steele, State Comptroller of Banks for the State of Mississippi, said that: "I wouldn't let anybody go into Greenwood now * * * nor Leflore County * * * the damage it could do to the existing banks from an earning standpoint and from affecting their liquidity" makes the presence of a sixth bank in Leflore County prohibitive (Tr. 458). Not only does the speculativeness of the future of the Leflore County economy deter banks from branching therein de novo, but such a move would probably be prohibited by the regulatory authorities.

Moreover, de novo entry into Leflore County is not economically feasible. A Vice President of FNB Jackson who is also Comptroller of the Bank, made a cost study of de novo entry into Leflore County and projected the estimated cost of establishing such a branch. He projected expenses for the first 12 months of operation of a branch of FNB Jackson in Leflore County of $169,995, and income during the same period of approximately $66,500. Thus the first year's operation would result in a net loss to FNB Jackson of approximately $103,000. It would take between seven and ten years for a branch of FNB Jackson in Leflore County to show a net profit (Tr. 780–785). On the other hand, entry by merger would immediately add to the income of FNB Jackson. It is to be noted that this de novo branch entry cost estimation and projection does not include salary expenses of specialists. The full services of FNB Jackson would be available in the Leflore County area only after a period of years through a de novo branch. However, through entry by merger, the full services of FNB Jackson would be available immediately. As noted by FNB's Board Chairman, Robert Hearin, de novo branching into a new area results in slow growth and slow development of services available. Thus, even were a de novo branch in Leflore County possible, such means of entry into the area would not serve the convenience and needs of the community nearly as well as entry by merger.

Another substantial obstacle to establishment of a de novo branch in Leflore County by FNB Jackson is the fact that such a move would incur the displeasure of not only the banks in the City of Greenwood, but also that of banks throughout the State of Mississippi (Tr. 597). According to the testimony of the President of FNB Jackson, Mr. Lampton, and of the Executive Vice President of GB, Mr. C. A. Miller, such displeasure would cause FNB Jackson to lose considerable correspondent banking balances throughout the State and would practically destroy their correspondent banking department (Tr. 597; Tr. 688–690).

In view of the foregoing circumstances, it is this Court's opinion that the only manner in which the convenience and needs of the Leflore County area can be served is through merger by one of the existing banks in that area with a larger bank from some other area. The resources available within the market now and which will be available in the future are simply inadequate to meet the community's needs. The entry of a larger bank into the market by a de novo branch is not feasible. A merger such as the one proposed herein is therefore the only method by which the convenience and needs of the Leflore County area can be served.

### CONCLUSION

Based upon *reasonable probability* arising from the actual and practical realities of the business of banking, as contrasted to *possibilities* arising from theoretical postulates, this Court on review de novo, as required by law, applying the standards prescribed by the Bank Merger Act of 1966 (12 U.S.C. sec. 1828(c) (5), (7) (B), concludes that the proposed merger of the Defendant banks, First National Bank of Jackson

(FNB Jackson) and Bank of Greenwood (GB) is lawful and not in violation of the Bank Merger Act of 1966 (12 U.S.C. sec. 1828(c)), or Section 7 of the Clayton Act, (15 U.S.C. sec. 18) and in support of this conclusion finds the following:

1. That this Court has jurisdiction of the parties and of the subject matter;

2. The stipulated and agreed relevant geographic market or section of the country for the assessment of whether the proposed merger between the Defendant banks violates Section 7 of the Clayton Act by adversely affecting competition, actual or potential, is Leflore County, Mississippi;

3. The appropriate or relevant line of commerce or product market in which to test competitive or anti-competitive effects of the proposed merger between the Defendant banks in broader than commercial banking, that is, it includes all of the financial institutions competing in the relevant geographic market for the savings and investment dollars and extension of credit, namely, five commercial banks, four savings and loan associations; one credit union; several financial companies including the giants in the finance company business, Universal C.I.T., Commercial Credit Corporation, and General Motors Acceptance Corporation; several life insurance companies; and securities brokers and dealers; the Federal Credit agencies and affiliated organizations, Federal Land Bank, Farmers Home Administration, Greenwood Production Credit Association, and Staple Cotton Cooperative Association; and there are no reasonably probable anti-competitive effects flowing from this merger in this particular line of commerce or product market;

4. Assuming that only commercial banking is the appropriate and relevant line of commerce or product market for judging the effects of this proposed merger, as contended by the Plaintiff, there are no reasonably probable anti-competitive effects flowing from this merger for the reasons stated in the foregoing opinion;

5. The Defendant banks were and are not competitors, actual or potential in the relevant geographic market or in any economically significant section of the country, regardless of whether or not the line of commerce or product involved be only, or broader than, commercial banking;

6. The proposed merger between FNB Jackson and GB will not have any adverse competitive, or anti-competitive, effects in the relevant geographic market, whether or not the line of commerce or the relevant product market involved herein be only, or broader than, commercial banking;

7. The proposed merger of FNB Jackson and GB will not substantially lessen competition or tend to create a monopoly in the relevant geographic market in violation of Section 7 of the Clayton Act, regardless of whether or not the line of commerce or the relevant product market involved herein be only, or broader than, commercial banking;

8. Neither of the Defendant banks is a likely potential de novo entrant into the relevant geographic market in which the other is operating, and more specifically, FNB Jackson is not and will not be in the reasonably foreseeable future a likely potential de novo entrant into the relevant geographic market of Leflore County because:

a. Because regulatory approval for permission of FNB Jackson to open a de novo branch in Greenwood or Leflore County probably cannot be obtained now or in the reasonably foreseeable future;

b. It is not economically feasible for FNB Jackson to open a de novo branch now or in the reasonably foreseeable future in Greenwood or Leflore County, Mississippi;

c. FNB Jackson has never evidenced any desire or intention, either through history or otherwise, to enter de novo into Leflore County;

9. Assuming arguendo that FNB Jackson is a likely potential de novo en-

trant into Leflore County now or in the reasonably foreseeable future, which the Plaintiff has completely failed to prove, this constitutes only a redundant force or restraint on GB's exercise of undue market power, and its elimination as a potential competitor, in view of the actual restraint through the presence of four other banks operating in Leflore County, would have only a de minimis effect;

10. No reasonably probable anti-competitive effects will result from the proposed merger between FNB Jackson and GB, and the proposed merger will not substantially lessen competition or tend to create a monopoly or operate in restraint of trade in the relevant geographic market, regardless of whether or not the relevant line of commerce or relevant product market involved herein be only, or broader than, commercial banking;

11. The evidence in this case clearly shows that the merger between FNB Jackson and GB is not likely to have any anti-competitive effects in the relevant geographic market, and this is true whether or not the relevant line of commerce or the product market involved herein, be only, or broader than, commercial banking;

12. Assuming arguendo that the proposed merger of the Defendant banks would produce the effects proscribed by Section 7 of the Clayton Act, as contended by the Plaintiff herein, such anti-competitive effects are clearly and overwhelmingly outweighed in the public interest by the probable effect of the merger in meeting the convenience and needs of the community to be served, within the meaning of the Bank Merger Act of 1966, considering the financial and managerial resources and future prospects of the existing and proposed institutions and the convenience and needs of the community to be served; and this Court has applied the standards set forth in said Bank Merger Act of 1966 in making this determination, de novo;

13. In weighing the convenience and needs served by this merger against the anti-competitive effects ascribed thereto by the Plaintiff, the Court concludes that the State of Mississippi as a whole and especially the Delta Region should be included within the relevant geographic market, but assuming arguendo that the relevant market is limited to Leflore County, the Court nonetheless concludes that the alleged anti-competitive effects are clearly and overwhelmingly outweighed in the public interest by the probable effect of the merger in meeting the convenience and needs of the community to be served;

14. This Court is convinced by the evidence that the only way to achieve and effect the above meeting of the convenience and needs of the community to be served as contemplated by the Bank Merger Act of 1966, is through the proposed merger, for the reasons hereinabove stated;

15. Plaintiff has failed to prove its case by a preponderance of the evidence;

16. The Defendant has proved its alleged affirmative defense by a preponderance of the evidence, assuming that the proposed merger between the Defendant banks would have the anti-competitive effects which the Plaintiff ascribes thereto;

Accordingly, based on the foregoing opinion containing the Court's findings of fact and conclusions of law based thereon, judgment is granted in favor of Defendants and Intervenor and against Plaintiff, and the Complaint is dismissed with prejudice. The automatic injunction preventing the proposed merger between the Defendant banks be and it is hereby dissolved and lifted as of the date of the Judgment to be entered herein.

The foregoing opinion constitutes this Court's findings of fact and conclusions of law as required by Fed.R.Civ.Pr. 52(a), and the Defendant banks shall prepare and submit an appropriate form of judgment to this Court in the manner and within the time prescribed by the Rules.